Scotty GRUBBS, Norman Q. Wright, Elbert Thompson, Debra M. Walling and Stanley Scott, on behalf of themselves and others similarly situated

v.

Harold B. BRADLEY, Lamar Alexander, Robert Morford, Catherine Walton, Dorothy Greer, John Moore, J. Larry Daniels, Marian Hills, Evans Fine, Jamie S. Brodie,* Ronald Bishop, Robert Waller, Glenn Rogers, Robert C. McElrath, Robert Childress, Jim Rose, Charles B. Bass, Herman C. Davis, Jimmy M. Harrison, Eileen Radeker, Seth Garrington, Benjamin Jerry Poindexter, Aileen Love, Bobby J. Stephens, Bill McWherter, Otie R. Jones, and Gary Livesay, or their successors in office in their official capacities.

Nos. 80–3404, 80–3581, 80–3616 and 80–3617.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 11, 1982.

(As corrected Aug. 13, 1982).

---

* The court, *sua sponte,* substitutes Mr. Brodie as successor in office to Paul Frishkorn, who was named in the amended class action complaint in his official capacity as Director of Medical Services. Fed.R.Civ.P. 25(d)(1).

G. Gordon Bonnyman, Jr., Kathryn F. Calhoon, Drake Holliday, Russell J. Overby, Legal Services of Middle Tennessee, Inc., Frank C. Gorrell, E. Clifton Knowles, R. Dale Grimes, Bass, Berry & Sims, Nashville, Tenn., David Kozlowski, Legal Services of South Central Tennessee, Inc., Tullahoma, Tenn., Alvin J. Bronstein, Shawn Moore, The National Prison Project of the American Civil Liberties Union Foundation, Inc., Washington, D.C., Lenny L. Croce, Rural Legal Services of Tennessee, Inc., Oak Ridge, Tenn., Susan Kay Vanderbilt, Legal Aid, Nashville, Tenn., for plaintiffs.

William M. Leech, Jr., Atty. Gen. of Tenn., Robert B. Littleton, John F. South-worth, Jr., Jennifer Helton Small, John C. Zimmermann, Michael D. Pearigen, Asst. Attys. Gen. of Tenn., Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

## I. INTRODUCTION

This action pursuant to 42 U.S.C. § 1983 challenges the constitutionality of conditions of confinement in 12 of Tennessee's adult penal institutions. The case originated as several separate *pro se* prisoner complaints, each of which challenged various related aspects of prison conditions in the state. Having determined that this court's previous, consistently followed practice of abstention in favor of a pending state court action on the same issues was unjustifiable in light of a recent decision by the United States Court of Appeals for the Sixth Circuit, *Hanna v. Toner,* 630 F.2d 442 (6th Cir.1980),[1] the instant cases were consolidated, and because of the seriousness and complexity of the issues raised, attorneys were appointed to represent the plaintiffs. Thereafter, an amended class action complaint was filed, seeking certification as a class of all present and future adult inmates committed to the custody of the Tennessee Department of Correction (TDOC). Pursuant to Fed.R.Civ.P. 23(c), the court entered an order certifying said class.

The amended complaint challenged a wide range of living conditions in Tennessee's prisons, including, *inter alia,* overcrowding, sanitation, medical care, violence, idleness and the classification system. The plaintiffs have asserted that these and other conditions lead to the wanton infliction of unnecessary pain and suffering, and therefore amount to cruel and unusual punishment, prohibited by the Eighth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment.

---

1. *See* discussion, *infra,* and the Memorandum Opinion and Order entered in the present cause on June 2, 1981.

*See Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (case wherein Supreme Court first assumed incorporation of the Eighth Amendment into the Fourteenth Amendment), and numerous subsequent cases, *e.g. Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The same conditions are alleged to violate provisions in the Tennessee Constitution as well. *See, infra.*

Before proceeding further, the court deems it appropriate to digress a bit in order to clarify the record concerning the manner in which the instant action arose, and the reasons why this court is now faced with deciding issues previously litigated in the state courts of Tennessee. *See Trigg v. Blanton,* No. A–6047 (Dav. Ch. 978), *retired on grounds of state abstention, sub nom., Trigg v. Alexander* (Tenn. July 2, 1981).

As is the trend in federal courts throughout the nation, this court in recent years has been inundated with complaints filed by state prisoners incarcerated within this district alleging violations on the part of prison authorities of various rights secured by the constitution and laws of the United States. Such complaints are typically filed *pro se,* and in this court's experience, have often challenged the constitutionality of conditions of confinement within state prisons. In the past, this court has ruled on individual claims concerning prison condi-

tions on a case by case basis. *See, e.g., Carroll v. Murray,* No. 77–3467, mem. op. (M.D.Tenn.1979).

However, during the pendency of *Trigg, supra,* a class action very similar to the instant case, this court determined that principles of comity justified a policy of abstention in cases challenging prison conditions, pending a full and complete state court review of the situation. The court therefore developed a "retired docket" whereby cases challenging conditions of confinement in TDOC institutions were filed, so as to toll the applicable statutes of limitations, but were retired pending a final decision in *Trigg,* with the possibility of later reactivation upon simple motion in order to determine any issues not precluded by the state court judgment. *See, e.g., McDonald v. Henderson,* No. 77–3242, mem. op. (M.D.Tenn.1977).

Then, in September 1980, the Sixth Circuit's ruling in *Hanna, supra,* to the effect that abstention is improper in cases challenging institutional violations of constitutional rights prompted the court to reconsider its previous policy. While *Hanna* is arguably distinguishable from the instant case because of the presence here of potentially dispositive state constitutional claims, the court concluded that the likelihood of a state court decision that would preclude or alter consideration of the federal constitutional issues was at best slim,[2] and would

---

2. Indeed, only a single state constitutional provision is in any sense novel enough to even arguably affect the federal claims. In Art. 1, § 32, the Constitution of Tennessee provides:
 That the erection of safe and comfortable prisons, the inspection of prisons, and the human treatment of prisoners will be provided for.
 The court determined that despite this provision, the standard for judging the constitutionality of conditions of confinement in Tennessee would remain firmly grounded in Eighth Amendment analysis. And despite some language to the contrary, the Chancellor's decision in *Trigg* does not, on close analysis compel a different conclusion. While the Chancellor said that prisoners in Tennessee are, by virtue of the quoted provision, entitled to greater protection than would be due under the federal Constitution, in no instance did he find any condition violative of the Tennessee Constitu-

tion that was not also found to be violative of the federal Constitution. And the only cases cited in support of his decision involved application of the federal Constitution, in particular, the Eighth Amendment.
 This court previously concluded and still believes, that whatever original gulf between Tenn. Const. Art. 1, § 32 and the U.S. Const. Amend. VIII existed at the time the state document was drafted, has through development of the Eighth Amendment, now been bridged. Until fairly recently, the Eighth Amendment was held only to regulate the types of punishment that could be imposed, and in fact, only in the last decade have prison living conditions been subjected to more than passing scrutiny under Eighth Amendment standards. See § IVB, *infra.* That the state constitution has for many years separately protected conditions is of little import.

not justify contravention of the clear language of *Hanna*. *See Dixion v. Bradley,* Nos. 80–3578 et al., mem. op. (M.D.Tenn. June 2, 1981).[3]

Nevertheless, the court remained hopeful that there would ultimately be no need for substantial federal court intervention, since the *Trigg* case, dealing with many of the same issues as the case *sub judice,* was then on appeal to the Tennessee Supreme Court, and any final decision by the state courts would be entitled to full faith and credit here. Thus, if the instant action would not have been entirely foreclosed by res judicata, certainly many issues would have been subject to collateral estoppel in the event of a final state court decision.

■ Unfortunately, there has been no final state court decision. On July 2, 1981, the Supreme Court of Tennessee, in a decision that so far as this court is aware is wholly unprecedented in the annals of our federal system, ordered abstention by the state courts pending federal resolution of the present case. Without considering whether such action may have amounted to an abdication of the duties assigned to state courts by the Constitution and laws of Tennessee, the effect of the decision is clear: The task of resolving the serious and politically sensitive constitutional claims raised by inmates incarcerated by the State of Tennessee has been passed to the federal courts. It is a task which this court does not take lightly, in part because of a natural reluctance to interfere with the State's administration of its own prison system. Yet, to shrink from decision would be in contravention of the clear policy statement in *Hanna* that, where institutional violations of federal constitutional rights are concerned, federal courts must act to hear those claims. 630 F.2d at 444, *citing, Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1978). That the state courts have chosen to sit and wait for a federal decision is simply an unfortunate curiosity, a decision which this court assumes will remain an aberration and not evolve into a new policy of state abstention.

■ Trial of this cause was held on November 23–25 and December 7, 1981. At the conclusion of trial, some 20,000 to 30,000 pages of evidentiary material, including a plethora of detailed documents, reports, responses to discovery, depositions and other material considered by one or both parties to be relevant was filed and submitted for the court's consideration. Objections to the introduction of particular exhibits were raised by the defendants. Those objections, along with the merits of the case itself, were taken under advisement by the court.[4]

---

Furthermore, the court does not consider this analysis to be inconsistent with the admonition in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (decided two weeks after this court's order refusing to abstain in the instant case) that the Eighth Amendment does not guarantee "comfortable" prisons. Rather, it is based on the understanding that "comfort" is a relative term, and that the Eighth Amendment does in fact protect against discomfort so severe as to cause needless human suffering, as determined by mankind's evolving standards of decency. *See Trop v. Dulles,* 356 U.S. 86, 88, 78 S.Ct. 590, 591, 2 L.Ed.2d 630 (1958). Even in *Rhodes,* the Court at least implicitly acknowledged that in some cases, overcrowding may be so severe as to violate the Eighth Amendment, thus continuing the previously understood protection against such serious discomfort as amounts to unnecessary pain. This court simply is not convinced that Tennessee's courts would extend to Art. 1, § 32 any substantially broader protec-

tion than is now afforded in the Eighth Amendment.

3. The opinion cited is the present case, previously styled under the name of plaintiff Melvin James Dixion, who subsequently sought and was granted voluntary dismissal without prejudice of his individual claims.

4. The court has not considered here any of the prisoner testimony objectionable as hearsay, nor has it considered, as expert opinion, those portions of Samuel W. Hoover's report that are beyond the scope of his expert witness statement. *See* Local Rule 11(c)(5), M.D.Tenn. That evidence, however, is admissible as factual testimony, to the extent that it is within Mr. Hoover's personal knowledge or based upon his own observations. Otherwise, unless specifically noted herein, the remaining objections raised by the defendants are expressly overruled.

Consideration of the issues properly before the court necessitates a detailed inquiry into specific conditions at each of the individual institutions encompassed by this litigation. In order to place the institutional conditions in their proper perspective, the court will first explore the TDOC system: Its organization of personnel and responsibilities, and the division of functions between the Department and the individual institutions.

## II. THE TDOC SYSTEM

### A. General Overview

At the head of TDOC is the Commissioner of Correction, a post presently held by defendant Harold B. Bradley, an individual whose competence, dedication and professional credentials are beyond reproach. The department's number two administrator is Deputy Commissioner Robert Morford, who, along with Commissioner Bradley, oversees all TDOC functions. Reporting directly to the Commissioner or Deputy Commissioner are an assistant commissioner of community relations, the staff attorney, the director of internal affairs and the director of medical services. Those persons administer TDOC functions that, for one reason or another are not assigned to any of the five major divisions of the department.

The Division of Adult Services is headed by Assistant Commissioner Dorothy M. Greer. Administrative staff for this division includes the director of rehabilitative services, the director of offender classification, the director of adult probation and the director of institutional programs. Individual prison wardens report to TDOC through the Division of Adult Services.

The Division of Agri-Industries consists of two sections: Tennessee State Industries and Institutional Farms. Each section is headed by a director, who reports to the Assistant Commissioner for Agri-Industries, Larry Daniels. The Division of Agri-Industries works closely with an independent nine-member Prison Agri-Industries Board, established by the legislature as an advisory body but utilized, according to Mr. Daniels, much like a board of directors for setting divisional policies and providing expertise in areas such as management, finance and marketing. Under the direction of Mr. Daniels, with the assistance of the board, agri-industries within TDOC have expanded considerably over the last few years. However, even now the division employs only about 1,150 inmates out of the total of more than 7,000 in TDOC custody.[5]

Two other divisions that are potentially relevant here are the Division of Organization Development and the Division of Administration, both headed by assistant commissioners. The former division has directors in charge of the following areas: Planning and research; internal audit; management information systems; volunteer services; and staff development and training. The Division of Administration has directors in the area of fiscal services, personnel and engineering. The remaining division is Youth Services and is not relevant to the present case.

There are approximately 7,000 adult inmates in those TDOC institutions currently under this court's review. The largest single facility is the Tennessee State Penitentiary (TSP or "main prison"), a maximum security facility located in Nashville which currently houses approximately 1,930 inmates, in addition to over 300 others administratively assigned there but not physically present. The Nashville Community Service Center (NCSC) which prior to July 1, 1981, was administratively part of TSP, houses approximately 350 minimum security and work release inmates. The Fort Pillow State Farm (FP), located in Lauderdale County, houses over 700 inmates and is a close security prison. The Tennessee Prison for Women (TPW) is the primary institution for housing the State's female inmates and is also designated close security. Located in Nashville, TPW houses approxi-

---

**5.** And, as discussed, *infra,* a substantial number of those prisoners employed in farm jobs work only on a seasonal basis.

mately 300 women. Brushy Mountain Prison (BM), located in Morgan County, is a maximum security prison with a population of about 450. The Turney Center for Youthful Offenders (TC) is a medium security facility housing about 630 inmates, and is located in Hickman County. The Memphis Correctional Center (MCC), also medium security, houses over 400 inmates and is now used as the classification and intake center for some new inmates from West Tennessee. DeBerry Correctional Institute for Special Needs Offenders (DCI) houses approximately 275 inmates assigned there for various types of psychological care and is a maximum security facility. The Nashville Regional Correctional Facility (NRCF), a medium security prison,[6] is the primary intake and classification center for male inmates in the state, houses just under 600 inmates. Three other regional prisons, also medium security, are Bledsoe County Regional Correctional Facility (BCRCF), Morgan County Regional Correction Facility (MCRCF), and Lake County Regional Correctional Facility (LCRCF). They have populations ranging from approximately 400 at LCRCF to approximately 470 at MCRCF. In addition, TDOC operates community service centers in Memphis and Chattanooga, as well as the transitional center in Memphis, none of which are challenged in the present action. An additional 300 or so state prisoners are housed in county jails pursuant to contracts with the State. Conditions in those jails will not be directly reviewed herein.

The current TDOC prisoner population of about 7,000 inmates is almost double the population of 10 years ago. Every indication is that the increase, which for the five years ending in 1979 averaged 454 inmates per year, is likely to continue. Using that figure in a 1980 program evaluation, the State Comptroller of the Treasury projected a total of 8,366 inmates in TDOC institutions by 1985. In fact, the population increase from 1979 to 1980 was over 800 inmates, well above the previous average. And, according to Commissioner Bradley,

the rate of increase at the time of trial was about 100 inmates per month. Present TDOC projections place the inmate population at more than 12,000 by mid-1986.

Although the regional prisons were built in response to the problem of overcrowding, the fact that those facilities already house inmates at or above their design capacity of 400 is indicative of the apparently persistent nature of the spiraling prison population. In fact, overcrowding has been a recognized problem in Tennessee's prisons for many years, dating back at least to 1937. According to the State Comptroller's 1980 evaluation, the actual prison population is consistently well in excess of nationally accepted minimum standards, a conclusion with which the experts in this action uniformly agree. And although average daily populations are maintained relatively close to the various prisons' "design capacities," that is accomplished through the juggling of figures, in which design capacities are routinely raised whenever it appears that the department is no longer able to keep the count at or near the previously designated capacity. In their post-trial brief, the defendants admit that TDOC institutions continue to face a serious problem in regard to crowded conditions. They argue, however, with the vague and conclusory nature of the term "overcrowding," and contend that current conditions meet constitutional minima.

Just as the prison populations continue to increase, so, too, do costs. The TDOC budget, which was under $15 million in fiscal year 1968–69, had risen to over $76 million in 1978–79. During the same period, the average annual cost per prisoner rose from $2,201 to $6,705. The department's budget is now in excess of $100 million. In its appropriation request for 1982–83, TDOC indicates that expenditures of almost $127 million will be required to maintain a "base" budget, that is, to simply maintain services at current levels, with no additions of personnel. It now costs the state nearly $10,000 per year to house each inmate committed to TDOC custody.

**6.** The portion of NRCF known as "Guild 17," *see infra,* is a maximum security unit.

Thus, TDOC's dilemma appears intractable. In the face of constantly rising numbers of prisoners and costs of incarceration, problems over which the department has no effective control, increased appropriations are needed just to maintain the status quo. Yet the political climate is such that the legislature is reluctant to authorize substantial increases in funding for TDOC at a time when other programs are being cut. TDOC's task is at best a formidable one.

It appears that the present administration, perhaps in response to *Trigg* and the instant litigation, are making some strides toward improvements in spite of the unenviable position in which the department finds itself. Substantial reorganization has occurred over the last few years, including restructuring the TDOC hierarchy with the creation of new assistant commissioners, the hiring of a health professional as director of medical services and the ongoing effort to implement standard departmentwide policies and procedures. Just as clearly, the changes that have been made have been neither swift nor entirely effective to correct numerous admitted deficiencies of long standing.

While the determination whether particular conditions amount to violations of the Eighth Amendment must necessarily be made on an institution by institution basis, two areas under dispute are so subject to central TDOC operation as to warrant systemic consideration. The first is classification. The classification function occurs upon the arrival of a new inmate into the system, and determines that inmate's placement, security status and opportunity to participate in any work or educational programs. Although reclassification at least theoretically occurs at the institutional level from time to time, the initial process is clearly a systemic function and will be considered as such.

The other arguably system-wide function that will be so considered here is the health care delivery system. Although primary health coverage is furnished at each local institution, TDOC at least monitors the level of care through the director of health services. The department also maintains a central hospital at TSP for referrals from throughout the system and funnels all inmates in need of acute mental health care to DCI for treatment. The plaintiffs have argued that various systemic deficiencies in this arrangement negatively affect the level of care actually delivered at the institutional level. Thus, following the classification discussion, but before embarking upon the institution by institution analysis of conditions, which will include individual health care delivery capabilities, the department's system for assuring the delivery of care will be separately examined.

*B. Classification*

The function of the classification process is to determine each inmate's security level, the institution to which he will be assigned, and the employment, educational or vocational program in which he or she should participate. It is essentially undisputed that a competent classification system is very important to the operation of a prison system, and should identify the medical, psychological, vocational and educational needs of inmates, as well as insuring the separation of violence prone prisoners from their potential victims and enabling closer supervision of higher escape risk inmates. The defendants' classification expert, Mr. Ernest Reimer, described the classification function in his deposition as follows:

[A] System of accumulating pertinent information about an inmate to allow programming and treatment and management of that inmate on an individual basis; to promote the safety and well being of the inmate, other inmates, staff and the public, and to enhance the social, vocational and personal growth of the inmate.

As will be discussed, *infra,* there simply is no distinct constitutional right either to a particular security classification, assignment to a particular institution, or to participation in employment, vocational or educational programs while incarcerated. Thus, much of the proof submitted on classification deficiencies is entirely irrelevant and will not be addressed here. Nonethe-

less, there is substantial evidence that certain deficiencies in the classification system contribute to an unconstitutionally high level of violence in TDOC prisons, and for that reason, the classification process must be examined.

Initial classification occurs at three facilities in the Tennessee prison system. Most male inmates are classified at NRCF, a facility which includes a 16-guild regional facility which opened in 1979 and is sometimes referred to as Cockrell Bend (CB), and a facility some two miles away now known as Guild 17, which was constructed in 1910. Beginning in the summer of 1981, the department began performing the initial classification of some inmates from the Memphis area (those with less than five years to serve) at MCC. All initial classification for women is done at TPW. Classification functions and procedures are substantially the same at each of these locations. Therefore, only the process at NRCF will be presently examined in detail, but because of the similarities, the findings reached will be deemed applicable across the board, unless expressly noted otherwise.

New inmates going through classification at NRCF are taken first to Guild 17, at which time they are fingerprinted, photographed and asked to provide basic personal information. Soon after the inmate's arrival, an intake medical screening that has been appropriately characterized as a "quick and dirty" assessment is made in order to isolate those inmates readily identifiable as needing immediate acute care.

Within a day or two of the inmate's arrival at Guild 17, he is given a "salient factor profile" which is designed to provide general information on that inmate's security risk. Those inmates whose score on this profile indicates a low security risk remain at Guild 17 only until space is available at the CB facility, where they are transferred for the remainder of the classification process. Those whose score indicates a high security risk, as well as all "Class X" of-

fenders[7] are designated "keepers" and remain at Guild 17 for the entire classification process.

The classification process takes about six weeks to complete. During that time, each inmate is assigned to a classification team that consists of a psychological examiner and a counselor. Those persons are responsible for completing the interviews and obtaining information about the inmates. The counselor also conducts an oral orientation program, providing the inmate with general descriptions of the other institutions in the TDOC system.

During the classification process, each inmate is given a complete medical examination, including a TB skin test,[8] a dental examination and a battery of psychological tests. The psychological tests regularly given include: the Beta II, an intelligence test; the Minnesota Multi-Phastic Personality Inventory (MMPI), designed to give a general idea of a person's psychological make-up; the Wide Range Achievement Test, which recently replaced the California Achievement Test as the system's measurement of basic educational skills; and the Wide Range Interest-Opinion Test, which recently replaced the General Aptitude Test Battery as a vocational aptitude test.

Alternative tests are used for retarded or illiterate inmates. These include a taped version of the MMPI for inmates unable to read, and the Wechsler Adult Intelligence Scale for retarded inmates. The Peabody Picture Vocabulary is also used for educationally deficient inmates. However, none of the tests are specifically designed to identify violence-prone inmates.

The major tests are usually administered in groups by a testing diagnostician, and the results are forwarded to the psychological examiner for evaluation. The testing occurs by the end of the inmate's third week at the classification center. After the scores are tabulated by the testing diagnostician, they are forwarded to the psychological examiner for evaluation.

---

7. See Tenn.Code Ann. § 39–5401 *et seq.*

8. At TPW, the medical exam also includes tests appropriate for women in addition to those tests routinely performed at NRCF and MCC.

During the inmate's fourth week of incarceration, he or she is interviewed by the psychological examiner, who formulates recommendations based upon his impressions from the interview and his evaluation of the test results.

After the tests and interviews have been completed, usually in the fourth or fifth week, the inmate meets with the classification committee. The committee's composition is apparently fluid, but always includes a counselor, a security officer, and an "administrative" member, drawn from some other area of the institution. The psychological examiner may attend if he or she desires to, and the warden or associate warden may also be in attendance. It is this committee, acting upon the recommendation of the inmate's classification team, which actually makes the classification decisions, i.e., the institution to which the inmate will go, his security classification and his job and programming recommendations.

Usually within two weeks of the classification committee's decision, the inmate is transferred to the designated facility referred to as the "time building" institution. Once, there, the inmate's classification and programming recommendations are reviewed either by a counselor or the reclassification committee. A determination is then made, subject to approval of the warden, concerning the inmate's housing and programming assignments. Although the classification recommendations are by policy considered by the receiving institution, they are not always implemented. Further, inmates of differing security classifications are routinely housed together in the same unit and often even within the same cell. Even though housing assignments are not, as a matter of policy, made on a space available basis, in reality space availability is the main determinant in most housing assignments.[9] And, as will appear, *infra*, programs are so scarce that recommendations as to placement in them frequently simply cannot be followed.

The security classification assigned to inmates by the classification committee determines the level of custody required for what is considered to be effective supervision of each inmate. The classifications are maximum, close, medium and minimum.[10] The minimum security classification is further subdivided according to the type of supervision required when the inmate is outside the security perimeter of a facility, into minimum direct (direct supervision by TDOC employee), minimum trusty (supervision by other state employees) and minimum community (work or educational release). An inmate may be classified as maximum or close security because of his violence potential, escape risk or some other factor indicative of a need for a high level of supervision.

It is undisputed that the vast majority of inmates coming into the TDOC system receive initial classification as medium security prisoners. In fact, both of the classification experts who appeared in this case agreed that some inmates are routinely classified as medium security who would be appropriate candidates for minimum security classifications.

The reasons for the phenomenon are to some extent disputed and are of questionable relevance in any event. There is agreement, however, that one primary cause of the initial classification procedure's failure to accurately classify low risk inmates is the problem of obtaining a verified criminal record in the form of an F.B.I. "rap sheet" prior to the termination of the classification process. According to Warden Stephens of NRCF, only in an extremely low percentage

---

**9.** Housing assignments are usually made by the shift captain who reviews the inmate's age, criminal record, physical appearance, size and preference. However, given limited cell space, actual availability necessarily controls, for all practical purposes, most housing assignments.

**10.** The security designation of a facility, on the other hand, designates the highest security classification inmates that can be assigned to that facility. It is common, however, for a prison to house inmates at levels lower than the facility's designation, as seen, e.g., in TSP's housing of approximately 989 medium security inmates despite the prison's classification as a maximum security institution.

of cases does the department receive a rap sheet before an inmate leaves NRCF. Yet, without that rap sheet, the only way for an inmate to be classified below medium security is upon the recommendation of the Director of Offender Classification and the concurrence of the Commissioner, a procedure that is utilized only in rare circumstances.

The problem of this "overclassification" of inmates is that it leads both to increased levels of violence and to the psychological deterioration of non-violent inmates housed with a tougher element of the prison population. The problem was acknowledged by both classification experts, and is most severe in its impact upon young first offenders, whose chances for rehabilitation are lessened by incarceration with the hard core elements of prison society. In fact, the Tennessee Law Enforcement Planning Commission recognized as much in its 1975 report:

> The correctional system must be able to screen out those individuals who are dangerous to the community and must be incarcerated. However, the underlying problem is that so often offenders who could better be served in a community based treatment or residential treatment program are incarcerated in a penal institution. It is quite evident that once a person is exposed and indoctrinated into the hardcore elements of a prison society, the lesser his chances are for adjustment or habilitation back into society.

T.L.E.P.C., "Comprehensive Plan for the Improvement of Law Enforcement in the State of Tennessee" (1975) Ex. No. 8922 at 72. Even as early as 1937, a Citizens' Committee established by the Commissioner of Institutions found that the state's prisons were "giving a post graduate course in crime ... that ... will continue as long as boys of tender age are mixed with sex perverts, the venereal diseased and prisoners serving terms for three or four felonies." Report, "Prisons, Reformatories and Penal Institutions in Tennessee," (1937), Ex. No. 8914, at 53.

Yet, as the defendants' classification expert, Mr. Reimer, made clear in his deposition, the adverse impact resulting from overclassification is not restricted either by age or the nature of the offense for which the inmate is incarcerated. The most important consideration appears to be simply the propensity of a given inmate to participate in violence. William G. Nagel, a nationally acclaimed authority on corrections, described the problem in terms of the psychological impact of housing non-violent prisoners together with those who actually require a more restrictive setting. In that situation, Mr. Nagel testified, the non-violent prisoner begins to perceive himself as just "as bad as the next guy," and starts to behave accordingly. The result is that the system makes "problems out of people who shouldn't be problems."

In Tennessee, the overclassification problem is exacerbated by the incarceration of many inmates convicted of non-violent property offenses who would not even go to prison in most states.[11] While currently only 25% of the inmates in TDOC institutions are classified as minimum security, it is readily admitted that many more would qualify for that status.[12] Furthermore, those inmates who are classified as medium security are usually housed in institutions that also contain close or maximum security inmates, and often share individual units or even cells with higher classification inmates.

The proof is clear that an inmate's potential for violence is simply not, to any appreciable degree, taken into account in the initial decision where in the TDOC system

---

11. This factor is, of course, both outside the scope of this litigation, and beyond the control of the defendants, but is nonetheless real in its effect. Some hope that sentencing alternatives may soon help to reverse the trend is provided by a newly enacted state statute allowing for judicial, rather than jury sentencing of convicted felons. Tennessee Criminal Sentencing Reform Act of 1982, Ch. 868, 1982 Pub.Acts.

12. In fact, Commissioner Bradley has established a goal of increasing the number of minimum security inmates to 40% of the population.

he is to be housed. And, to the extent that an inmate's violent or non-violent nature is considered at all in the classification process, all distinctions are effectively obliterated by the pervasive practice of classifying the overwhelming majority of new arrivals as medium security or higher. Furthermore, particular institutions almost uniformly house inmates of various security classifications, often within the same units or even cells. The fact that housing assignments within an institution are made largely on a "space available" basis, further reduces the system's ability to effectively separate those inmates who may somehow have been identified as more or less violent. The conclusion is inescapable that the increased violence and psychological deterioration which the experts uniformly attribute to overclassification occurs to a significant extent in Tennessee's prisons.

The court views the remainder of the plaintiffs' complaints about the initial classification process, such as the lack of "objective criteria," and insufficient participation by inmates in the process, as raising problems of classification theory properly left to the sound discretion of prison administrators. There is no substantive evidence to indicate that those factors, even to the extent that there might be deficiencies in the classification process, negatively impact any constitutionally protected right. Furthermore, to the extent that the plaintiffs would have the court order specific relief in areas such as the alleged deficiencies in numbers and training of staff, such areas represent the sort of minutiae of details with which this court will not interfere. *See* § IV, *infra.*

In contrast to the situation at the time of the Chancery Court decision in *Trigg,* TDOC now has a policy requiring periodic review and reclassification of inmates.

That policy requires reclassification of each inmate every six months. However, compliance with the policy has been less than total, and Commissioner Bradley doubts whether it will ever be practicable to reclassify all inmates every six months.[13]

In addition to the six-month review policy, the department has a policy that each inmate's classification recommendation be reviewed within two weeks of his receipt at his "time-building" institution. Other factors that can trigger an early reclassification are a disciplinary action, the lodging or dropping of a detainer, or the arrival of a rap sheet. Both Dr. Fisher and Dr. Reimer criticized the apparently frequent failure to automatically review classification recommendations upon the receipt of the rap sheet. And, while Warden Rose said that such review should occur, neither he nor the Director of Offender Classification, Evans Fine, knew of any policy requiring it. In fact, the court is persuaded that such a review rarely occurs, and that the predominant overclassification of inmates to medium security (in part because of the absence of the rap sheet) is not often corrected in a timely fashion.

Furthermore, it is clear that the six-month reclassification, when it occurs, is not successful in curing much of the initial overclassification. There exists neither a department wide policy setting forth the goals of periodic reclassification, nor any sense of consistency in the way the process is carried out at various institutions. For example, although Commissioner Bradley has identified transfers, job assignments, counseling and special programs as among the decisions that ought to be determined in a reclassification hearing, job and program placements at a number of institutions are apparently determined by a job board

---

**13.** A series of audits compiled in late 1980 and early 1981 showed widely variant compliance rates among the various prisons. For example, at TSP, 41% of the sample reviewed had not been reclassified within 6 months, while at BCRCF, there was almost 100% compliance. Mr. Reimer contends that his review of all the audits showed an overall 80% compliance rate. However, of the eight audits furnished to the court, representing 75% of the TDOC population, 28% of the inmates surveyed had not been reclassified in the previous 6 months. In any event, the policy and the ongoing efforts to improve compliance are commendable developments and represent a substantial improvement over the situation that existed at the time of the Chancellor's opinion in *Trigg,* although significant problems clearly remain.

(which may consist of a single person) without consultation with the reclassification committee. At its worst, the reclassification process is, as found by Mr. David Fogel, a corrections expert called by the plaintiffs, little more than a mockery. Such is apparently the case at least part of the time at BCRCF, where inmate participation in the process at times seems limited to "just [signing] the papers," without even meeting the reclassification Board.[14]

Beyond the lack of definition and consistency in the reclassification process, however, the system's failure to remedy initial overclassification is evident in the department's admission, *see supra,* that a large number of inmates who could be handled on a minimum security basis continue to be confined as medium security prisoners. Although it has been asserted that the problem is partially attributable to the lack of minimum security programs and bed space, there is a consistent problem of filling spaces in the minimum security community service centers. In fact, each institution has now been assigned a monthly quota for transfers to the CSC's. Yet, despite the admitted presence of many minimum security candidates, the various reclassification committees have been unable to consistently meet those quotas. Consequently, overclassification often continues throughout an inmate's stay in TDOC custody, and reclassification has to date not gone far toward alleviating the increased violence and psychological deterioration that result.

### C. The Health Care Delivery System

The evidence is convincing that the health care needs of inmates are greater than the needs of the general free world population. A variety of factors seem responsible for that phenomenon, some of which are related to the socio-economic and family backgrounds of the prison population. Other factors equally important, however, stem from the prison environment itself: overcrowded conditions and the con-

comitant ease with which communicable diseases can spread, and the propensity of prisoners for violent attacks upon one another, to state but two of the most obvious. At the same time as these factors enhance the likelihood of physical disease or injury, many of them also lead to or worsen psychological and emotional problems as well. Thus, the fundamental fact against which the level of health services must be evaluated, is that within a prison system, a variety of serious physical and mental health problems can be anticipated. Sobering but true is the further realization that the physical and mental conditions of many inmates can actually be expected to deteriorate during their stay behind the walls. The health care delivery system must be capable of meeting those needs in at least a minimally adequate fashion, so as to prevent needless pain and suffering.

That deficiencies exist in the delivery of health care to prisoners in the TDOC system is beyond serious cavil. Chancellor Cantrell, in the *Trigg* decision, found that the level of medical care in the system was "inadequate to protect life and limb, ... [causing] needless human suffering." *Trigg* (Dav.Ch.Op. at 31). That conclusion was supported by extensive factual findings, the accuracy of which has been admitted by the present defendants. Although there have been some changes in the intervening years, deficiencies clearly remain. Even the defendants' expert witness on health care, Richard A. Kiel, while concluding that the health care delivery system is "adequate" has acknowledged the continued existence of many persistent problems and the resulting need for many additional improvements. The defendants' Director of Health Services, Jamie S. Brodie, has likewise identified numerous deficiencies in the present level of health care available to inmates in Tennessee. The issue of concern here, therefore, is precisely what and how serious the present deficiencies are.

14. Interestingly, BCRCF had the highest rate of compliance (99.96%) with the 6-month review policy of any institution for which an audit was furnished. Evidence of the procedure followed there leaves the court to wonder whether the figure, and the process itself, can be anything more than simple illusion.

The present section will examine the TDOC health care delivery program from a systemic perspective, for indeed, many of the complaints raised by the plaintiffs are systemic in nature. In the following sections, dealing with challenged conditions at the institutional level, the court will address the facilities, staffing and the level of care actually available at each individual prison.

The linchpin in the ostensibly centralized TDOC health care delivery system is the TSP hospital, which is used as a referral center for male inmates throughout the system who require inpatient treatment.[15] Emergency and infirmary type care are provided at each institution, and civilian hospitals are utilized when needed. Inmates in need of extensive mental health care, including treatment for alcohol and drug dependency are referred to DCI, as individual institutions are not equipped to provide such services.

The TDOC health care system is under the supervision of the Director of Health Services, Jamie S. Brodie, a registered nurse who has served in his present capacity since February 1981. Although Mr. Brodie's title is "Director," he actually has no direct authority to control the provision of health services. Rather, his role is merely advisory. Mr. Brodie reviews the department's health care delivery system, including equipment, facilities and staffing at each institution, and makes such recommendations as he deems necessary. However, Mr. Brodie is able to implement his recommendations only to the extent that he can convince Commissioner Bradley or local wardens to do so. His only real power is to study, recommend, and lobby for his position.

Ultimately, it is individual wardens who retain the power to control the provision of health services at their respective institu-

tions. The wardens are responsible for institutional health care budgets in conjunction with their general operating budgets, and are similarly responsible for hiring health care personnel, and for the requisition of necessary equipment and supplies. In the development of institutional budgets, the wardens are often faced with balancing the needs of the health care delivery system against competing demands upon the scarce fiscal resources allocated to their facilities. And, when the friction is between health care and security needs, health services are frequently the hardest hit and the first to be cut.[16]

Both Mr. Brodie and the defendants' medical expert, Mr. Kiel, are satisfied with the present system wherein Mr. Brodie functions in an advisory "staff" position without direct line authority to implement his recommendations. Mr. Brodie and Mr. Kiel assert that the system allows input and influence by the Director of Health Services, without infringing on the ability of wardens to manage their own institutions. It is their belief that Mr. Brodie can be effective in his supervision of medical services by virtue of his close working relationship with the Commissioner and the wardens who, it is asserted, will usually go along with Mr. Brodie's recommendations out of respect for his judgment.

Yet, in reality, those recommendations are often not followed. As an example, a number of health staff positions that Mr. Brodie deemed essential were subsequently abolished by the wardens, who considered them expendable. The clearest example of Mr. Brodie's inability to effect meaningful changes can be found in the way his recommendations for the TSP hospital have apparently fallen on the deaf ears of Warden Rose. Easily correctable problems cited in his September 1981 report, including the

---

**15.** Female inmates from TPW also use the TSP hospital, but only on an outpatient basis.

**16.** One apparent reason for this phenomenon is that since health professionals generally command higher salaries than security personnel, greater savings can be achieved with fewer layoffs in health services as opposed to other

jobs. Furthermore, it is quite likely that wardens remain more sensitive to the security needs of the institution than to the medical needs of inmates, and for that reason tend naturally to favor reductions in health services over other functions whenever fiscal constraints require cuts in some area.

presence of outdated I.V. solutions and pharmaceuticals in the emergency room, and the use of open cupcake tins for bulk storage and dispensing of medications, have not been corrected. Warden Rose has simply not responded to numerous other recommendations. These include:

(1) replacing the present hospital administrator, Harley Seimer, with a professionally qualified administrator (a move which Mr. Brodie deems "essential");

(2) restructuring the delivery of patient care according to the principles of levels of care;

(3) freezing the opening of the West 100 psychiatric unit at TSP hospital;

(4) use of the hospital's third floor for a therapeutic community;

(5) removing hospital beds from institutional capacity and restricting their use to medical patients only;

(6) achievement of licensure for the hospital;

(7) reform of the budget process;

(8) developing a master staffing plan with criteria for measuring performance and planning changes;

(9) developing a central pharmacy; and

(10) instituting quality assurance mechanisms.

Another proposal, to establish a permanent cadre of security staff assigned full time to the hospital, was acknowledged and rejected. It thus appears that Mr. Brodie is often simply ineffective in persuading the wardens to adopt his proposals, at least at budget time, when health services compete with security needs for scarce dollars.

With the wardens thus firmly in charge of the TDOC health care delivery system, and in light of the glaring absence of any effective centralized authority to mandate changes, it is not surprising that the level and quality of care varies widely from one institution to another. For example, annual expenditures for health care services recently ranged from $297 per inmate at FP, to $1,152 per inmate at TPW. At the same time, TPW needed emergency equipment that would have cost less than $100, in contrast to the expenditure of over $50,000 at TSP to purchase three new x-ray machines, when only one machine was needed. Centralized health care planning and budgeting would surely eliminate some of the irrationality that is apparent in the present system.

The problem, however, is exacerbated by the absence of comprehensive system-wide health care policies and treatment protocols. This dearth of policies and protocols is a widely recognized problem of long standing which has impacted areas ranging from hiring practices and the proper qualifications for health care providers,[17] to the level of emergency care that is available at each institution. And, while there is evidence that comprehensive policies are now being developed, the project is proceeding at a snail's pace, and at the time of the submission of the record in this case, only two health care policies had been adopted and inserted into the policy manual.[18] In addi-

---

**17.** The most outrageous snafu concerning the hiring of an unqualified person for a health care position in fact occurred at the department level a number of years ago, with the hiring of one George Allen, alias "Dr. Adams," as the department's medical director (the position now held by Mr. Brodie). In reality, "Dr. Adams" was a former crop duster with no background in medicine. Following his dismissal from the job in 1979, he was apparently tried and convicted on criminal charges related to the false pretenses surrounding his employment by TDOC. While this example is extreme, it surely bespeaks the need for clearly promulgated system-wide policies on hiring and qualifications. Although such a policy has now been implemented, see n. 18, infra, the

extent of institutional compliance remains to be seen. Even assuming total compliance in futuro with respect to hiring decisions, the court doubts whether presently employed personnel will actually be required to demonstrate their compliance in a timely fashion. Rather, it is more likely that the impact of the policy's previous absence will continue to be felt, as existing employees continue to administer care and treatment that are beyond their training and expertise.

**18.** The only existing health care policies in the manuals originally furnished to the court by the defendants concern inmate access to treatment (policy 113.17) and a general policy on staffing, equipment and supplies (policy 113.45), both of which became effective in September 1981.

tion, the absence of treatment protocols continues unabated, leaving the health care staff at each institution to respond ad hoc to emergency situations that may arise at times when the personnel on duty may be unqualified to develop a proper response. Indeed, the department has failed to develop any sort of comprehensive plan for the organization of either personnel or equipment to properly handle emergency situations.

Similarly, there is no functioning program or device to assure the maintenance of quality control in the delivery of health care to inmates. Recommendations for quality assurance mechanisms have come from several sources over the years, and Mr. Brodie himself views quality assurance as "absolutely essential." Yet, in the absence of a quality assurance program, the evidence indicates that nurses routinely perform functions beyond the level of their license or certification, former military medics are used interchangeably with nurses without apparent regard to the individual's actual qualifications, and staff remain largely unaccountable for the level or quality of care actually delivered. This lack of accountability extends beyond the quality of services, and has produced a situation in which staff idleness is a common problem,[19] and which in one case revealed extensive falsification of time records by a staff dentist.

Perhaps the single most serious systemic defect that results from lack of the central administration of the TDOC health system is the failure to follow up on patient treatment. One common manifestation of the lack of follow up is the transfer of inmates among institutions for treatment, unaccompanied by their medical records. As a result, the experience of the BM health staff is not exceptional, when they stated that approximately 60% of Brushy inmates transferred to TSP for hospital care never receive the needed treatment. Even within a particular institution, continuity of care is often woefully lacking. There is no system for regular periodic physical examinations even for certain high risk inmates for whom close monitoring is indicated. Furthermore, even when treatment is provided and particular followup ordered, such followup often never occurs.

The defendants contend that the full implementation of a new "problem oriented" medical records system will help to remedy many of the problems related to continuity of care and assurance of adequate followups. The new system has been two years in the making, and if the schedule goals set by Mr. Brodie have been met, should be fully effective at the present time.

The system consists of three components: A health records manual, containing forms and detailed descriptions of procedures to be followed; a newly designed problem-oriented record folder; and 40 or 50 standardized forms. One of the main features of the folder is the supposed ease with which an accurate summary of an inmate's medical condition and required treatment can be obtained. A standard form has been developed to accompany an inmate on transfer among institutions which is to describe pre-

---

Subsequently, the court granted the defendants' motion to reopen the record to allow submission of additional policies that have become effective, including, inter alia, policy 113.-02 on credentials of health care personnel. Although the effort is commendable, the new submissions do not change the assessment of the defendants' own expert that the policy project is in the early development stages. Neither does the progress indicate that the project has been given the high priority urged by Mr. Kiel, as well as by numerous other persons over the course of the past several years.

19. Any substantial level of idleness among health care staff at TDOC institutions is surely unjustifiable in light of the convincing evidence that the institutions are seriously understaffed. Such a failure to control staff and assure the adequate performance of their duties is a major indicator of the lack of central administrative leadership with afflicts the health care delivery system. Moreover, the unavoidable result of such an irrational pattern is either the total denial (or unwarranted delay) of necessary health care, or the delegation of treatment responsibilities to untrained inmate staff. In varying degrees, both of these results have characterized care at the various TDOC prisons.

cisely the type of care, testing or followup needed by the inmate upon transfer.

Evidence also shows that the TDOC health care system has been unable to provide adequate safeguards against the possible outbreak of communicable disease, particularly hepatitis. The need for such safeguards is clear. Overcrowding and the attending poor sanitation are major factors contributing to the outbreak of the disease, which is highly communicable and sometimes fatal. Several major hepatitis outbreaks have been identified in TDOC institutions in recent years, and have risen to epidemic levels at FP and TSP in 1976, and again at TSP in 1977 and 1979. The incidence of the disease at TSP continued to be high in 1980, and has also been identified as high at MCC. Reports prepared by epidemiologists at both the National Center for Disease Control in Atlanta and the Tennessee Department of Public Health have criticized TDOC's failure to institute a mechanism for monitoring the incidence of hepatitis. Yet, despite the studies and recommendations, no action has been taken to either monitor occurrence of the disease or reduce the likelihood of an outbreak. Furthermore, the wardens at the institutions most affected persist in maintaining that no problem exists.

Similar deficiencies exist in the monitoring and control of both tuberculosis and venereal disease, both of which present serious problems in the institutional setting. Evidence was presented that policy memoranda establishing a mechanism for monitoring and reporting TB cases, and for requiring routine pre-employment screenings and mandatory followup for prison staff, have been largely ignored. Indeed, Mr. Brodie's 1981 evaluation of health services at TSP included the observation that cases of communicable diseases at the prison are apparently not even being reported to the local health department, as required by state law. And while Mr. Brodie believes that effective screening for VD is essential in the prison setting, Dr. Lambert King found that the health staff at MCC, one of the two intake and classification centers for male prisoners, did not even know how to screen for gonorrhea. Clearly, the department has not been effective in taking measures to control the outbreak of communicable diseases.

Further illustrations of the problems generated by the lack of a central administrative leadership for TDOC's health care system include: Inefficient and poorly organized pharmacy services, in the face of repeated recommendations that the system would be better served by a single centralized pharmacy; the absence of even a titular director of dental services, with the attendant lack of coordination among facilities and widely variable levels of care; and the lack of coordination of mental health services, including an almost total absence of any meaningful correlation of mental health and physical treatment. With respect to both dental care and mental health care, Mr. Brodie is unqualified to provide informed professional leadership even if his role allowed him an effective voice, and even if the other duties required of him allowed adequate time to devote to those areas. Neither condition is present in the existing administrative scheme.[20]

The presence of the systemic problems noted above, as well as others perhaps as serious, has been evident for a number of years. Indeed, as noted, *supra,* Chancellor Cantrell in the *Trigg* decision included specific findings regarding the same deficiencies. Studies conducted by independent sources in both 1977 and 1979 also identified many of the same problem areas. Although some steps toward reform have been taken, and although Mr. Brodie appears determined to do his best to steer the department in the right direction, the overall improvement has been slow. The departmen-

20. This finding should not be construed as a personal criticism of Mr. Brodie. To the contrary, he appears to be the most effective person yet to serve as Director of Health Services. Rather, the purpose is merely to emphasize particular intrinsic limitations in the existing system and to suggest that perhaps the task of supervising the entire range of health related services might well be inherently beyond the ability and training of a single person.

tal system for assuring the delivery of minimally adequate health care to inmates remains beset by numerous problems that clearly have an adverse impact upon the level of care available in the TDOC system.

It is, of course, the level of care actually provided at each institution by which the constitutionality of the system as a whole must ultimately be judged. The discussion to follow will therefore include an examination of health care delivery at each TDOC facility as part of the broader analysis of conditions of confinement within the individual prisons.

## III. CONDITIONS OF CONFINEMENT

### A. Introduction

A leviathan body of evidence (much of which is of questionable relevance) was introduced concerning what are broadly referred to as conditions of confinement within TDOC prisons. Of concern are only those conditions which, either alone or in combination, so affect the quality of life that the incarceration of inmates under such conditions may amount to cruel and unusual punishment in violation of both the federal and state constitutions. The evidence took many forms, including the reports and testimony of expert witnesses who offered factual testimony as well as conclusions and opinions regarding the impact (and at times, even the constitutionality) of particular conditions.

The plaintiffs presented the testimony of three expert witnesses with regard to housing conditions. Samuel W. Hoover, an expert in the field of environmental health and sanitation, inspected conditions in four Tennessee prisons, TSP, TPW, FP and BMP. William G. Nagel, a nationally acclaimed corrections and criminal justice authority, examined TSP, FP, BMP and MCC with regard primarily to housing and idleness, two areas that he believes are of paramount importance. Mr. David Fogel, another nationally recognized corrections expert (and a former commissioner of corrections in Minnesota), inspected six TDOC facilities, TSP, BMP, FP, TC, TPW and MCRCF. Mr. Fogel's examinations also included housing and idleness, but were much more wide ranging, touching upon, *inter alia,* security coverage and the existence *vel non* of standard departmental policies and procedures for various aspects of prison operations. Accordingly, his opinions include systemic conclusions as well as conclusions regarding the particular institutions inspected. The sole expert witness for the defendants with respect to most issues raised by Messrs. Hoover, Nagel and Fogel, was Commissioner Bradley, who, as stated previously, is himself well respected in the correctional field. No challenges have been raised to the qualifications of any of these individuals as expert witnesses.

Other evidence concerning conditions in TDOC prisons was offered in a variety of forms. The findings which follow reflect the court's review of the entire record, including trial and deposition testimony and the thousands of pages of documents introduced at the conclusion of trial. Conditions at each institution will be examined separately. .

### B. Tennessee State Penitentiary

#### 1. Housing Facilities

Built in 1898 in the then classic "fortress" design, the Tennessee State Penitentiary is the largest of the state's adult penal institutions. Originally constructed to house a maximum of 1,600 inmates, TSP now regularly contains in excess of 1,900 prisoners. An additional 300–350 are assigned to the facility administratively, but are not actually housed there.[21] The current population is down from an apparent high of approximately 2,300 in the months preceding the Chancery Court opinion in *Trigg, supra.*[22]

---

**21.** In mid-August 1981, the count was 1,930 inmates actually housed at TSP and 332 assigned there but not physically present. The latter count includes inmates temporarily out to court as well as those housed in county jails pursuant to contracts with TDOC.

**22.** Evidence submitted in the present case shows 3,020 "residents on hand" in January 1978. This figure probably includes inmates housed at the Nashville Correctional Rehabilitation Center (now NCSC), and perhaps inmates administratively assigned to TSP but not

The facility is classified as a maximum security institution, but approximately 98% of the men there are medium security prisoners.

Of the 21 buildings in the TSP compound, 4 are actually used for housing prisoners in 7 separate cellblocks or units. The largest of these housing units is a long and narrow structure extending both to the left and right directly behind the administration building. These buildings comprise the entire front side of the rectangular principal compound at TSP and combine to impress observers with the imposing image of a seemingly impenetrable, if aging, fortress. This main housing building is divided into four cellblocks, Units I–IV, which together house nearly 80% of the total population at TSP.[23]

Units I–IV are similar in design, although there are some minor variations. Each unit has five levels of cells extending down the center of the unit, with two rows or "walks" of cells positioned back-to-back on each level. The hall in front of each upper level walk is essentially a narrow catwalk, suspended in the air, which faces the building's outside wall and the vertical, arched windows that provide the cells with at least some fresh air and natural light, albeit from a number of feet away.

Units I and III each consist of 109 38-square foot cells and 80 53-square foot cells. Units II and IV each contain 189 45-square foot cells. All or virtually all of the cells in Units I–IV are "double bunked," that is, they house two inmates per cell. Thus, when fully occupied, Units I and III each confine 218 inmates in cells that afford 19 square feet per inmate and 160 men in cells providing 26.5 square feet per inmate. Units II and IV house, when full, 378 inmates each in cells providing 22.5 square feet per inmate.

Units I–IV at TSP are maintained regularly at population levels very near these capacities. For example, on July 24, 1981, Unit I housed 369 inmates, Units II and III each contained a full house of 378 inmates, and Unit IV housed 374. Unit I houses inmates in protective custody or "check-ins" (so called because they voluntarily check in for their own protection) and general population inmates. Units II–IV are general population cellblocks. In July 1981, 18 of the prisoners in these 4 units were classified as close security and the remainder were medium security inmates.

Immediately behind Units III and IV is a building containing the prison gymnasium/auditorium, dining room and, on the floor above the dining room, housing Unit V. Unit V is a single level cellblock containing 54 cells on 6 parallel corridors. Of these, 48 cells have 100 square feet and house 4 inmates each. The remaining 6 cells have approximately 50 square feet each and are double occupancy. As of July 24, 1981, the unit was fully occupied with 204 general population inmates, 2 of whom were close security, with the remaining 202 classified as medium security.

A separate single-story structure situated behind Units I and II contains the prison's maximum security cellblock, Unit VI. Unit VI consists of 48 cells ranging in size from 35 square feet to 44 square feet, which, except for those inmates on "death row,"[24] are double occupancy cells. In addition to death row inmates, Unit VI houses inmates on administrative and disciplinary segregation, and at times some check-ins.

The remaining housing unit is the Self Determination Center (SDC), located near the extreme opposite end of the TSP compound from Units I–VI, and used to house

physically present (*see* n. 21, *supra*). The *Trigg* opinion was issued in August 1978 and found that 2,300 inmates were housed at TSP, a figure that apparently reflects inmates physically present only and not those assigned to NCRC. At that time, inmates were housed in the gymnasium and other areas not designated for housing, as well as in the present living units.

**23.** As of July 24, 1981, Units I–IV housed 1,500 inmates out of a total population of 1,930, or 77.7%.

**24.** There were 19 death row inmates, all single celled, as of July 14, 1981.

inmates on "honor" status. The SDC is a three-story structure which contains, on the ground floor, its own kitchen, laundry area and activity rooms. The second floor consists of 22 rooms, 2 of which house 4 inmates each in areas of 200 square feet and 150 square feet. The other 20 rooms are approximately 100 square feet each and are all double occupancy. On the third floor, 21 rooms of approximately 95 square feet (actually partitioned cubicles of a former dormitory area) house 2 inmates each. Four rooms on the third floor are single occupancy rooms of about 60 square feet.

Finally, some additional prisoners are housed temporarily at the TSP hospital, although at any given time, some or all of those may be inmates on administrative transfer from another TDOC institution. However, primarily because of the shortage of cell space at TSP, inmates who enter the prison hospital lose their cells and must often remain in the hospital after the need for treatment has passed, awaiting an available cell.

There is no dispute about the fact that TSP housing facilities are seriously overtaxed. Ninety percent or more of the prison's 1,900 plus inmates are double bunked in cells ranging from 38 square feet to 53 square feet in size. Over 1,400 inmates at TSP are housed, 2 to a cell, in areas about the size of a ping pong table, 45 square feet, or less. Each of those cells contains two bunks, a sink and a toilet, as well as any personal belongings that the inmates are allowed to keep.

Little imagination is required to realize that considerable anguish and inconvenience necessarily accompany the confinement of two individuals in such close quarters. The burdens include the lack of room for two men to do more than simply stand up at the same time and the difficulty a relatively tall inmate has in fully extending either his arms or his legs inside the cell. Further, the close proximity of the shared toilet facilities, which are often old and in serious need of repair, is a condition that is repugnant to civilized sensibilities.

Yet, overcrowding is but part of the story and must be evaluated in light of other factors that affect the quality of life behind the walls. Those factors include: environmental conditions such as sanitation, lighting, heating, ventilation and the level of noise; the availability and accessibility of space outside the cells and the amount of time typically spent in the cells; and finally, the level of violence and the fear thereof which are present within the prison.

*2. Environmental Conditions and Sanitation*

Extensive testimony concerning environmental conditions at TSP (as well as FP, BM and TPW, *see, infra*) was presented by Samuel W. Hoover, a registered sanitarian with the United States Public Health Service from 1962 until his retirement in 1979, who is now engaged in environmental health consulting work, including a contract with the U.S. Bureau of Prisons. Mr. Hoover's specific factual findings are credible and to a large extent undisputed. They will be relied upon extensively herein.

(a) *General Maintenance*

The court is not surprised to find that an institution as old and as crowded as TSP, and inhabited as it is by persons who are hardly models of social responsibility, has fallen into a state of some disrepair. The problems identified by Mr. Hoover ranged from relatively minor items like broken windows and missing screens to leaky ceilings, deteriorated floors, rust-covered cell doors, exposed electrical wiring and seriously deteriorated plumbing. The broken windows, leaky ceilings, deteriorated floors and rusty cell doors were relatively isolated occurrences and need no further explanation here. The problems with the prison's electrical wiring and plumbing, however, were found to be extensive and will be discussed in more detail.

Mr. Hoover found exposed electric wires, jerry-rigged connections and make-shift extension cords throughout TSP's living units. Exposed wiring existed to some extent in every cellblock, and on occasion in the shower facilities as well. Electrical

switches and outlets were found on numerous occasions to be without covers, and many cells contained homemade extension cords and plugs. The conditions were found to present serious risks of both electrical shock and fire. Mr. Hoover acknowledged that many of the problems were attributable to unauthorized actions of the inmates themselves.

Mr. Hoover's inspection of TSP uncovered extensive problems with the institution's plumbing. Those problems generally fit into two categories. The first involves what may be described as plumbing design defects, and the second consists of inadequate or improper maintenance and repairs. In combined effect, these defects present real as well as potential hazards to the health of the prison population, and surely contribute to the misery that accompanies life at TSP, through, for example, the emission of noxious odors.

Mr. Hoover identified instance after instance of what are described as cross-connections between toilets and the drinking water supply. Such a condition can lead to the contamination of drinking water with raw sewage. Cross-connections were found in all TSP living units and were so extensive that Mr. Hoover estimated that at least 151 of the 189 cells in each of Units I–IV contain toilets that are directly cross-connected with the drinking water.

With the exception of the absence of anti-siphon devices on hoses attached to water faucets in the TSP kitchen, the remaining plumbing problems identified by Mr. Hoover at TSP concern the need for or inadequacy of repairs to the plumbing system. They included leaks in the sewer lines, stools or water lines in virtually every living unit, the use of inappropriate or ineffective patches on existing leaks, the resulting accumulations of pooled sewage (and in one instance identifiable human feces), missing drain covers, and other miscellaneous examples of faulty plumbing facilities.

In the SDC, an additional plumbing problem was evidenced by the fact that whenever certain toilets were flushed, other toilets were immediately filled with raw sewage.

It should be noted, however, that Mr. Hoover did not find evidence that sewage at TSP overflowed directly into any living units. Rather, the pooled sewage found was in pipe chase areas. In addition, the record indicates that the defendants responded to Mr. Hoover's findings and have already remedied some of the defects found. Other more extensive problems such as the faulty plumbing are apparently being corrected on an ongoing basis.

### (b) *Lighting, Ventilation and Noise*

In his inspection of TSP, Mr. Hoover found that lighting throughout the housing units was substantially less than that considered necessary for reading, writing and the maintenance of proper personal hygiene. While stating that a minimum of 30 footcandles is considered necessary, the lighting in many cells was measured at less than 5 footcandles. Indeed, of the 57 readings taken by Mr. Hoover in TSP living units, only three met or exceeded the 30-footcandle minimum standard. The lighting level on some lower bunks was as low as 0.2 footcandles. Even on top bunks and in the middle of cells, the readings often revealed lighting levels of less than 5 footcandles. Although Mr. Hoover's lighting measurements were taken in only a small percentage of the total cells, the figures do appear fairly representative and reflect lighting levels in some cells within each of TSP's living units.

Lighting at TSP was also criticized by another plaintiffs' expert, William Nagel, who testified that the near exclusive reliance upon artificial light can in and of itself have a deleterious effect upon inmates.[25] Mr. Nagel noted that even in Units I–IV, the cells of which face outside

---

**25.** The court is not overly impressed by Mr. Nagel's opinion about the harmful psychological effects of an absence of natural light. Nevertheless, his findings are interesting for comparison with Mr. Hoover's detailed findings that the level of lighting is inadequate. Certainly, a significant contributing factor to the inadequacy is the paucity of natural lighting, which at the least emphasizes the need for more adequate artificial lighting.

windows, the natural light is muted because of the distance from the windows to the cells. In Unit V, only two walks face windows at all, and they have been painted over. Two of the four walks in Unit VI do face windows that provide some natural light.

On the dates of Mr. Hoover's inspection of TSP, in early September 1981, he recorded "effective temperatures" [26] ranging from 74°F in some cells to 80.5°F in others. Except for Unit VI, where a fan was not working on the day of his inspection, Mr. Hoover reported no serious problems with ventilation at TSP. In addition, Mr. Nagel found that on the day of his inspection, August 18, 1981, the temperature in the TSP living units was not excessive.

Mr. Nagel did find that the level of noise inside TSP cellblocks was extremely high, and at times becomes "intolerable," He explained in his trial testimony that the excessive noise level results from constant activity within the cells, including the frequently simultaneous use of radios and televisions, as well as constant talking (sometimes shouting to be heard above the noise), the flushing of toilets and the clanging of cell doors. Particularly in the case of the multi-tiered Units I–IV, the noise travels from level to level and tends to reverberate off the steel and masonry from which the cellblocks are constructed. Mr. Nagel's testimony was confirmed by inmate Jerry Brazen, who testified that the noise was often "enough to literally set your teeth on edge," and that a person could sit in his cell and become irritable just because of the noise.

(c) *Sanitation*

Issues concerning poor sanitation at TSP have been raised with respect to both the living units and the kitchen area. To some extent, the problems in the living units have been discussed in relation to faulty plumbing. Those findings will not be repeated, except to say that many of the plumbing deficiencies give rise to unsani-

tary as well as noxious conditions, and are conducive to the spread of communicable diseases.

Beyond dilapidated plumbing, however, Mr. Hoover found that the living units at TSP were frequently unclean both inside the cells and out. For example, he found that the living areas were heavily littered, including in some instances the presence of food garbage, and that there was extensive evidence of cockroach infestation. Filthy pipe chases were found to be prime harborage areas for roaches and other vermin. Inside the cells themselves, Mr. Hoover found that toilets were not only dirty, but that a great many of them are so old and deteriorated as to be uncleanable. These conclusions are well-supported by photographic evidence in the record, which shows toilets in such a state of deterioration that they appear virtually unfit for human use. Although inmates are supposedly provided with materials with which to clean and maintain their own cells, testimony indicated that those materials are sometimes difficult to obtain, particularly for inmates on check-in status.

Mr. Hoover concluded from his inspection that the food service area at TSP failed to meet basic sanitation standards. His specific findings included: poor sanitation in the garbage area, which may attract disease-carrying vermin; improper storage and handling of foods in both cold storage and dry storage areas; food residues and poor sanitation generally in the kitchen, including standing water; a leaky ceiling in the food storage area; insufficient temperatures in utensil and dishwashing facilities; and improper maintenance of temperature on food served to segregation inmates. Using an evaluation form provided by the Public Health Service of the Food and Drug Administration, Mr. Hoover found deficiencies in 25 of 44 inspection areas, including eight areas characterized as "critical." Using that form, Mr. Hoover rated the TSP food service area at 45 out of a possible 100.

---

**26.** Effective temperature is calculated from ambient air temperature, relative humidity, air movements and radiant temperature. Mr. Hoo-

ver's opinions regarding temperature adequacy are not considered herein. *See* n. 4, *supra.*

It should be noted that a public health environmentalist with the Metropolitan Davidson County Public Health Department routinely inspects the TSP kitchen and food service facilities at least every six months. Although his reports consistently reveal some sanitation problems, they are generally more favorable than Mr. Hoover's report. On the other hand, the defendants admit that TSP's large population places a strain on kitchen facilities and that improved monitoring of conditions there is needed.

(d) *Personal Hygiene and Facilities*

As previously noted, the vast majority of TSP inmates have toilets and lavatories located within their cells. The single exception to this rule is the SDC, where toilet facilities are located in common areas. And, as stated, *supra,* many of the toilets are in such a deteriorated condition or are constructed of such materials that effective cleaning of the stools is virtually impossible. The significance of this condition is certainly magnified by the proximity of the toilets to the space in which the inmates live, sleep and sometimes eat.

Showers in each of the living units are located in common areas, in ratios ranging from 4.6 inmates per shower head for death row inmates to 11–21 inmates per shower head for inmates in the other units. Like the other areas in the TSP housing units, the shower areas are showing the effects of time, are deteriorated and in poor repair. Nevertheless, the showers are more or less functional and serve their essential purpose of allowing inmates to bathe. No substantial issue has been raised concerning the frequency of which inmates are permitted to take showers.[27]

Facilities for the laundering of prisoners' clothing are provided at TSP. However, it appears that many inmates choose to wash their own clothes in their cells, because of fees charged by inmates who work in the

laundry and because of incidents of clothes not being returned to their owner after being laundered. On the whole, however, it should be noted that Mr. Hoover could find "no severe problems" with the laundry facilities at TSP.

The only other problem identified in the TSP housing units relative to personal hygiene or environmental health which the court finds even arguably relevant is the indication that there are no facilities or procedure for the routine sanitizing of bedding prior to its reissue to other inmates. This fact may be made more significant because of the apparent frequency with which cell changes are made, although nothing in the record suggests whether or not bedding might follow a particular inmate from cell to cell within the facility.

3. *Fire Safety*

Several issues have been raised with respect to fire safety precautions at TSP. While as explained, *infra,* the court does not believe that the evidence establishes any constitutional violation arising out of inadequate fire safety, in the interest of a complete record, the allegations will be briefly discussed.

In the view of the plaintiffs, the "most startling" fire safety deficiency at TSP is the prison's continual extensive use of pillows and mattresses made of polyurethane foam. That material has been known for years to emit deadly fumes when burned, and TDOC policy has for several years prohibited its use. Although Commissioner Bradley had thought that all polyurethane mattresses and pillows had been replaced, Mr. Hoover discovered otherwise. Of the 15 TSP cells that he checked, there were 20 polyurethane pillows and 4 polyurethane mattresses in use.

Another problem cited was the absence of a second means of exit from housing units I–VI. Such exits were recommended by a 1977 TDOC report and are thought by the department's chief engineer, Ed Hardy, to

27. Evidence indicates that inmates on segregation status are normally allowed a shower every other day, in contrast to general population inmates who usually may shower once a day.

However, the court is convinced that even if true this fact raises no constitutional issue, either alone or in combination with other conditions.

be absolutely necessary to save lives in the event of a serious fire. The plaintiffs further complain that even where such exits exist, they are ineffective because of the prison's lack of a fire evacuation plan and failure to prepare for a fire by conducting fire drills. The defendants, by contrast, presented evidence that second exits are being installed and that a fire evacuation plan does indeed exist, although they do admit that fire drills are not conducted.

Finally, the plaintiffs point to two alleged impediments which it is asserted will hinder prompt evacuation of inmates in the event of a fire. First, it is noted that TSP guards are not furnished with breathing masks to enable them to endure heavy smoke during the evacuation process, in spite of two 1977 reports recommending their acquisition. Second, Mr. Hoover noted the danger inherent in the present system whereby individual cells must be separately unlocked to release inmates and recommended a centrally controlled electronic locking system.

### 4. Idleness

Idleness of inmates is recognized, even by TDOC officials, as one of the most serious problems currently faced by the department. Commissioner Bradley has characterized the situation as both "serious [and] ... intractable." Similarly, there is little dispute about the effect of overpopulation on the dearth of meaningful activities. In the absence of increased expenditures, idleness grows with population. Of course, the level of idleness is directly governed by the availability of employment opportunities or other programs to occupy inmates' waking hours. At TSP a large number of inmates appear not to be engaged in any form of constructive work or rehabilitative activities.

For present purposes, inmates will be considered idle whenever their available daytime hours are not spent either working or attending educational or vocational training classes. Inmates who are not engaged in such activity are left largely to their own devices to determine how to spend their days behind the prison walls, with the result that large numbers of inmates spend substantial portions of each day in their cells.

In reality, there are two distinct classes of idle inmates at TSP. First, and most conspicuously, are the inmates who are neither employed nor enrolled in any daytime training program. At the time of Warden Rose's deposition in this case, there were about 600 inmates in the first group. The second group is more difficult to quantify and consists of inmates who on paper are assigned to work or training programs, but for whom these activities require only a portion of their available time. The most glaring examples of this kind of hidden idleness can be found among those inmates assigned to institutional support jobs (e.g., the prison laundry, kitchen or maintenance positions), where a practice known as "featherbedding" results in the assignment of too many inmates to too few bona fide jobs.

Although ascertaining the precise extent of idleness due to job featherbedding is inherently difficult, and is perhaps on the present record impossible, it is absolutely clear that the practice of featherbedding at TSP is a substantial contributing factor to the overall idleness extant within the prison. Of 1,312 inmates employed at TSP on September 30, 1979,[28] 729 were assigned to institutional jobs. At the time of Mr. Fogel's inspection on August 26–27, 1981, he concluded that out of a total population of 1,915, only 369 were employed in Tennessee State Industries. An estimated 653 inmates were "without real work assignments," and the remainder were assigned to institutional jobs, many of which Mr. Fogel found to be suspect. In Mr. Fogel's opinion, which the court credits, "legitimate institutional ... needs cannot gainfully occupy more than a fraction of the ... men who would have to look to such jobs for employment."

**28.** Figures include inmates assigned to the Correctional Rehabilitation Center (CRC), now known as NCSC, in addition to TSP proper.

Total population at the time this data was compiled was 2,625 for those two institutions.

While featherbedding is apparently more serious with respect to some institutional jobs than others, it is a pervasive practice throughout the system. For example, Mr. Fogel reported Warden Rose's inability to explain the duties of the 293 men assigned to "operations" jobs and questioned the 35 men in "clothing," the 25 in "laundry," and the 30 assigned to "farms."[29] In addition, a former TSP guard, Sammy Ray Mathis, stated that of the 10–20 men usually assigned to a "yard crew," the work would be done by three or four and the rest would sit around doing nothing. Featherbedding has also made its way into the TSP hospital. In September 1981, the TDOC director of medical services, Jamie S. Brodie, conducted an evaluation of health services which found that the TSP hospital employed twice as many inmate workers as were necessary.[30] Mr. Brodie accordingly recommended a reduction, having found that the overstaffing resulted in widespread idleness among inmate workers, many of whom actually worked only about 2 hours per day and spent the rest of their time standing around the hallways and visiting with each other. Warden Rose, without directly acknowledging the existence of featherbedding in institutional jobs, has admitted that it would not be practical to add any more inmates to the institutional payroll because the need for that type work is "pretty well covered." In light of the evidence, the understatement of the warden's assessment is obvious.

Thus, with its current population level, TSP is unable to occupy a large number of its residents with any sort of gainful employment. And of those who are employed, a large number are not kept busy during a full work day. At least for those inmates with no job assignment at all, the only presently available effective antidote to idleness would be enrollment in some educational or vocational training program. Yet, as is the case with job opportunities, the number of available training programs are inadequate to meet the current needs of the TSP population.

The defendants have admitted that as of January 1978, vocational and educational programs at TSP (as well as most other institutions) were inadequate to meet needs. As of July 10, 1981, daytime academic and vocational classes at the prison had a total capacity of 367 students, and an additional 50 could be accommodated at night. Even if the vocational and educational programs were operated at full capacity, and it appears they are not, a substantial number of inmates would be left without either work or training assignments to occupy their time. And, in view of the widespread idleness among even those inmates assigned to jobs, the absence of more extensive academic and vocational programs further exacerbates the problem of inmate idleness at TSP. It should be recalled that Warden Rose's estimate of 600 idle inmates, *supra,* referred to those neither working nor in a training program.

Inmates without work or classes to attend are left with few choices. For most, the majority of time is apparently spent in the cells. The prison gymnasium, when open, is available for basketball, weightlifting and boxing. However, the total capacity for all of these activities is about 20 inmates at any one time. Mr. Nagel stated that in his experience with prisons around the nation, unsupervised gymns, including the one at TSP, lend themselves to domination by a relatively few of the more athletic inmates, further reducing the gym's availability as an alternative to time in the cell for the majority of idle inmates. In addition to the gym, inmates have access to the exercise yard for about 2½ hours per day in good weather.

Another choice for idle inmates is to read or study in the prison library or law library, subject to the hours of operation and the number of inmates the libraries will accommodate at one time. The main prison does not have any "dayroom" space in which inmates can congregate and visit outside

---

**29.** There is no farming operation at the main prison compound.

**30.** The propriety of utilizing inmate workers in the hospital at all is considered, *infra.*

the strict confines of their cells.[31] The compound does include both indoor and outdoor visiting areas. But these, of course, can be used only when an inmate is visited by free-world persons.

Doors to the cells at TSP remain locked throughout the day and are opened once each hour when inmates wishing to pass between their cells and other parts of the prison may do so. As a result of the widespread idleness and the limited access to activities outside the cells, a large number of inmates spend the vast majority of their time inside their cells. Mr. Nagel estimated that it would not be uncommon for a prisoner at TSP to remain in his cell 16 hours or more per day. And while there is no evidence what percentage of those incarcerated at the prison actually remain in their cells for such extended periods, the court credits Mr. Nagel's estimate and finds that a substantial number of TSP inmates spend most of each day in their cells. That factor must be considered in evaluating the overcrowded condition.[32]

### 5. Violence

Violence behind the TSP walls takes a variety of forms, from strong arm robbery to stabbing, homosexual rape and even murder. While most episodes of prison violence are inmate upon inmate, on occasion there are instances of inmate-upon-guard or guard-upon-inmate violence. The resulting atmosphere of fear, intimidation, threats and coercion is simply a way of life for TSP inmates.

Quantifying the level of prison violence is difficult at best. Official incident reports, upon which the defendants base their opinion that the level of violence is not excessive, are so underinclusive as to be almost wholly devoid of meaning. Somewhat more helpful are records of disciplinary convictions of inmates for violent rules infractions, although they too present only a partial picture. The TSP hospital emergency room log is instructive for comparison, but in light of the often unsatisfactory explanations given by prisoners for their injuries, those records also do not provide a precise measure of violent episodes.

In fact, it is clear that none of the existing records, either alone or in combination, reflect the actual frequency with which violent acts occur at TSP and that, indeed, no system of recordkeeping could ever be equal to the task. The simple reason for this inherent deficiency is that many of the episodes of actual or threatened violence are never reported to prison officials and thus are not subject to any form of recordation. Life behind TSP's walls is to a large extent governed by the "inmate code," one tenet of which strictly prohibits prisoners from "snitching" on fellow inmates. The consequences of becoming a snitch may include physical retaliation, including threats of death,[33] the fear of which helps to persuade even well intending inmates to abide by the code. Thus even violent incidents that are witnessed by a large number of inmates are never reported by either the victim or the witnesses. Furthermore, there is evidence that the reach of the inmate code extends beyond the prisoners to affect, at times, the conduct of the correctional staff as well. In any event, the evidence is absolutely clear that the inmate code exists and that it prevents the reporting of a great many episodes of actual or threatened violence.

An examination of just the violence that is reported, however, compels the conclusion that TSP is an extremely violent institution. In 1979, 170 prisoners were convicted

---

**31.** *Cf.* the Lucasville, Ohio facility at issue in *Rhodes v. Chapman, supra.*

**32.** As noted, *infra,* the court does not believe that the level of idleness and lack of rehabilitative programs, taken alone, amount to discrete constitutional violations. The court is convinced, however, that these factors must be taken into account in evaluating the adequacy of the TSP facilities to house the number of prisoners presently incarcerated there.

**33.** Warden Harrison of Fort Pillow indicated that murder was a possible form of retaliation for snitching in violation of the inmate code. While his experience is at another institution, the inmate code is the same at TSP, and the potential ramifications for its violation there are no less severe.

in prison disciplinary proceedings of violent offenses: 56 for assault, 7 for sexual malpractice or rape, 83 for fighting and 24 for strong arm robbery. Another 77 inmates were disciplined that year for possession of a deadly weapon. In 1980, 57 inmates were convicted of assault, 22 for sexual malpractice or rape, 95 for fighting and 17 for strong arm robbery, a total of 191 disciplinary convictions for violent infractions. An additional 57 inmates were convicted in 1980 for possession of a deadly weapon.[34] During the first eight months of 1981, the last period for which figures have been provided, there were 137 disciplinary convictions at TSP for violent offenses: 55 for assault, 9 for sexual malpractice or rape, 55 for fighting and 18 for strong arm robbery. During the same eight months, there were also 54 convictions for possession of a deadly weapon.

Perhaps more telling than sheer numbers, which in any event underestimate the magnitude of violence, are descriptions which have been offered of the nature of the violence that occurs behind the walls. Both rapes and robberies are often accomplished with the aid of knives or other deadly weapons, and victims who do not give in are subject to being stabbed, viciously beaten or even killed. Most stabbings that occur involve multiple wounds, as evidenced by the hospital emergency room logs. One inmate testified that he was stabbed three times over a 15-minute period.

Another inmate, Ralph Janou, was stabbed nine times in what Mr. Janou thinks was a simple misunderstanding concerning his identity. Although Mr. Janou apparently passed out soon after the attack began, the perpetrator continued to stab him about the chest, back and throat. His injuries included a punctured heart sac and punctured lung, requiring treatment at an outside hospital for nine days.

The record is replete with other examples of violence among inmates at TSP. The most commonly related stories are of stabbings and rapes. The episodes have on occasion led directly to the death of the victim. For example, inmate Eddie Pitman described a murder by stabbing that occurred in the prison dining room. The same inmate described a fight between two men on the ballfield in which one was armed with a knife and the other defended himself with a baseball bat. These and numerous other instances, both reported and unreported, lend credence to Warden Rose's belief that all TSP inmates live in constant danger of violent attack.

Furthermore, it is evident that the violence is so pervasive that no area of the prison can be considered safe. Evidence has been presented of violent attacks occurring in housing units, including locked cells, in the showers, hallways, hospital, dining room, ballfield, and virtually every other area of the prison compound. Even those prisoners who check in for their own protection cannot assume that they are in fact safe from attack, since the record includes numerous instances of rapes, stabbings and other violent attacks on check-ins at TSP.

The ability of the prison staff to protect the inmates from violent attack is, under present circumstances, severely limited. Oftentimes, guards are simply nowhere to be found when an attack occurs. Other examples indicate that even when guards are present they are sometimes unable or unwilling to protect inmates from attack. To the extent that the inmate code is followed by staff members, see supra, such a result is not surprising.

The problem of inadequate protection of inmates, however, is not limited to isolated instances of particular guards failing to act. Rather, the deficiencies appear to be endemic to the system, and to have roots much deeper than the conduct of individual officers. Furthermore, the beast has many heads, all of which must shoulder a share of the blame.

---

**34.** *Cf.* with the figures shown through examination of the 1980 incident reports, which reflect only 18 assaults, 2 instances of sexual misconduct, 1 fight and no instances of strong arm robbery or possession of a deadly weapon.

Clearly the incident reports are so underinclusive that reliance solely upon them to assess the level of violence at TSP, as Commissioner Bradley has apparently done, will necessarily result in a grossly distorted impression.

One aspect of the problem at TSP is attributable to the architecture and design of the complex itself. Many areas of the prison compound simply are not designed for proper surveillance, but are, instead, virtual blind spots that render consistent surveillance impossible. These areas are obviously prime candidates for violent episodes, and in fact provide the loci of a number of incidents identified in the record.

Beyond problems inherent in the design of TSP, the guards there are, in large measure, substantially undertrained. Although a state statute requires that correctional officers receive two weeks' inservice training within six months of their entry on duty, past compliance with that law has not been exemplary. Even when training is provided, the evidence strongly suggests that the sessions are woefully short, both in terms of hours of training and in the topics on which instruction is offered. Without question, the training provided to guards at TSP is inadequate preparation for dealing with the security needs of the institution, including the right of inmates to be kept reasonably safe from violent attacks.

In addition to a general lack of adequately trained guards, TSP experiences a problem in retaining experienced guards as well. Warden Rose estimates that there is a 20%–35% turnover rate among TSP correctional staff, and that a single position could change hands as often as three or four times per year. Inmate testimony in this case has made clear the serious abuses that can result from the use of untrained and inexperienced guards. These include the repeated housing of weaker inmates with a known sexual predator whom one inmate described as apparently "unstable."[35] John Doe No. 15 told of instances in which he had observed "inmates pay guards to let [an] inmate into a cell to rape another inmate." He had also observed payment by inmates to guards for bringing drugs into the prison. Doe said that he had seen the same guard who sold the drugs instruct another guard to "bust" the inmate who had made the purchase so that the drugs could be confiscated for sale to another inmate.[36]

Yet another shortcoming of the main prison security force is that the number of guards is simply insufficient to properly control a population of nearly 2,000 inmates. Indeed, there are times when one guard is expected to patrol as many as four separate walks, each housing 30–39 men. This, combined with the difficulty of observing activity within individual cells without actually passing in front of the cell, makes controlling violent acts committed in the cells themselves extremely difficult. The evidence is clear that, despite Commissioner Bradley's opinion to the contrary, a substantial amount of the violence at TSP does occur in the cells. And such violence is not limited to the acts of cellmates against one another, but includes acts perpetrated by persons outside the cell upon occupants inside. For example, reported incidents include the thrusting of a knife between the bars, throwing scalding water on a man in a cell, and even dousing an inmate with a cleaning mixture resulting· in burns to the inmate's eyes.

The ability to adequately protect inmates is further hampered by a classification system that permits mixed housing of inmates with different security classifications and that in fact does not attempt to fully evaluate a prisoner's propensity for violence prior to assignment to a particular prison or unit. *See supra.* In addition, cell changes are made by correctional officers without any apparent regard to an inmate's violent nature. These changes occur with such frequency that, when coupled with the fact

**35.** This inmate testified by name, but the court, out of a sense of caution and concern for his safety, chooses not to identify him here.

**36.** This statement is not objectionable as hearsay for the reason that it is not offered to prove the truth of what the guard said, but rather the simple fact that he said it. The only credibility at issue is that of Doe, who was subject to as thorough an examination on the point as counsel for the defendants wanted to conduct. *See generally,* "Weinstein's Evidence ¶ 801(c)[01]; *United States v. Wolfson,* 634 F.2d 1217 (9th Cir.1980).

that guards also are assigned to different units from time to time, the officers on duty simply do not know which inmates are assigned to what units. As a result of that confusion, inmates who wish to harm their fellow prisoners can gain relatively easy access to the cells of their intended victims.

One final factor that makes the protection of inmates difficult is the ready availability of weapons behind the walls. Some indication of this availability can be seen in the number of disciplinary convictions for possession of a deadly weapon: 77 in 1979; 57 in 1980; and 54 through August of 1981. According to inmate testimony, weapons may be purchased within TSP, and at the time of trial the going price for a knife on the prison black market was about $30. While it appears that knives or homemade shanks are the most common weapons in use at the prison, guns and other weapons are also available. For example, on February 11, 1981, officials found a .32 caliber automatic pistol and 12 rounds of ammunition inside a cell.

The conclusion is inescapable that, as acknowledged by Warden Rose, TSP's inmates do live in constant danger of violent attack. Equally clear and disturbing is that the correctional staff is insufficient and ineffective to prevent many such attacks from taking place.

6. *Health Services*

(a) *Medical Care*

As noted, *supra,* the main prison hospital serves as the central referral center for all of the adult prisons in the state. The facility also provides some primary and emergency care for inmates assigned to NCSC as well as those confined at TSP itself. The recently renovated and expanded hospital (at an estimated cost of $2.5 million) has produced an impressive physical plant, including three elaborate new surgical suites, sophisticated x-ray equipment (three new machines were purchased at a cost of over $50,000), and a modern new intensive care unit.

Some confusion exists, even among the defendants themselves, concerning the role of the main prison hospital, and the level of care to be provided there. For most purposes, the facility is referred to and treated as a hospital, but in defense of claims in this action, it is asserted that the hospital is really just a high level infirmary, providing emergency and intermediate care. Even Mr. Brodie seems confused (or at least ambiguous) about the hospital's role, when he refers to the recent renovation as supporting the department's goal of developing a licensable hospital, yet immediately defends TDOC's refusal to comply with hospital accreditation standards by asserting that those standards are not applicable to the kinds of "intermediate functions now occurring and planned for the TSP Hospital."

In fact, the TSP facility has been used to provide acute hospital care for many years. In the *Trigg* decision, Chancellor Cantrell ordered the state to either meet hospital accreditation standards or cease using the facility for acute hospital treatment. At about the same time as the Chancellor's order, a University of Michigan Correctional Health Care Program evaluation of health services in Tennessee prisons urged that the hospital be immediately downgraded to an infirmary, citing many of the same deficiencies found by the Chancery Court. However, instead of downgrading, the state embarked on its ambitious renovation and expansion program, apparently intent upon providing even more acute care services, but still without any plans to seek hospital accreditation.

That the facility continues to provide acute hospital care is abundantly clear. Although many major surgical procedures are farmed out to civilian hospitals, others are performed on site. In 1980, 61 major surgeries were performed at the TSP hospital in addition to 138 operations classified as minor, 42 cases of orthopedic surgery and 112 cases of plastic surgery. In the same year, 961 inmates were admitted to the TSP hospital, as opposed to a total of 265 admitted to outside hospitals. Similar patterns are evident for the first nine months of 1981, the last period for which figures were provided, when over 40 major surgical oper-

ations were performed on site. Many if not all of the major surgical procedures require the use of spinal or general anesthetics. In addition, the TSP hospital continues to treat critically ill patients requiring around-the-clock care, including heart patients and others with chronic disorders.[37]

The contention that the main prison hospital is presently used to provide only infirmary-level care is simply not supported by any substantial evidence. To the contrary, the contention is inconsistent with, *inter alia,* Mr. Brodie's assessment (n. 37, *supra*), with the sophisticated design of the renovated facility, with other evidence of the level of care currently provided, and with the defendants' clearly established plans to further expand the level of services being furnished on site. The contention, in short, is inconsistent with the overwhelming weight of the evidence that the state is currently attempting to furnish, at the main prison hospital, a wide range of acute hospital services.

Yet the evidence is also clear that the TSP hospital staff are insufficient in terms of numbers, training and experience to adequately provide acute hospital care. Likewise, it is clear that the provision of adequate medical care is severely hampered by administrative problems that plague the hospital's organization and operation. The court will first examine the TSP hospital administration and related problems and then will review the medical staff whose duty it is to actually deliver health care.

The main prison hospital is administered by Mr. Harley Seimer, a registered nurse who serves as hospital superintendent. Mr. Seimer is directly accountable to Warden Rose, with no direct accountability to Mr. Brodie or any other central TDOC official. While this structure is typical of the health systems and organization departmentwide,

described *supra,* the results are particularly anomalous at TSP, where the hospital is relied upon to care for inmates from throughout the system. In such a situation, it would appear especially important that the hospital management remain primarily sensitive to patient health needs as opposed to prison security.

Unfortunately, however, that is not the case with Mr. Seimer, who has a close and well-established relationship with Warden Rose. For example, Mr. Seimer has vocally resisted efforts of health staff to assign security personnel to the hospital on a permanent basis, a move urged by Mr. Brodie but which would somewhat restrict the Warden's flexibility in day-to-day guard assignments. In another instance, Mr. Seimer was apparently willing to risk a patient's safety because of the institution's tight fiscal situation. In that case, a licensed practical nurse (LPN) on duty alone at night discovered that a patient who was recovering from abdominal surgery was hemorrhaging. When he phoned Mr. Seimer for instructions, he was told to open the patient's abdomen and tie the blood vessel off, a procedure which the LPN was neither trained nor qualified to perform. Mr. Seimer argued that the nurse should perform the procedure despite his lack of qualification, on the grounds that the hospital's yearly budget to finance treatment at outside facilities had already been spent. Fortunately for the patient, the nurse adamantly refused Mr. Seimer's order, and Mr. Seimer finally agreed to outside treatment.

In his September 1981 evaluation, Mr. Brodie found that Mr. Seimer ran at best a loose ship. Mr. Brodie found that the hospital was "administratively unhealthy," and that Mr. Seimer's approach to management "has contributed to a chronic morale problem and high turnover rate among employ-

37. Mr. Brodie in his report of September 4, 1981, recognizes that some of the hospital's patients are in need of acute hospital care, but states that the provision of such services would require "a substantial investment in equipment and staff. In an addendum, he notes several pieces of equipment that should be acquired for such purpose, as well as his belief that the adequate provision of acute care would require 50 additional staff positions and the introduction of 24-hour on-site physician coverage. The court takes these portions of Mr. Brodie's report as an implicit admission by him that the TSP hospital is inadequately equipped and staffed to provide the level of services currently required by some of its patients.

ees." The report concluded that Mr. Seimer has failed to demonstrate the "ability to successfully administer" the TSP hospital and recommended his transfer to a smaller prison and his replacement by a professionally trained hospital administrator. In Mr. Brodie's opinion, "the main prison hospital is stagnant and in desperate need of fresh administration." Such a change is essential, said the report, "to the future development of a quality health care program."

Some of the manifestations of ineffective management of the TSP hospital were also contained in Mr. Brodie's report. These include the absence of comprehensive hospital policies, the need for a separate medical protocol manual, and for official organizational, functional and supervisory plans. Mr. Brodie found that the present administrative system is so devoid of policies or clear planning that the resulting "lack of supervision of either free world or inmate workers . . . at times defies imagination." Despite such serious criticism from the department's own Director of Medical Services, Mr. Seimer remains on as superintendent of the TSP hospital, and there is no evidence that substantial changes are in the offing.

Yet another problem that flows, not from ineffective management but from the administrative system itself, is the inclusion of the hospital beds in the prison's institutional capacity. Mr. Brodie's report recommended that this practice be abandoned, so that complete control of the hospital beds could be put in the hands of the health care staff. Under the present system, security personnel have the authority to move inmates into hospital beds for security or space reasons on nights and weekends without the approval of any medical personnel. Further, inmates who are hospitalized for legitimate reasons almost always lose their cells because of the shortage of space and following medical discharge must remain in the hospital until other cell space becomes available, often as long as several weeks. Mr. Brodie's report notes that at any given time as many as 15–20% of the hospital population is designated "discharge pending cell." In any case, inmates housed in the hospital with no medical reason tend to be disruptive as well as occupying hospital bed space, at times resulting in the cancellation of needed surgery. Testimony at the trial by a former nurse at TSP concerning incidents of violence within the hospital supports Mr. Brodie's position that housing healthy inmates in hospital beds is a disruptive and dangerous practice.

Clearly the most serious deficiencies in the provision of health care at the TSP hospital are related to the insufficient number and qualifications of the medical staff. In addition, Mr. Brodie's audit found that the staffing practices at the TSP hospital were irrational and characterized by inappropriate utilization of job classifications, inequitable distribution of workloads and hours of duty, and by a lack of supervision. As a result, Mr. Brodie found that despite a serious shortage of qualified personnel the main prison hospital is beset by staff idleness, improper shifting of duties to inmate workers and some consistently vacant positions.

Medical practitioners authorized at TSP include three physicians, six physician's assistants (PA's) and ten registered nurses (RN's). At the time of Mr. Brodie's report, one MD position was vacant, as were one PA position and four RN slots. In addition, of ten authorized LPN positions, nine were vacant at the time of Mr. Brodie's report. Likewise, the single authorized nurse specialist position was unfilled. Overall, of 70 positions authorized for the TSP health care staff, only 49 were filled in September 1981.

As the Brodie report stated, prior to renovation "it was generally acknowledged . . . that the positions authorized were not adequate to the work load or patient care needs." Mr. Brodie found that during the renovation process, when the hospital bed capacity was cut in half with the consequent increase in the staff-patient ratio, there was a noticeable improvement in the quality of care and a more acceptable degree of patient supervision.

The general absence of adequate patient supervision is exemplified by the fact that

even when nurses refer inmates for further treatment, the followup is likely to be done by a PA since physicians see only one-fourth to one-third of the inmates seeking care. Indeed, inmates may go through their entire period of hospitalization without an attending physician, leaving decisions such as diagnosis, treatment (including prescription medicines) and even discharge to a PA, who may have little or no relevant training (*see, infra*). Mr. Brodie's report found that the head physician, Dr. Paul Frishkorn was, under present circumstances, simply unable to adequately safeguard patient needs. In point of fact, it is clear to the court that there is grossly inadequate physician coverage at the TSP hospital to adequately care for the patients hospitalized there.

Inadequate in-house physician coverage is mitigated somewhat by TSP's fairly extensive use of outside consultants on a contract basis. Specialty services provided on this basis include anesthesia, dermatology, gastroendoscopy, neurology, opthalmology, optical services, orthopedics, otology, urology and oral surgery. Most of the contract physicians provide their services on site at the TSP hospital, while for others, inmates must be transported to the doctor's office. Mr. Brodie described the role of contract consultants as being to provide "secondary and tertiary care to the entire adult population of the department." Thus the consultants do not serve to relieve the shortage of physicians in the provision of primary care.

The staffing shortage does not end with physicians. Mr. Brodie has indicated that minimal staffing for an acute care facility (which the main prison hospital is) would require an extra 27 nursing positions, bringing the total authorized nursing positions to 57 (including Med Tech/Corrections positions).[38] Moreover, considering the difficulty of recruiting and retaining qualified

medical staff (in fact, only 17 of the authorized nursing positions were filled at the time of Mr. Brodie's report), the current deficiency is even more alarming. The defendants' own medical director states that 57 nurses are needed to provide quality acute care, yet the defendants are presently attempting to provide acute care with a working staff of 17 nurses.[39] Other defense witnesses, including their medical expert, Mr. Kiel, and Superintendent Seimer, agree that the present level of staffing is inadequate for an acute care facility, and Mr. Kiel's opinion that the present staff is sufficient for even infirmary type care is based upon an assumption that all authorized positions would be filled.

With staff spread so thin, it is not surprising that services must often be provided that are beyond the training and skill of the persons called upon to perform them. As previously mentioned, PA's make many of the treatment decisions during the course of inmates' stays in the hospital. Further, it is common for decisions regarding triage and appropriate referral of patients upon their initial complaints to be made by persons without even the training of an LPN. Even where such diagnosis is made by licensed nursing personnel, the evidence indicates that they are often lacking in the specific skills necessary for the job. The absence of clear guidelines or policies for personnel qualifications has helped to produce a situation where unlicensed staff members often function as fully licensed professionals, and where even those who are licensed frequently perform functions beyond their training and expertise.

The most shocking and perhaps the most pervasive example of the provision of medical care by unqualified personnel is seen in the extensive reliance of the TSP hospital upon inmate staff. At the time of Mr. Brodie's report, 70 inmates were employed

---

**38.** The court notes a discrepancy between the number of authorized nursing positions identified by Mr. Brodie in two sections of his report. For present purposes, the figures on p. 45 are accepted, although these reflect five fewer Med Tech positions and one fewer RN, as opposed

to the figures shown on p. 24 of the report, introduced as Doc. No. 1691.

**39.** Interestingly, when Mr. Brodie was Associate Director of Nursing at TSP, he had suggested that a total of 63 nurses would be appropriate.

in the main prison hospital, and while 24 were in non-medical positions such as custodial or clerical jobs, the remainder were involved in the direct delivery of health care. These inmate workers are completely exempt from any requirements of certification, licensure, or even of relevant work experience or training. Most of the inmate workers, in fact, have no such training, and TDOC provides none. Nevertheless, inmates are utilized in tasks which include assisting free world personnel in the observation of examinations, assisting in surgery, cleaning equipment, taking x-rays without direct supervision, and providing emergency treatment, as well as working in other positions providing direct access to patient medical records. As Mr. Brodie found in his report, this extensive use of inmate workers inevitably results in a breach of the confidentiality of the doctor-patient relationship, as well as violating a number of state health codes. Mr. Brodie recommended that the number of inmate health care workers at TSP be immediately cut in half, but while he believes any reliance upon inmate workers in the direct delivery of health care is undesirable, he also believes that with the current staffing shortages and fiscal constraints, some level of reliance upon inmates continues to be necessary.

The foregoing discussion has largely concerned deficiencies that impact rather broadly upon the whole panoply of health services provided at the main prison. Other problems, however, are more narrowly focused upon particular facets of the health care delivery system. While the existence of most of the problems is supported by multiple items of evidence, primary reliance herein will be upon Mr. Brodie's September 1981 report. For indeed, it is he who has conducted the most extensive recent review of the subject. And, although his ultimate conclusions may be different from those of either the plaintiffs' experts or the court, Mr. Brodie has nevertheless candidly identified a wide range of deficiencies which are worthy of mention.

In the outpatient department, Mr. Brodie noted various problems mostly related to poor organization, crowded conditions and reliance upon inmate workers. This department is responsible for initial processing of all ambulatory care patients, including triage of complaints, documentation of vital signs, and referral to medical practitioners, as well as supervision of the emergency room and administration of noncontrolled medications, among other functions. Particular problems identified include improper storage of medications such that they are accessible to inmates, and the use of inmate workers to take vital signs and decide which physician or PA is to see a particular patient. Mr. Brodie found that this department, like the hospital as a whole is understaffed by qualified free world personnel and specifically recommended additional nurses.

At the time of Mr. Brodie's evaluation, the emergency room at TSP was staffed by two inmate workers only, but by the time of his report, a registered nurse had been added. The inmate workers were further found to have access to drugs and needles and to be unsupervised in their work. He found this use of inmate workers to be inappropriate and recommended that the practice be discontinued.

While Mr. Brodie found that the emergency room was reasonably well equipped, he noted an absence of adequate control over stock and the presence of outdated pharmaceuticals and IV solutions. Similarly, many of the prepackaged sterile kits were out of date, and unsanitary conditions were found to be prevalent. One "serious deficiency" which he noted was the unavailability of emergency supplies throughout the other areas of the hospital, including the operating rooms.

Finally, Mr. Brodie criticized the lack of training of hospital personnel in emergency procedures such as cardiopulmonary resuscitation (CPR). Such training, including annual recertification, seems especially important where the emergency room is not staffed by professionally trained and qualified personnel on a 24-hour basis.

X-ray services at TSP seem adequate to the point of overkill, except for the problem mentioned above of using unsupervised inmate workers to operate the x-ray equipment. However, it does appear that the films are ultimately read by a professional radiologist working under contract.

Laboratory and diagnostic services were also found to utilize inmates in the performance of tasks which should be done by professional technicians. On the other hand, Mr. Brodie found that the free world laboratory personnel, all but one of whom are well qualified, adequately supervise the inmates in their lab work. The report also found, however, that the laboratory was "extremely dirty" and generally disorganized, and recommended improvements in those areas in addition to reducing the amount of reliance upon inmate workers.

Some of the problems found to exist in the operating room department (OR) have been previously mentioned, such as the absence of adequate emergency equipment and the reliance upon inmate workers in the preparation for and performance of surgical procedures. With respect to the latter, Mr. Brodie recommends that the number of inmate workers be reduced immediately and additional free world staff hired, with the goal of eliminating inmate workers altogether. Other problems noted include the use of an unsterile dressing cart in the OR, a practice so risky that "such carts are virtually unknown in modern hospitals," and improper safeguarding of supplies of nitrous oxide, an anesthetic commonly known as "laughing gas" and a popular street drug among substance abusers. Mr. Brodie also noted that the renovated physical facilities are far more extensive than presently needed, and thus recommended undertaking a study to determine the feasibility of expanding the surgical service.

A number of problems have been identified in the area of pharmacy services, both by Mr. Brodie and others. There seems to be a general consensus, for example, that TDOC could more efficiently operate and control a central pharmacy than its present diversified institutional system. Other problems were identified within the TSP pharmacy that for present purposes are more significant, because of their more direct impact upon patient care. One of these was inadequate inventory control methods, such as the use of large cupcake tins to hold medications with little or no control, a practice that Mr. Brodie described as bordering on the archaic. Another serious problem is the presence of bureaucratic hurdles to the rapid processing of emergency drug orders. One other major problem noted by Mr. Brodie was the poor supervision of staff, with the result that there were persistent reports of a pharmacist regularly sleeping on duty.

### (b) Mental Health Care

With the departmental consolidation of mental health services at DCI, there has been a corresponding decrease in what were, even before, pitifully scarce staff and resources for mental health treatment at the main prison. A staff that used to consist of a full-time clinical psychologist, four counselors, two psychological social workers and a psychological examiner (which Mr. Brodie sees as "more in line with the [present] treatment needs" of TSP), has been effectively reduced to one psychological examiner, a position that was vacant at the time of the report, and one counselor. In addition, the prison contracts with one psychiatrist and one psychologist, each of whom is available four hours per week. The former Division of Psychological Services has been abolished, with such meager services as are still offered being under the auspices of the counseling staff.

Prior to renovation the TSP hospital contained two units that were used for mental health purposes. One of these, West-300, was an open ward containing a therapeutic community. The other, West-100, was used as a short-term observation or holding area for psychiatric patients prior to transfer to DCI. The therapeutic community concept formerly embodied in West-300 has apparently died in the renovation. West-100, however, has been reopened, apparently to serve largely the same function as before;

its designation is now "medical security ward."

As Mr. Brodie acknowledged in his report (in which he recommends placing substantial restrictions on the use of West-100 for housing psychiatric patients), that unit has been criticized as a major deficiency in virtually every study that has been conducted of the TSP hospital. Chancellor Cantrell in the *Trigg* decision provided a graphic as well as grim appraisal of conditions in West-100:

> This area cannot accurately be described as a hospital ward since it is no more than a row of segregation cells enclosed by heavy steel grid doors. These cells are inadequately lit and improperly ventilated. Although self-mutilators and suicidal patients are caged in this area, it is physically impossible to maintain them under observation . . . . Recently a medical review committee appointed by a former Commissioner of Correction to investigate conditions at Tennessee State Prison, described West 100 as "not much more than a medieval dungeon out of the dark ages, where a man can only deteriorate further, emotionally, mentally, and physically." The overwhelming weight of the evidence leads the court to concur in that appraisal.

*Trigg, supra,* (Dav.Ch.Op. at 43–44).

Although the renovation resulted in some physical improvements to West-100, including enlargement of cells and improved lighting, its primary purpose remains a segregation unit, used for overflow from punitive and administrative segregation units, as well as some check-ins, in addition to psychiatric "patients." And, with the drastic reduction in psychiatric and mental health staff, the little treatment that patients caged in West-100 could formerly have hoped to obtain is no longer available. Further, the ability to keep inmates in West-100 cells under observation has not improved in the renovated design, and, in fact, the remaining psychological counselor

at TSP warned Warden Rose in an August 13, 1981, memorandum that certain changes that had been made themselves rendered the unit dangerous and unfit for housing mentally disturbed inmates. In Mr. Brodie's view, the use of the new West-100 "as an inpatient psychiatric 'lockup' unit without providing adequate treatment or staffing borders on the inhumane." Yet, in accordance with Mr. Seimer's belief that West-100 is necessary to provide "intensive treatment of acutely disturbed patients, and with the blessings of Warden Rose and the concurrence of the security staff, the West-100 dungeon has been reopened, albeit with a fresh coat of paint.

In addition to those inmates in need of acute psychiatric care, there are others in need of outpatient treatment. Despite the fact that the demand for outpatient psychological care is high, the main prison offers little in the way of services. In fact, the sole remaining counselor, Mr. Ernest Burson, shoulders virtually the entire load, by holding a "psychological clinic" during morning sick call several days per week. The prison offers no treatment programs for drug or alcohol abuse,[40] and no group therapy. As Mr. Brodie's report notes, "the present staffing is inadequate for the provision of mental health services with the exception of crisis intervention," and that is virtually the only mental health service now provided there. Indeed, Mr. Brodie seems to have identified the "bottom line" in this area when he found in his report that "[t]here is no organized program for the provision of mental health services at the Main Prison."

### C. Fort Pillow State Farm

#### 1. Housing Facilities

Fort Pillow State Farm is a close security facility built in the late 1930's in a rural area of Lauderdale County. At the time of the trial, FP housed approximately 750 inmates, of whom about 35 were close security, about 125 were minimum security, with

---

**40.** Two private organizations, Alcoholics Anonymous and the Seven Step Program do offer sessions for TSP inmates.

the remainder classified as medium security. Over the last few years, the housing areas at FP have undergone renovation, the final stages of which were in progress during the instant trial. Although the court has not been advised whether the project was completed on schedule, the renovation was supposed to have been finished in the early part of 1982.

The main compound at FP is shaped like a cross, with the long and narrow, three-tiered housing blocks A and B extending to the left and right behind the administration building. The fourth prong of the cross, opposite the administration building (which also houses the infirmary) is formed by the gymnasium.

A and B blocks are identical in size and construction, although at the time of trial Unit B–1 was still undergoing renovation. The top two units of each block contain 50 cells each, about 110 square feet in size, and are all or virtually all double occupancy. The renovated Unit A–1 likewise contains 50 cells the same size, as will B–1 when renovation is complete, if it is not already. Thus, A and B blocks, when full, will house 600 inmates in 300 cells. Blocks A and B contain all of the close security inmates as well as medium security prisoners. Unit B–1 is the segregation unit, used for housing inmates on punitive or administrative segregation as well as check-ins. As at TSP, the cells in A and B blocks at FP contain two bunks, a toilet and lavatory. Because of the larger size, however, there is also room for a small desk, upright lockers and desk chairs in the FP cells.

C block at FP is an open dormitory originally built after the *Trigg* litigation for use as an industrial building. The building is divided into two 90-man dormitories of approximately 7,000 square feet each. A control point separates the two units, which are designated C–1 and C–2. The bunks in both dormitories are all on one level and are positioned side by side in long rows. C block dormitories contain medium security prisoners.

Outside the fence of the main FP compound are two trailer complexes, each consisting of three trailers in "T" configurations, and each housing 29 minimum security inmates. A guard post is located at the head of each "T." The trailers provide 44.7 square feet of space for each inmate housed there.

Also outside the main compound is a "farm dormitory" housing 30 minimum security inmates assigned to farm work. The building was formerly used for housing guards and was described by Mr. Fogel as a "shabby" structure. While Mr. Hoover stated that the 35 square feet of space per inmate in the farm dorm was below acceptable standards, he viewed the building as being overall the best and most desirable housing at FP.

2. *Environmental Conditions and Sanitation*

Mr. Hoover conducted his evaluation of environmental health conditions and practices at FP on August 30 and 31, 1981. The problems which he identified are generally minor in comparison with those cited at TSP. The court has mostly excluded from present consideration the wholly deplorable conditions found to exist in B–1, which was the last of FP's units to be renovated. At the time of trial, the unit had been closed for renovation. Based upon the defendants' representations that the renovated B–1 was to be identical to the other units in A and B blocks (although it will still be used for segregation), the court deems it unnecessary to consider in detail the previous condition of the unit. Suffice it to say that the evidence overwhelmingly supports Mr. Fogel's assessment that the old B–1 was "shocking" and fell "below any standard of decency," as well as Mr. Hoover's specific findings of environmental deficiencies in the unit.

In terms of general maintenance of the physical plant, the most extensive deficiencies identified by Mr. Hoover were the presence of a number of broken windows, the lack of screens to prevent the entry of flies, mosquitoes and other insects, and several leaky ceilings. In some instances, the leaks resulted in pooled water around beds, and in one case the leak was found to have resulted in wet clothing.

The only cross-connected plumbing of the type found at TSP was in the kitchen restroom and the old Unit B–1. The latter, presumably, has now been remedied as part of the B–1 renovation. In addition, however, the absence of an air relief valve on the water washing attachment in the outside garbage area was cited as a possible source of back siphonage of contaminated water into the drinking water system.

The level of lighting in the FP living units appears generally a little better than at TSP, although Mr. Hoover still believes that many FP inmates are not provided adequate lighting for daily living activities. Mr. Hoover's readings in blocks A and B revealed light on top bunks in excess of the 30 footcandles he deems necessary, while readings taken at other points in the cells were generally below that level. Light readings in the dormitories were widely variant, ranging from a high of 125 footcandles at one C–2 bed to 12 footcandles at another bed in the same unit. The farm dorm had overall probably the worst lighting of any FP housing units, while the one trailer unit examined appeared generally better than average. The findings support Mr. Hoover's conclusion that lighting is poor in FP housing units.

The "effective" temperature in the FP housing units on the days of Mr. Hoover's inspection (late August 1981) ranged from 74°F in one cell at 9:30 in the morning to 81.5°F in another at 5 p.m. No substantial evidence has been introduced that would indicate either that the temperature was excessive or that ventilation in the cells was less than adequate.

Mr. Hoover found evidence of some unsanitary conditions in both the housing areas and kitchen area at FP. In the housing areas, conditions noted included the use of improper and dirty containers for the collection of trash and garbage, and accumulated water from leaks in the ceiling and plumbing. In one of the showers, Mr. Hoover noted the absence of disinfectants in the foot bath, and in C–2 dormitory's toilet area, a number of broken fixtures were found, including one dysfunctional toilet

that was full of fecal matter. In the same area, pooled water was present on the floor, and Mr. Hoover found "no evidence of cleaning or maintenance."

Unsanitary conditions found in the food service area included improper cold storage of foods in such a way that they "provide fertile areas for the growth of disease producing bacteria." The dry storage area was characterized by evidence of roach and rodent infestation, "general debris," and an open sewer line running through the area. The restrooms off the kitchen were found to be filthy. In one of them, there were no towels for handwashing; also one toilet was found to be cross-connected to the drinking water supply.

In the kitchen itself, Mr. Hoover discovered old, dirty and uncleanable utensils and such poor basic sanitation that he said the area showed no evidence of recent thorough cleaning. The washing of pots and pans was found to be improper and unsanitary. He found a severe roach infestation in the kitchen, and flour and cornmeal that were also infested by bugs. Utensils that were stored for use as though clean were found to contain old food residue or to be otherwise soiled. Mr. Hoover identified a variety of other unsanitary and improper conditions in the kitchen, including the failure to maintain foods at safe temperatures during serving. On the whole it is clear that the FP kitchen is an unsanitary disaster area, where any one of a number of conditions could well lead to the outbreak of disease among inmates and staff alike.

The most serious condition found by Mr. Hoover with respect to toilet and bathing facilities would appear to be the plumbing deficiencies and unclean conditions already noted. Inmates in A and B blocks have a toilet and lavatory in each cell, and common shower areas with fixtures in a ratio to the number of inmates well within the range identified by Mr. Hoover as minimally adequate. The dormitories and minimum security units provide both showers and toilet facilities in common areas, and except for the farm dorm, are sufficient in number to comply with Mr. Hoover's recommended

minimum. In the farm dorm, there is one toilet and lavatory for each 13 inmates, compared to the 1 to 8 ratio recommended, and one shower to each 20 inmates rather than the 1 to 15 recommended.

Some deficiencies were cited by Mr. Hoover in the bedding materials in use by a number of inmates. The most serious is probably the fairly extensive use found of polyurethane foam mattresses and pillows. That material emits a noxious and potentially deadly fume in the event of fire, and TDOC officials had, sometime before Mr. Hoover's inspection, directed that its use be discontinued. A number of dirty and torn mattresses and pillows were also found, some of which the inmates claimed to have been issued in such conditions. Mr. Hoover found no evidence of any arrangement for sanitizing used mattresses and pillows before they are reissued.

Inmates at FP apparently regularly wash their own clothes in their cells, a practice criticized by Mr. Hoover as inconsistent with basic sanitation principles. Several inmates stated that the reason for this practice is that in order to get one's personal clothes returned from the prison laundry, it is necessary to pay an inmate laundry worker $5.00 per month. Mr. Hoover also observed dirty and laundered clothes being transported in the same cart, a practice that can lead to contamination of clean items and the spread of disease.

3. Idleness

FP is the site of TDOC's main farming operation, with about 3,000 acres presently under cultivation. Most of the farm work is performed by inmates assigned to "long lines," crews of 25–50 who work under armed supervision. Farm work is, of course, seasonal and does not provide year-round employment. However, the long lines are used throughout the year as weather permits (they apparently do not go out when the temperature is below freezing) for various maintenance and land reclamation jobs.

The long lines at FP were criticized by plaintiffs' experts for several reasons, including the lack of relevance of the kinds of work performed to free world job opportunities. It was noted that the FP population are predominantly of urban background and that in any event the types of farm work performed manually by the long lines are usually done by machines in a free world setting. Mr. Nagel was especially critical, calling the long line activities "make work" and possibly leading to built up hostilities and confrontations. Nevertheless, to the extent that the long line inmates are at least kept busy, most of those who testified agreed that some work was preferable to none at all.

The sole industrial operation at FP is a license plate factory, which employs 30–40 inmates. The only criticism of the "tag plant" that has been raised in the present proceedings is that substantially more inmates could be employed in the same size factory in some other industrial pursuit, and that therefore the plant is not an "optimum" use of the space.

It appears that, despite the presence of both farming and industrial operations at FP, the majority of working inmates are employed in institutional support jobs. As at TSP, there is a substantial amount of featherbedding in those institutional job assignments. For instance, Mr. Nagel found that while 121 inmates were assigned to food services, no more than 40 were needed for those jobs. Mr. Fogel also stated that in his opinion various other institutional job classifications at FP were suspect, in that although listed as full time positions, they could be accomplished in a short time, or were, like food services, supply overassigned.

The availability of educational programs at FP has changed considerably in recent months. In July 1981, the school program was abolished, only to be reinstituted later in the year. As of December 3, 1981, classes were offered through Dyersburg State Community College in English, art, history, business, health, and development studies, in addition to two adult basic edu-

cation classes and a GED program, with a combined enrollment of 416.[41]

Aside from a small locally operated course in auto mechanics, which accommodates five or six inmates at a time, there is no vocational training program at FP.

Other opportunities to engage in meaningful activity at FP include a gym which is open during the evenings but not during the day, an exercise yard that includes a ball field, and a law library that is open each day. In addition, movies are shown every Saturday night.

On the whole, it appears that the problem of idle inmates at FP is less severe and less pervasive than at TSP. Nonetheless, the experts who testified agreed that a significant amount of idleness does exist there. For example, Mr. Nagel estimated that on his inspection tour, he observed one-third to one-half of the inmates in their cells at 11:00 a.m., although he noted that two of the long line supervisors were on vacation that day and that his estimate was consequently inflated. Whatever the correct figure, some idleness, primarily due to overassignment of FP inmates to institutional jobs, is a reality at the facility. Mr. Fogel's characterization of the prison as a "correctional slum" due to lack of programming appears related as much to his assessment of the lack of rehabilitative value in existing programs as to the fact of substantial idleness.

### 4. Violence

As noted, *supra,* quantifying the level of violence in a penal institution is practically impossible. With reference to the record before the court, precisely quantifying the level of violence at FP is completely impossible. Nevertheless, on the basis of the record as a whole, the court is left with a clear impression that FP is in fact a very violent institution, where inmates are constantly in substantial danger of attack by other prisoners.

As at other facilities, the inmate code is a factor that severely inhibits the reporting of violent episodes at FP. The existence of the code was expressly acknowledged by Warden Harrison, along with the fear of violent reprisals for its violation.

However, even reported violence at FP is substantial, despite the warden's apparent lack of knowledge. For example, while the warden said that the facility averages about one fight per month, 111 FP inmates were found guilty of fighting in 1980 alone. Likewise, while the warden was unable to recall any homosexual rapes in the recent past, there were 11 inmates convicted of that offense during 1980. In addition, a murder that occurred at the facility in March 1981 was, as the warden acknowledged, related to attempted homosexual advances.

Inmate testimony established that "all kinds" of weapons are readily obtainable and frequently possessed behind the FP walls. The same prisoner testified that he had observed guards carrying knives inside the prison, although he had never seen a guard use a knife against an inmate, except "playing around." Testimony also provided examples of various forms of violence at FP, including a stabbing for something so innocent as a request that a radio be turned down.

Evidence in the record strongly suggests that violence is particularly pervasive in the FP dormitories, despite Commissioner Bradley's opinion to the contrary. Inmates have described frequent instances of stabbings, assaults and rapes within the dormitories. Both Mr. Fogel and Mr. Nagel agree that dormitory housing is dangerous and inappropriate except in highly controlled circumstances. Deputy Commissioner Morford concurs that dormitories housing 50 inmates or more "can be a highly dangerous housing situation, if . . . the . . . men are simply dumped in the dormitory willy-nilly and are crowded up and so forth."

---

**41.** Four hundred sixteen was the total number of student slots filled, but the figure does not indicate how many inmates actually partici-

pated, since some inmates might well have been enrolled in more than one class.

Yet despite that recognition and contrary to the advice of the defendants' own classification expert, such "willy-nilly" dumping is precisely how the dormitory spaces are filled. While Mr. Reimer testified that medium or higher security inmates should not be housed in dormitories, C-block at FP not only includes such inmates, but in fact mixes them with minimum security prisoners. Both Mr. Nagel and Mr. Fogel have noted a further danger whenever new arrivals are placed in a prison's dormitory unit, as is done at FP. Such inmates are both easy prey for violence prone veterans of the facility, and also are themselves of an unknown quality with respect to their own propensity for violence.

One additional problem with respect to the FP dormitories is inadequate security coverage. Because of the design of the units it is impossible for a single guard to have a view of more than a fraction of the beds within a particular unit. Yet guard coverage at C–1 and C–2 is one guard in each unit per shift. It should be noted here that neither Mr. Fogel nor, apparently, Deputy Commissioner Morford believes that the addition of more guards to the dormitory units would make the areas substantially safer. In fact, Mr. Fogel concluded that the FP dormitories were "too dangerous . . . [and] even with more staff [could not] be made safe."

Indeed, Mr. Fogel also found security coverage throughout the FP facility to be "haphazardly low." Coverage, except for Unit B–1, is generally one guard per shift per unit. He stated that the situation was made worse by inadequate communications capabilities, which consist of a single telephone system with no backup system.

Like at TSP, guards at FP are often inadequately trained and inexperienced.[42] Inmate testimony indicated that FP guards have on more than one occasion assaulted inmates, and have even attempted to provoke a fight between inmates. In any event, it is clear that the FP correctional staff fail to prevent many episodes of violence.

### 5. Health Services

Medical care at FP is furnished primarily through an infirmary which, like the TSP hospital, was recently renovated. The infirmary now has 13 beds, a number that is generally conceded to be in excess of what is required for a prison the size of FP. Overall, the remodeled FP infirmary is, as found by Mr. Kiel, "an excellent . . . facility [that is] neat, very clean, well-lit and spacious." One serious flaw in the infirmary's design, however, is its location on the third floor of a building without elevators or ramps, thereby rendering the facility largely inaccessible to handicapped or seriously ill or injured patients. Beyond that nearly incomprehensible design defect, there is convincing evidence of other deficiencies that render the FP health care delivery system, despite the otherwise impressive physical facility, inadequate to furnish much necessary primary and emergency care. Indeed, the problems are so severe that Dr. King characterized FP health services as "a disaster area."

One problem that has been discussed as endemic throughout the TDOC system, but that is particularly acute at FP, is the health care management structure, which places the warden in control of the delivery of health services. Not only is Warden Harrison untrained in medical care (as are most other TDOC wardens) but he has also displayed a remarkable ignorance of his own institution's health care program. He is unaware what qualifications health care staff should have or what qualifications his present employees have in fact. Similarly he is unaware whether equipment in the infirmary is sufficient for either present or future needs. Neither he nor the associate warden for treatment is apparently in any position to assess the quality of the hospital superintendent's work. Warden Harrison appears, in essence, out of touch with the health care delivery system that is under his control.

**42.** This finding is applicable systemwide, since there is a uniform training policy and program that, as found in regard to TSP, functions inadequately.

Although there is overwhelming evidence that the former FP hospital superintendent was incompetent both as a manager and as a health care provider and that under his leadership the infirmary was plagued by persistent problems including continuing violations of state laws, he has now been replaced by a qualified and experienced master's level RN. That is certainly a hopeful sign and in fact was one of two positive aspects of health care at FP noted by Dr. King. (The other was a well organized and thorough tuberculosis skin testing program at the facility.) However, to the extent that administrative problems are beyond the hospital superintendent's control, they may be expected to continue. Such is the case, for example, with the regular placement by security staff of general population inmates in infirmary beds for no medical reason.

Such is also apparently the case with the consistently inadequate health care budget at FP, a problem about which witnesses in this case generally agreed. Dr. King characterized the funding as "absurdly low," and both Mr. Brodie and Mr. Kiel admit that the prison's medical component is seriously underfunded. Yet, in spite of a consistently growing prison population, the health care budget for FP in fiscal 1982 remains at approximately the same level as in previous years.

The most glaring manifestation of the low level of funding is seen in staff shortages at virtually all levels and positions. Permanent health care staff at FP consists of the hospital superintendent (now an RN), an additional RN, three medical technicians, one of whom is an LPN, and a medical records technician. A physician's assistant position and additional RN position were abolished in July 1981 because of an apparent difficulty in recruiting.[43] Physician

services at FP are provided on a contract basis, with mixed reviews as to their adequacy. In any event, it is evident that the frequent absence of a physician on site, combined with the absence of mid-level practitioners, has resulted in the routine delegation to nursing staff of diagnostic decisions and other critical medical judgments that are beyond their level of training and expertise.

Further evidence of the staffing shortage at FP is provided by the facility's extensive reliance upon inmates in the direct delivery of patient care, including emergency surgery and minor suturing procedures. While there is evidence that the use of inmate health care workers at FP has been substantially curtailed as a result of Mr. Brodie's February 1981 audit, at least one inmate continued to provide triage and emergency care when free world staff were not available, at least up to the eve of trial.

Indeed, it is clear that FP operates many hours during nights and weekends without any medically trained personnel on site to respond to an emergency.[44] This situation, combined with the prison's remote location (where the 15-minute civilian ambulance response time suggested by the defendants may be overly optimistic) convinced Mr. Brodie to strongly urge the training of some staff members from each shift in basic first aid and CPR. The presence of some such trained staff members is, in Mr. Brodie's opinion, "imperative" for adequate emergency care. Yet, no such training is offered, and FP is left without emergency trained personnel on nights and weekends.

Thus, primarily because of insufficient funding and inadequate staffing, the FP infirmary is unable to meet many serious medical needs of inmates housed in this remote facility. In fact, under present circumstances, the word "infirmary" as ap-

---

43. One need only consider the demise of these two funded positions in the face of Mr. Brodie's adamant recommendations that at least the PA position be immediately filled or replaced by a certified family nurse practitioner, to realize the futility of Mr. Brodie's position as a director without real authority.

44. In fact, Mr. Brodie strongly urged the provision of 24-hour nursing coverage at FP, but this portion of his recommendation has gone unheeded. Instead, the two positions discussed in n. 43, *supra,* and accompanying text, were abolished in the face of Mr. Brodie's stated opinion that at least the PA position was essential.

plied to the facility is a misnomer. The facility, in the absence of 24-hour coverage by health trained personnel cannot be used for inpatient care but can operate only as an outpatient clinic. Even for the provision of those outpatient services and especially for the assurance of proper emergency care, the present level of staffing is clearly inadequate to meet existing needs.

Inmate access to primary care at FP (such as it is) is provided through an open sick call performed by an RN or medical technician each morning, including weekends and holidays. While some inmates testified that security staff at times are indifferent to their requests for care, or even take actions to interfere with the provision of care, any such actions are at most isolated instances and do not reveal a consistently followed policy or practice.

One additional aspect of health care at FP deserving of mention here is the prison's pharmacy service. The FP pharmacy functions on a budget of less than $2,000 per year and has a pharmacist on site only two to four hours per week. When necessary, prescriptions can be filled at a community drugstore as well. Daily dosages of prescribed medications are dispensed once each morning by an RN or medical technician. DEA and psychotropic drugs are dispensed on a dose-by-dose basis only, and a member of the medical staff observes each inmate receiving such medication ingest the prescribed dose. Some outdated medications were found in the inspection of the FP pharmacy.

Otherwise, there is little in the way of medical care currently available at FP. Most lab work is conducted at outside laboratories, and although the prison does have x-ray equipment, there is currently no staff member trained in its usage. There is no substantial evidence that therapeutic diets ordered by physicians or RN's are not always prepared and served in accordance with instructions.

The level of mental health care available at FP is minimal and consists of the services of one unlicensed counselor and minimal contract services. The contract services are with the Covington Mental Health Center and consist of the availability of a psychiatrist and a psychological examiner, for two hours each per week. As with other TDOC facilities, inmates from FP may be referred to DCI when deemed appropriate. There is general agreement that FP needs additional mental health staff, at least psychological examiners, in order to provide more adequate care for its present population.

### D. Tennessee Prison for Women

#### 1. Housing and Environmental Conditions

The Tennessee Prison for Women was opened in 1966 with a designated capacity of 115. Additional housing areas have since been added, the last being the "annex," the former NCSC, which in November 1981 housed 65 women. Conditions in the annex have not been challenged in this suit. TPW proper is a close security facility consisting of an administration and infirmary building, a school and gymnasium/auditorium building, two main housing units and a small "honor" dormitory. The main housing units, also referred to as dormitories, are actually divided into rooms of 120 square feet, almost all of which are double occupancy. Dorm I consists of two wings containing 50 rooms, and Dorm II consists of three wings with 74 rooms. The honor dorm is an open bay unit with 30 beds. In August 1981, the population of TPW was 275, exclusive of the annex.[45]

The cells in Dorms I and II line corridors of 25 rooms each that project out from a central dayroom and security office, or "control" area. Thus, the dayroom in Dorm I serves the two wings in that unit, while in Dorm II a similar dayroom is shared by all three wings. Each of the cells in these two

---

**45.** According to a supplemental stipulation filed in December 1981, intake and segregation cells at TPW had been made single occupancy. The court presumes that this was accomplished by the removal of more women to the annex (cf. 65 count in November, supra, with the 34 housed there in August) and that, in fact, the total TPW population was at that time below the 275 figure, which indicates double occupancy throughout the facility.

units is equipped with a sink and a toilet in addition to beds, dresser, desk and chair. The construction of the cells is solid block, with wooden doors which allow for observation only through a small window. Located behind the control point in each unit is a so-called "dry cell," which actually is equipped with both a sink and a toilet, that is used for short-term isolation and observation of problem inmates.[46]

The only issues that have been raised concerning alleged overcrowding at TPW concerned celling of up to four women in some intake and segregation cells. However, since these areas are now single-celled, there would appear to be no substantial claim remaining that TPW is unconstitutionally overcrowded.[47]

In addition, very few issues have been raised concerning environmental conditions at TPW. Mr. Hoover's inspection did reveal lighting and ventilation in TPW living units below what he considered adequate. On the other hand, the "effective temperature" in the living units was found to range from 74.5°F to 78°F in the cells for which readings were recorded. (The highest temperature recorded was actually 80.5°F in the showers of Dorm II.) All readings were taken on September 4, 1981, between 11:00 a.m. and 2:30 p.m.

Some deficiencies were also noted in the level of sanitation maintained in the TPW food service facilities, although Mr. Hoover concluded that this area, like others at TPW, was generally better than at the men's facilities that he inspected. The problems identified included improper disposal of garbage, the use of "nonfood grade plastic" to store some food, a weevil infestation in cornmeal, improper use and cleaning of some utensils, and the failure to maintain a sufficiently high temperature in the final rinse of the dishwashing process. Mr. Hoover also found that "some improve-

ments are necessary in basic sanitation, as reflected by the presence of mold, meat residue, and roaches."

The only other environmental condition complained of at TPW relates to alleged inadequate fire safety precautions. In particular, the plaintiffs cite the existence of air space above and below each cell door in Dorms I and II, and the likelihood that air pulled through those spaces by the smoke ventilation system would be likely to fan any fire and inhibit evacuation. Mr. Hoover also found a small number of polyurethane pillows in use at the facility, despite the recognized danger posed by the material in the event of fire, referred to *supra.*

On the whole, while TPW inmates could benefit from some improvements with respect to fire safety, food service sanitation and lighting and ventilation in the housing units, the court is convinced that the prison is a spacious, modern, clean and generally well kept facility. Housing conditions there do not seem unduly oppressive or even particularly uncomfortable.

### 2. Idleness

The defendants have readily admitted that idleness at TPW is a serious problem, and that the level of programming is so low that there just are not opportunities for many women prisoners to engage in meaningful activity. As a result, Mr. Nagel discovered a large number of TPW inmates just sitting around the dayroom doing nothing on the day of his inspection.

In fact, virtually the only form of employment available to TPW inmates is in institutional jobs. As of October 1980, a total of 117 inmates were working in kitchen maintenance, as dorm aides, staff aides, laundry aides or on the "work crew." These women apparently average six hours of work per day. A few additional TPW inmates work outside the prison at Spencer

---

46. Mr. Fogel criticized the dry cells because of the difficulty of actual observation through the two steel doors that separate the cells from the guard stations. In his opinion, the use of these cells is "dangerously unsafe."

47. Prior to the opening of the annex, it was generally conceded that TPW was overcrowded, both from the standpoint of beds and program space. In fact, Commissioner Bradley viewed it as the most overcrowded prison in the TDOC system. The annex opening has, at least temporarily, alleviated the problem.

Youth Center or for the State Department of General Services. There is currently no agri-industries employment available at TPW, although there is apparently a plan to begin an industrial sewing operation to make such items as uniforms for TDOC guards and clothing for inmates.

There is currently a vocational type sewing program, as well as courses in cosmetology, business (or typing), cashier/checker, culinary arts, data processing and arts and crafts. Educational programs include ABE and GED courses, as well as college level instruction through a contract with Tennessee State University. As of October 1980, there were approximately 190 TPW inmates involved in the vocational and educational programs. Former Acting Warden Farrar testified in his deposition that there are generally waiting lists for vocational courses at TPW, but not for educational programs. Mr. Farrar also testified that there were a total of 430 TPW inmates enrolled in vocational and educational classes at the time of his deposition. The figures used by the court were compiled in a department-wide survey that was distributed in February 1981 and comprise the only empirical data that is available to the court. Regardless of which figures are more accurate, TDOC officials readily admit substantial idleness and the need for increased programming at TPW.

The most serious allegation concerning lack of meaningful activity at TPW (and perhaps the most serious allegation concerning any condition of confinement there) concerns the denial of exercise to inmates in punitive or administrative segregation. Those inmates are apparently confined in their cells for 23 hours per day. According to Mr. Farrar, segregated prisoners receive no exercise at all for the first 30 days of their confinement and 30 minutes per day for each day thereafter. To the extent that description is accurate, it appears to be in violation of TDOC policy and is unconscionable.

### 3. The "Point-Grading System"

Programming at TPW has been attacked by the plaintiffs because of a feature that is unique in the TDOC system. The prison employs a behavior management system that Mr. Fogel has characterized as "a bewildering point and four level system," in which monthly points are amassed by inmates in four separate areas of prison life to determine what level of privileges the inmate is entitled to receive. The point-grading system has been criticized as being confusing, arbitrary and inconsistently applied.

In Mr. Fogel's opinion, the effects of the system are to foster dependence on the part of inmates, to encourage manipulative behavior and to "juvenilize the women, weakening whatever self-confidence or free-world coping skills they may have." Mr. Fogel also believes that the educational programs and the emphasis upon traditionally "female" occupations also foster a similar feeling of dependence. These programs, in Mr. Fogel's opinion, represent "violence against the spirit."

### 4. Violence

In contrast to the "violence against the spirit" that Mr. Fogel found as a result of TPW programming, he concluded that "one does not sense [at TPW] a raw fear and physical violence prevalent in the men's prisons." Indeed, there is little in the record that would suggest a contrary conclusion, although certainly there are violent episodes at the facility from time to time. The evidence simply does not convince the court that violence at TPW is pervasive or that security coverage is, under present circumstances, inadequate.

### 5. Health Services

In contrast to some other TDOC prisons, TPW receives funding for medical services that is uniformly accepted as adequate for the provision of necessary care. Nevertheless, certain problems have been identified both by the plaintiffs and by witnesses for the defendants, making it clear that in spite of adequate funding, the level of care at TPW is not as good as it should be. For example, the TPW clinic provides only outpatient treatment, including emergency and dental care. Dr. King criticized the lack of any beds on site for infirmary type care,

and TDOC officials largely agree that such services would be a desirable addition.

Health services at TPW are the victim of what Mr. Brodie has termed "sloppy management," resulting in the prison's inability to retain a sufficient qualified professional staff. Mr. Brodie attributed the high staff turnover to "poor clinic organization, frustration over perceived bureaucratic limitations, lack of appropriate orientation for new employees, and a lack of leadership within the clinic." Former Acting Warden Farrar, on the other hand, believes the problem is attributable to a general unwillingness of qualified personnel to long endure the immature and "psychopathic" tendencies of the TPW inmates. For whatever reason, staffing problems persist at the women's prison.

As of June 1981 TPW employed two RN's, one LPN, one medical technician and one medical records secretary, in addition to a pharmacist. Other funded, but vacant, positions included a PA, a second pharmacist and an additional LPN. General physician coverage is available nine hours per week, on a contract basis. Specialized physician care may be obtained on an outpatient basis at the TSP hospital, and inpatient care is available at area civilian hospitals.

While Mr. Brodie views 24-hour nursing coverage at TPW as an ultimate goal that could be achieved with two additional funded positions and the filling of all presently funded positions, he has recommended a plan for interim coverage on two shifts, seven days per week, utilizing existing staff. Yet, the prison administration has not moved in that direction, and health care staff remain assigned exclusively to the day shift. Thus not only is the TPW clinic understaffed, but such medical staff as there are apparently are not utilized in optimum fashion.

Sick call at TPW, when women in need of care must sign up for clinic treatment, is conducted three days per week, a situation that Mr. Brodie criticized in 1980 as inadequate for the provision of the basic health care needs of inmates. While sick call is conducted by a member of the health care staff, it appears that that correctional staff are in the position of prescreening requests for care and, despite their lack of medical training, determining whether a particular case is urgent enough to require immediate treatment. In the absence of such a determination that a complaint is urgent, inmates may have to wait a week or more to obtain treatment. There is a marked absence of written treatment protocols or policy to guide either correctional or health staff in the triage and screening of medical complaints.

Some deficiencies have been noted in the area of emergency care at TPW. Specifically, some emergency equipment, training and procedures recommended as necessary as long as four years ago are still not available at TPW. Mr. Brodie has noted that even the emergency equipment that is available at the prison is often not readily accessible. He has also recommended the development of policies to guide security staff in the event of an emergency and has urged that a supply of emergency drugs be maintained and regularly checked. At present, CPR-trained staff are apparently on duty at TPW for two shifts each day, but the prison does not offer first aid or CPR training for security personnel.

One final problem identified in the provision of medical care at TPW is the frequent failure of patients to receive followup care as needed. This includes patients on long term drug therapy without proper monitoring, the apparent failure of the TPW kitchen to provide therapeutic diets as prescribed by physicians, and the absence of periodic physical examinations for inmates identified as requiring regular monitoring.

Mental health services at TPW are more extensive than at any TDOC institution except DCI. The staff includes two licensed psychological examiners as well as counselors. In addition, a contract provides for three hours per week of on-site psychiatric care. In fact, TPW is the only institution aside from DCI where, in the view of the defendants' expert, Dr. Lawrence Bennett, psychological services were sufficient to

permit all inmates in need to receive treatment. As with other institutions, TPW inmates may be referred to DCI when additional care is needed. The plaintiffs did offer expert testimony of some inappropriate use of the observation cell known as the "dry cell."[48] In addition, the absence of a drug treatment program at TPW has been criticized.

### E. Brushy Mountain Prison

#### 1. Housing Facilities

Located in a remote mountainous area of Morgan County, the main BMP compound is a maximum security facility. It is enclosed by a wall on all sides except on one rear corner where the wall is anchored to the sheer face of a mountain. The main building, which is shaped like a cross, was built in 1934. This building houses the bulk of BMP's population in Blocks A, B and C. Additional inmates are housed in D-block, a separate building also behind the walls, and in two minimum security dormitories, known as the red building and the white building, that are situated outside the walls but behind a perimeter fence.

Approximately 325 inmates are housed behind the BMP walls. Blocks A and B are contained in opposite wings of the main building. The layouts of the two are identical with each having 79 cells on four tiers. Each cell has 72 square feet of floor space. All cells in A-block are double occupancy, as are 23 of those in B-block. The remaining 56 cells in B-block are single occupancy. C-block, located below the dining hall, contains 22 cells of 76 square feet each, and at the time of trial eighteen of those were double occupancy, with four of the cells housing four men each. General population inmates, with classifications of minimum, medium, close and maximum security are housed in all three of these blocks. B-block also houses check-ins and administrative segregation inmates as well. D-block, the control unit located next to the main building, houses inmates on punitive segregation, administrative segregation and check-in status. The 32 cells in D-block have 45 square feet of floor space each and are all single occupancy. Each cell in Blocks A, B, C and D contains a sink and a toilet.

The minimum security red and white buildings, located outside the walls, house a total of about 125 inmates. The red building houses close to 100 inmates in 15 rooms that are 144 square feet in size and 18 rooms of 96 square feet each. As of late July 1981, three of the rooms were single occupancy, 15 were double occupancy and 15 contained 4 inmates each. The white building consists primarily of two dormitory type rooms, one of 1,320 square feet and the other of 900 square feet. There are apparently a few smaller rooms as well, the sizes of which have not been provided. Both the red and white buildings are used for housing only. All other activities and support services take place behind the walls, including meals for those inmates housed in the outside buildings.

#### 2. Environmental Conditions and Sanitation

##### (a) General Maintenance

Mr. Hoover's inspection of BMP on September 5–6, 1981, produced findings of several deficiencies in the maintenance of housing areas at the prison. With respect to plumbing, the problems cited ranged from leaky shower heads and cracked lavatories to improperly patched sewer lines that resulted in pooled sewage in pipe chase areas. However, except for conditions in the control unit, Block D, the deficiencies identified seem relatively minor and isolated. In Block D, plumbing was found to be badly deteriorated, including numerous sewage leaks, old, uncleanable cement block-type toilets, inadequate showers and floor drains that did not work and at times resulted in flooding on the first floor.

Mr. Hoover cited problems with electrical wiring, especially instances of exposed wires and open junction boxes throughout the prison's living units. Once again, however, the control unit bore the brunt of his criticism. In that building, he discovered "multiple wiring violations ... involving

**48.** See n. 46, supra, and accompanying text.

exposed electric wires, improper fixture plugs, and extension cords." In one pipe chase area, the combination of exposed wires in open junction boxes and a ceiling fixture, together with four sewer line holes with improper patches, were found to present the danger of a sewer gas explosion. Mr. Hoover noted that because of time constraints, his survey of wiring deficiencies was "cursory," and that the findings therefore did not reflect all existing deficiencies.

### (b) *Lighting and Ventilation*

As with other prisons inspected, Mr. Hoover found that lighting in BMP cells was consistently below the level recommended for reading and maintenance of necessary personal hygiene. In fact, his measurements established less than adequate lighting in every cell in which readings were taken. One cell in the control unit was found to have no light at all, and seven of eight cells on a particular walk in that building had some identifiable problem with lighting fixtures. In one of the rooms in the red building, housing four inmates, the lighting measured six footcandles at mid-room and less than that at every other place in the room.

Temperatures in the housing areas at BMP on the days of Mr. Hoover's inspection ranged from a low of 73°F in one cell in A-block to 84.2°F (with 96% relative humidity) at 9:30 a.m. in Block D. Ventilation in the same cell in D-block was the lowest of any point measured by Mr. Hoover, as well, 16.9 cubic feet per minute. (Readings in the other cells taken were 178 CFM, 349 CFM and 186.6 CFM.) Inmates in D-block voiced complaints to Mr. Hoover about the lack of ventilation. While Mr. Hoover cited a variety of recommendations concerning ventilation, including 60 CFM per inmate recommended by the American Public Health Association, one air change per minute according to accepted architectural standards and 30 CFM, proposed standards of the American Society of Heating, Refrigerating and Air Conditioning Engineers, Inc., the conclusion that ventilation in D-block is inadequate is clearly justified.

### (c) *Sanitation*

Both Mr. Fogel and Mr. Hoover, following their inspections of the BMP kitchen and food service area, concluded that basic sanitary precautions were not being taken. Mr. Hoover described the operation as the worst he had seen "in some time." Mr. Fogel characterized the area as "filthy."

Specific unsanitary conditions were found throughout the food service and preparation areas. The garbage area was in "foul condition," including the use of open cans, one of which was half filled with dirty grease, and an infestation of flies. The toilet area that serves inmate food handlers was dirty, had no towels or hand drying device, and had an open hole lavatory drain connection to the sewer line. Numerous instances of improper food storage, both in dry storage and coolers were noted by Mr. Hoover. These included the leakage of an overhead plumbing drain onto a box of stored food, the accumulation of meat and chicken blood on floors and in one case on a sack of cornmeal, and generally dirty conditions inside the coolers.

In the kitchen itself Mr. Hoover found that storage containers for salt, cornmeal, powdered sugar, sugar, brown sugar and powdered milk were "absolutely filthy inside and outside." In the vegetable preparation area, a food chopper had a lid gasket that was "absolutely foul due to long cleaning neglect." Improperly welded repairs were found to have rendered cooker pots uncleanable and unsanitizable. Various other utensils were found to be dirty as were some pots and pans that had been stored as "clean." Two axe handles that were used as food mixers and had been stored as "clean" were found to have embedded and decayed food residue in notches on the end used for contact with the food. Other evidence of dirty and unsanitary conditions included debris on the floor and roaches in the area of the ice machine.

In the food service area, Mr. Hoover found that temperatures on some hot foods were too low and on cold foods were too

high. Pitchers for serving coffee were filled on the floor. Mr. Fogel noted on the day of his inspection that inmates served their own potatoes with a tea cup. Food handlers were not wearing hats (or hairnets) or gloves.

By contrast, the defendants introduced evidence of routine inspection of BMP food services that cast conditions there in a much more favorable light. A public health environmentalist with the Morgan County Department of Health conducts inspections at BMP approximately every six months. These inspections include food protection, personnel, food equipment, water, sewage, plumbing, toilet and hand washing facilities, garbage and refuse disposal, insect and rodent control, and other areas. The four most recent inspections resulted in scores of 91, 84, 96 and 96 out of a possible 100. In addition, the State Department of General Services inspects BMP facilities approximately once a month. While those reports reflect some deficiencies in sanitation in the food service area, they are consistently less critical than Mr. Hoover's report.

Viewing the evidence as a whole, however, the court is convinced that sanitation practices in the BMP food storage, preparation and service areas are careless at best, and are in general inadequate to protect against the outbreak of food-borne diseases. Food is often stored, prepared and served under filthy conditions and by unsanitary means.

Mr. Hoover noted several deficiencies in the areas of housekeeping and sanitation throughout the BMP living areas, including some cockroaches, dirty and uncleanable toilets and dirty shower areas. As with other conditions at the prison, however, the worst problems were in the control unit, D-block. Some of these have already been noted in the discussion about the unit's plumbing. Mr. Hoover concluded that the pipe chase areas where sewage, dirt and debris had accumulated were "harborage areas" for vermin. In addition, he found that almost all of the toilets in the unit were "old, cement block types, filthy and uncleanable." He also found the D-block

shower areas to be "extremely dirty" and moldy. The unit also apparently experiences flooding at times because of clogged floor drains. Overall, Mr. Hoover concluded that conditions in the unit "are abominable [and that] it should be closed as unfit for human habitation." Mr. Fogel concurred in that assessment.

(d) *Personal Hygiene and Facilities*

In addition to the problems previously noted, such as dirty, uncleanable toilets, dirty shower areas and otherwise unsanitary conditions, Mr. Hoover made a few other specific findings that are worthy of note. In his opinion, the shower facilities in the control unit, in addition to being dirty, were inadequate to serve the inmates housed there. However, the court believes that any deficiency in that regard is minor indeed. While Mr. Hoover stated that public health standards require one shower head for each 15 inmates, the control unit facilities provide one for each 16 inmates. More serious is the finding that the control unit cells are equipped with cold water only, a fact that obviously makes the maintenance of proper hygiene practically impossible for an inmate confined in such a cell for up to 23 hours per day, as men in that unit are.

As at several other facilities, inmates at BMP apparently frequently launder their own clothes in the cells, a practice that Mr. Hoover states is unacceptable from a public health standpoint. Also like other prisons, there is apparently no procedure for the sanitization of bedding prior to reissue to other inmates. Finally, Mr. Hoover found that in the BMP barber shop, the whisk, comb and razor were used between inmates without being sanitized, a practice that can facilitate the transmission of various types of skin and scalp diseases.

3. *Idleness*

The problem of idleness among inmates is more widespread at BMP than at any other TDOC institution. After the prison opened in 1934 until the mid-1960's, Brushy inmates were used in area coal mines. However, for approximately 15 years there has been no

industrial operation at BMP. Similarly, there is no farming operation to employ inmates there. The only jobs available behind the walls at BMP are institutional support positions, which provide work for about one-third of the prison's inmates. As at other facilities, it clearly appears that even those few jobs are featherbedded and generally require less than a full day's work. Minimum security prisoners housed outside the walls at BMP are all apparently employed in full-time positions, very few of which involve working inside the institution.

Furthermore, there are no vocational programs at BMP, and the only educational program is a GED course in which 13 inmates are enrolled. (In the past, there have been college level courses offered, but those have been discontinued). It is thus evident that the defendants run BMP in accordance with Warden Davis' perception of the facility as "more or less a holding institution."

The effects of the absence of jobs and vocational and educational programs at BMP are readily apparent. Mr. Nagel observed on his inspection tour that two-thirds of the inmates in one cellblock were in their cells at 2:30 p.m. and estimated that the average cell time for general population inmates was 18 hours per day. Inmates segregated in D-block fare even worse and spend 22 or 23 hours per day in their cells.

Even recreational opportunities at BMP are virtually non-existent. The gymnasium has been closed for some time due to structural defects. In good weather, inmates have access to outdoor recreation on the ball field and an outside basketball court. Indoor recreation facilities include a game room with a pool table, table tennis, weightlifting and cards.[49] On the day of Mr. Nagel's visit, he observed about 10 inmates playing basketball, a few on weights and about 40 playing cards and gambling with free world money.[50] Likewise Mr. Fogel observed widespread gambling among Brushy inmates. The practice apparently goes on regularly with the tacit approval of correctional officers. It at least gives the inmates something to do.

Indeed, there is very little else to occupy BMP inmates' time. There is a library that is available for use by industrious and self-motivated prisoners. However, most of the inmates behind Brushy Mountain's walls "do their time" simply wasting their time and are not regularly involved in any meaningful activity that could in any sense be construed as rehabilitative.

### 4. Violence

Although as is the case for other institutions, obtaining a reliable impression about the actual level of violence at BMP is difficult, the court is convinced that violent episodes behind the BMP walls are commonplace. Like at TSP and to a lesser extent FP, inmates at Brushy live in constant fear of violent attack. Violent incidents that have come to the court's attention in this case run the gamut from homosexual rape to strong arm robbery; from simple fist fights to stabbings and assaults with other deadly weapons; from glass jars hurled into a cell through the bars to cold blooded murder.

In fact, not only does it appear that weapons of various types are readily obtainable by BMP inmates (the warden forthrightly admits a problem with weapons, including knives, or "shanks" and homemade guns), but the evidence also shows occasional resort to more exotic forms of violence such as rat poison and tear gas. It further appears that at least on some occasions,

49. At the time of trial, the pool room had been closed since June 1981 because of an incident in which inmate James Earl Ray was stabbed there.

50. The use of free world money is generally disdained among corrections experts because of the difficulty in controlling activities such as gambling, extortion and the sale of contraband. Officials prefer to use either special "scrip" or computerized accounts which allow greater control of inmates' funds. BMP, in contrast to other TDOC facilities, permits prisoners to carry up to $110 in real money.

gang violence or the threat of gang violence is used as a form of coercion.

As at TSP, no part of BMP can be considered safe harbor from the constant threat of violent attack. Even inmates on check-in status are potential and actual victims. Somewhat perplexing is the fact that such an atmosphere is possible in a facility that has the highest ratio of guards to inmates of any TDOC prison. In fact, BMP was the only prison inspected by Mr. Fogel which was not found to have an inadequate number of guards.

Other factors contributing to the security staff's inability to control violence and the apparent delays in responding even after violent incidents occur, are much the same as at TSP. Inadequate training and experience are problems throughout the system. BMP's design also includes a number of "blind spots" where surveillance is difficult. The pervasive idleness at the prison, combined with its mix of security classifications that includes some "end of the line" type prisoners (although the majority of BMP inmates are medium security) are also factors that contribute to the prison's history of violence. Indeed, the fact that idleness contributes to increased levels of violence is largely admitted, and Commissioner Bradley has acknowledged that without more programming, BMP inmates have little to do except "sit around and hold themselves at arm's length."

On the whole, the court is convinced that violence is pervasive at BMP and that inmates there live in constant danger of attack and in an atmosphere of well-founded fear.

### 5. Health Services

BMP houses an infirmary consisting of a treatment room, a small laboratory, a medication room, a medical records room, an emergency room, a dental office including a small laboratory, an optical services room, an isolation room, and an open 12-bed ward for temporary admissions. The physical facilities are clearly adequate for the prison's needs, and indeed the 12-bed capacity of the infirmary, in the opinion of Dr. King, exceeds current needs.

The major health care deficiency at BMP challenged by the plaintiffs herein is the paucity of qualified professional staff. In fact, the full time health care staff consists entirely of four emergency medical technicians (EMT's) and an additional medical technician whose only relevant training is his experience as an Air Force combat medic. These persons are responsible for triage of all complaints, treatment of those considered appropriate and referral of others to a contract physician. However, the EMT's are totally devoid of any relevant diagnostic skills and untrained in treatment beyond emergency care.

As might be expected with a staff of EMT's, emergency care at BMP is by and large better than at most TDOC institutions. An attempt is made with the small existing staff to provide 24-hour coverage, although four days per week coverage is only on two shifts. CPR trained staff are available, however, on each shift even when EMT's are not present. The emergency room is fairly well equipped, although some additional equipment would increase the capacity to respond adequately to given situations. BMP maintains an ambulance equipped with oxygen and also has access to an outside ambulance service.

Hospital care is available at the Oak Ridge Hospital, as well as at TSP, where specialty services are also available to BMP inmates.

Mental health services at BMP are primarily in the hands of a psychological examiner, who divides his time between Brushy and the Morgan County Regional facility. He is ostensibly assisted in this area by a psychiatric chaplain, the associate warden for treatment and four counselors, none of whom has any psychiatric or psychological training, beyond the B.A. degree in psychology held by the associate warden. Contract services are provided 16 hours per month by the Regional Health Center of Oak Ridge. Referrals may also be made to DCI.

*F. Turney Center for Youthful Offenders*

*1. Housing and Environmental Conditions*

Turney Center for Youthful Offenders,[51] located on a 2,700 acre reservation in Hickman County, is a medium security facility housing about 630 inmates. The prison opened in 1971 and is of modern design, with the appearance more of a college campus than a prison. Most of the inmates at TC are housed in 27 small units, by and large of identical design, each of which contains 22 single occupancy rooms as well as a dayroom. Most of the rooms are 60 square feet, although corner rooms are only 48 square feet. In addition, a dormitory unit houses 30–35 prisoners, and approximately 15 more are quartered in 2 rooms in the back of a fire hall outside the prison's fence line.

The only complaint concerning overcrowding at TC is directed toward anticipated increases in the facility's population, and the double celling that such increases would entail. The court need not take a position on the propriety, constitutional or otherwise, of any such increases that may occur, since the only issues properly presented in this action concern presently existing conditions. Accordingly, the anticipated increases in TC population will not be considered herein.

Clearly, the overall environmental conditions at TC are among the least oppressive in the entire TDOC system. In fact, only two complaints have been raised concerning environmental conditions. First, it has been noted that the ventilation system at TC is similar to the one in use at TPW and carries with it the same danger for inmates in the event of a fire. *See, supra.* Second, the plaintiffs point to a 1980 inspection of the prison's waste water treatment system that found that the system was unacceptable from a public health standpoint. However, the evidence also shows that the TC warden agreed to recommend improvements in the system, and there is nothing to indicate that the system is currently inadequate.

On the entire record, the court concurs in Mr. Fogel's assessment that: "The facility is kept up nicely, is clean, and outside appears younger than its 8 years." Nothing in the record suggests that TC is presently suffering from any environmental deficiencies of constitutional dimension.

*2. Idleness*

In stark contrast to BMP, idleness at TC appears to be a relatively minor problem. The plaintiff's expert, Mr. Fogel, found that the combination of programs available at TC keep almost all of the inmates there busy for at least a part of the day. While he also found that some work assignments were suspect (Warden Garrington admitted that some jobs were make work and that in particular the yard crew was substantially overassigned), Mr. Fogel concluded that there was "an obvious deliberate attempt to assign men even at the expense of overassignment."

In addition to institutional support jobs, there are several industrial operations at TC, some of which are also used to provide vocational training. A dental prosthetics program there both trains inmates and produces false teeth. Also at TC are a mattress factory, a furniture refinishing operation and a clothing factory. As of October 1980, 93 inmates were involved in those industrial operations. Imminent TDOC plans call for establishing a repair facility for state vehicles in conjunction with TC's existing vocational programs in automotive repairs, as well as construction of a 120-bed conservation camp on the TC grounds. While the latter would employ 120 inmates in jobs with the State Department of Conservation, those would presumably be new inmates, and the camp can therefore not be seen as providing additional work for existing TC inmates.

Approximately half of TC's inmates participate in either vocational or educational programs. Educational offerings at TC are

---

**51.** Although most TC inmates are young (the average age is under 25), some are substantially older and all are adults. Originally designed to house young first offenders, at present approximately one-third of its inmates are Class-X offenders.

fairly extensive, but are limited to high school and remedial courses, with no college program. Approximately 230 inmates participate in the GED or ABE programs, which are administered by a school principal with a staff of seven teachers, a librarian, some aides and two counselors who serve as tutors. Vocational training programs include classes in auto mechanics, body and fender work, welding, barbering and meat cutting.

Thus, despite the existence of some job featherbedding, the court is convinced that from a programmatic standpoint, TC is far ahead of many other TDOC institutions. Idleness is at the present time not a serious problem there, although substantial population increases would severely strain existing programming.

### 3. Violence

Although in the years since its opening, TC has not been among the most violent of Tennessee's penal institutions, there is evidence that the level of violence there is increasing. Warden Garrington estimates that the current level of reported violent incidents at TC is 10–12 per month. However, he fears that with the increase in the number of Class-X offenders at the institution, and the rising population in general, violence will become more common. Even now, the warden admits both that some violence goes unreported and that the inmate code, although probably weaker than at some other institutions, is a force at TC as well.

Furthermore, the evidence indicates that violent incidents at TC, while less frequent than at other large prisons in the TDOC system, are no less severe. Reported incidents that appear in the record include fights, stabbings, homosexual rapes and murder. Indeed, Mr. Fogel believes that because of the increasingly volatile nature of the TC inmate population and the design of the institution, there are insufficient numbers of guards to adequately protect inmates. In his opinion, TC is "severely unsafe."

### 4. Health Services

As with other institutions in the TDOC system, health care services at TC are characterized by an impressive, even excessive, physical plant, and by what can only generously be called a "bare bones" staff. The TC infirmary contains an examination room, a treatment room, an emergency room, two dental units, both dental and standard x-ray areas, a laboratory, a medication room, a records room, an open ward with eight beds and an additional five private beds.

The staff assigned to this rather large and elaborate infirmary consists of a hospital superintendent with experience as a military medical technician, two RN's, two LPN's, a medical technician with LPN licensure and a medical records clerk.[52] Physician coverage is provided six hours per week on a contract basis, with consultants in the various specialty clinics available at TSP.

The plaintiffs have criticized the absence of a midlevel practitioner at TC, a situation that has resulted in those staff as there are delivering care beyond their level of expertise. Even Mr. Kiel has agreed that the superintendent, Mr. Bowen, is probably involved in clinical decisions that exceed his licensure or what his qualifications would make appropriate. Functions performed by the nursing staff include conducting sick call, triaging complaints, and treatment of those patients deemed appropriate by the examining nurse, including prescribing medications. As with Mr. Bowen, Mr. Kiel agrees that the other staff engage in treatments and the delivery of care which are beyond their qualifications and levels of skill.

Unlike BMP, where the small staff is geared almost exclusively to the provision of emergency care, none of the TC health staff have documented emergency care qualifications. The facility, however, does

---

52. In the past, there was also a PA and an assistant hospital administrator. While the former position has apparently been vacant since the summer of 1981, the latter position was scheduled for abolition on July 1, 1982.

have CPR-trained staff on duty at all times, and there is a regular program of periodic CPR training. There is, however, no basic first aid course available for the TC security staff.

One serious historical deficiency in the delivery of emergency care at TC has been the lack of an ambulance to transport seriously injured or ill inmates to outside hospitals. With the facility's remote location, there are no nearby civilian ambulance services that can be relied upon. Thus, state-owned vehicles, usually a station wagon but sometimes a truck or automobile, have been used in lieu of an ambulance. Obviously such vehicles are not equipped with emergency or life support equipment or supplies, even if there were available personnel qualified to use such equipment. This problem has apparently been minimized if not eliminated by TDOC's arrangement with the U.S. Army installation at Fort Campbell, Kentucky, for the provision of air evacuation services via helicopters, which have a response time to TC of approximately 20 minutes.

Mental health services at TC are, by Mr. Brodie's admission "quite thin." In fact, while the facility in June 1981 employed a psychiatric social worker, a psychological examiner and five counselors, only the psychiatric social worker and a single counselor remained by August of that year. In addition, the facility has a contract with the Cumberland Mental Health Center, but that contract provides only two hours per month of psychiatric care. Finally, although referrals may be made to DCI, it would appear that the present staff's ability to properly assess the need for such transfers would be strained, at best.

### G. Memphis Correctional Center

### 1. Housing facilities

Built as part of the regional prison plan, MCC is a medium security facility which now serves the added function of an intake and classification center for some male inmates from the Memphis area. *See supra.* Although of different design than the other regional prisons, MCC is about the same size, housing an average of about 408 inmates.

Housing at MCC is provided in 12 units contained in the prison's main building. Three of those units are open-bay type dormitories, each with about 50 men double-bunked in stalls separated by dividers of about four feet high. Each double-bunked stall is about 45 square feet in size and opens into shared dayroom space. The remaining housing units are composed of 16–18 double occupancy rooms of 87 square feet each. Each of those rooms has a sink and toilet, double bunk beds and has a solid door with a small window for observation. Inmates on each unit have constant access (during non-lock-up hours, presumably), to a dayroom area with a television set and other recreational luxuries, such as pool tables.

One 18-room unit is used for inmates on some form of segregation status. In general, minimum security inmates are housed in the "F" units, and the dormitories house medium security prisoners, although some minimum security inmates may also be housed there. It appears that dormitories at MCC are used for quasi-disciplinary purposes, as well as for housing new arrivals, with inmates having to "earn" the right to housing in the double occupancy rooms.

### 2. Environmental conditions

Complaints concerning environmental conditions at MCC in addition to the allegedly overcrowded condition itself are so minor by comparison to some of the other prisons as to hardly warrant consideration. Nevertheless, in the interest of providing a more complete picture of conditions at MCC, those complaints will be mentioned briefly here.

Two MCC inmates testified that the heating system is often not turned on through the winter months, resulting in constantly cold living units. Evidence also indicates that MCC housing units suffer from the same fire hazard complained of in regard to TPW and TC.

Finally, a few problems have been identified with reference to the MCC food service operation. They include structural prob-

lems and loss of cooling in some refrigeration units and the failure to screen one inmate food service employee for communicable diseases, or to obtain that inmate a health card from the local health department. Inmate witnesses also testified about the use at MCC of old army surplus rations and reported one instance of an inmate becoming ill after several meals of such rations. So far as the court is aware, no further allegations have been made concerning environmental conditions or sanitation at MCC.

*3. Idleness*

Mr. Nagel, by virtue of his inspection of MCC, determined idleness to be a pervasive problem at the facility. He found that in three particular units, almost all of the inmates appeared to be idle in the middle of the day. In reaching his conclusion, Mr. Nagel noted that there is no industrial operation at MCC. Neither are there any agricultural jobs available there. Rather, the sole employment for MCC inmates is in institutional support jobs which employed 102 men at the time of discovery in this action.

There are, however, an apparently substantial number of inmates at MCC enrolled in academic and vocational programs. According to the defendants' answers to interrogatories, 486 inmate slots were filled in academic programs, including 20–25 who attend classes at Shelby State Community College. Other educational programs offered include ABE and GED programs, and classes offered through the State Technical Institute at Memphis. Vocational courses at MCC include warehousing, woodworking and welding. At the time of discovery, 113 inmate slots were filled in vocational programs at MCC. By contrast, Mr. Nagel found both vocational and academic classes to be poorly attended on the day of his inspection and noted that academic programs in prisons do not occupy a full day in any event.

*4. Violence*

Although the record in this case does reveal a number of violent incidents at MCC since its opening in 1976, there is little basis for an accurate assessment of the relative level of violence there vis-a-vis the other prisons in the system. There is, however, the opinion of Mr. Nagel, which the court finds creditable, that security coverage within the prison's dormitory units is insufficient to afford inmates adequate protection from violence. One guard is assigned to each dormitory at any given time, and the layout of the units, with dividers separating double-level bunks in a large, curved room, makes proper surveillance of the inmates impossible. In addition, the use of the dormitories to house new arrivals and inmates on segregation status, and the indiscriminate mixture of various security classifications, supports the assessment of the officer who escorted Mr. Nagel that the dormitories are "trouble spots."

*5. Health Services*

The clinic at MCC consists of a combination treatment and emergency room, two additional examination rooms, a three operatory dental clinic, a pharmacy and a dental laboratory. One of the examination rooms contains a bed for patient observation. Otherwise, the facility is without inpatient capacity. Although the clinic is small, it has been described as clean, well lit and relatively well equipped.

The clinic provides primary care and related services for MCC inmates and has recently begun serving the intake examination function in the initial classification of new male inmates from the West Tennessee area. Except to the extent that the latter function is naturally impaired by existing staffing shortages and management problems, no evidence has been presented on the adequacy of the classification component of the MCC clinic.

Evidence of questionable management at MCC includes apparent uncertainty whether the clinic is run by one of two hospital superintendents or by an RN III to whom they both apparently defer. Dr. King also noted the management's failure to keep certain simple emergency supplies and expressed his opinion that overall emergency preparedness at the facility was seriously deficient. There is also substantial evi-

dence that the formulation of standing medical orders and operating procedures at the facility has proceeded along a sluggish, if not backward course.

The most serious problem with health care at MCC, however, is the shortage of staff. The full-time health staff consists of two hospital superintendents, both with military experience as their only medical training, two RN's, an EMT and a dental hygienist. Physician coverage is on a contract basis, with 12 hours per week on-site physician care and outside consultants available as needed. A contract dentist is on site 24 hours per week. With so few full-time health care staff members, the MCC clinic does not attempt to provide 24-hour coverage. As a result, jobs such as distribution of medications are entrusted to the security staff during times when no health personnel are on duty.

In addition, the staff shortage necessitates the use of inmate "runners" in conducting sick call, which is held only three days per week. Those runners are in a position whereby they can at least partially control the access of other inmates to medical care. Such access is further hindered by the fact that initial diagnoses are often made by one of the hospital superintendents or the EMT, none of whom has any documented qualifications to make diagnostic decisions.

Laboratory and x-rays, other than dental x-rays, are performed at outside facilities. The clinic's pharmacy is licensed, with a pharmacist on site two to three hours a day, five days a week. No substantial issues have been raised as to the adequacy of any of those services.

Mental health services at MCC consist essentially of a full-time psychological examiner and a contract for emergency referrals to North East Mental Health Center in Memphis. MCC also has access to the psychiatric unit of City of Memphis Hospital, as well as DCI. There is dispute, however, as to whether the psychological examiner is qualified professionally to order the transfer of inmates to a facility providing acute psychiatric care. Under the contract with North East Mental Health Center, one psychiatrist and two clinical psychologists perform on-site consultations and assessments of inmates.

## H. DeBerry Correctional Institute for Special Needs Offenders

### 1. Housing and Facilities

DCI, a maximum security prison located in Nashville, serves as the mental health treatment facility for all of TDOC's adult inmates. As such, it is the sole TDOC institution that houses both male and female prisoners. The facility was originally built in 1932 as the hospital for the criminally insane. After being closed in 1976, the facility was transferred from the Department of Mental Health to TDOC and was reopened as a prison in 1977. DCI treats inmates with all kinds of psychiatric problems, including sex offenders and substance abusers, but remains essentially a penal institution.

DCI contains 11 living units, each of which houses 16 to 28 inmates in various sized rooms containing 1 to 16 persons each. In mid-August 1981, the facility housed 275 inmates, of whom 19 were female. While the plaintiffs have noted that the current population is somewhat above DCI's originally established capacity, the housing at the facility has not been challenged as inadequate in physical space. Similarly, no serious challenges have been made concerning environmental conditions or sanitation at the facility.[53]

---

**53.** The plaintiffs have introduced a series of internal safety inspection reports upon which the court is asked to base a finding that various environmental conditions at DCI ought to be improved. Furthermore, the plaintiffs are correct in pointing out that many of the same deficiencies are noted in successive reports. But, as the plaintiffs also concede, the reports evidence the defendants' "good intentions" in monitoring conditions. The last report submitted, from January 1981, finds overall improvement in conditions at DCI, and in any event, the court could not find any of the conditions noted in the reports so serious as to establish, without more, violations of the plaintiffs' constitutional rights.

Rather, it is asserted that DCI is overcrowded from a programmatic standpoint. That is, the plaintiffs contend that the program, staff and facility at DCI are insufficient to meet even the psychiatric needs of inmates assigned there, and further, that the facility is, in any event, incapable of adequately serving the TDOC system as a whole. Thus the DCI treatment programs will be described, albeit briefly and a bit cursorily, here.

### 2. Treatment programs

Treatment programs at DCI include a sex offender unit with 21 beds, 2 units for substance abusers with a total of 42 beds, and a women's psychiatric unit with 19 beds. Except for some 30 staff beds, the remaining beds at DCI are for males with miscellaneous psychiatric problems.

The full-time mental health staff at DCI includes two clinical psychologists, one of whom serves as associate warden for treatment, two psychological examiners,[54] six psychological social workers, five counselors and a nurse clinician with a master's degree in psychological nursing. In addition, DCI has a contract for 15 hours per week of psychiatrist services and 75 hours per week of services by licensed psychologists. Additional contract services are provided by personnel from the Dede Wallace Community Health Center.

There is general agreement that additional staff are needed to provide DCI residents with completely adequate mental health care. The primary need is for additional nursing personnel to enable nursing intervention beyond the mere administering of psychotropic medications. In addition, Warden Love is convinced that a full-time psychiatrist is "essential" if DCI is to completely fulfill its mission in the TDOC system. Thus, it seems clear that DCI is to some extent programmatically overcrowded.

Similarly, the evidence is convincing that many inmates in other TDOC institutions could benefit from programs of the type only available at DCI, but are unable to do so due to lack of space at the facility. Indeed, it is also clear that the mental health needs of inmates generally are quite extensive in comparison to the needs of the general free world population, and that conditions behind the walls either exacerbate or (in some cases) create serious mental health problems. As the only game in town, DCI, with its capacity of about 275, is clearly inadequate to provide the level of mental health care that would be necessary to fully treat all the psychiatric problems of more than 7,000 incarcerated individuals.[55]

### 3. Idleness

The evidence is clear and uncontradicted that idleness among DCI inmates is pervasive. There are no vocational programs, nor is there an industrial operation there. Virtually the only jobs for inmates at DCI are institutional support positions in food services, maintenance, supply, and custodial services. An additional 8–12 inmates are employed as counselors at the facility. The only educational programs currently operating at DCI are a GED course and a basic skills course which involve a total of 161 inmates. The defendants' psychological services expert, Dr. Lawrence Bennett, found that DCI patients spend over half their time idle, usually asleep. Clearly, extensive idleness is an accepted fact of life for most inmates assigned to DCI.

### 4. Medical Care

Health services at DCI are perhaps the most adequate of any within the TDOC system from the standpoint of the coverage and qualifications of the professional staff. The plaintiffs have suggested that DCI's advantage over other institutions is a result

---

**54.** According to Warden Love's deposition testimony, there are three psychological examiners at DCI. Apparently one of the former counselors, a Steve Chandler, has completed his master's degree and is now listed as a psychological examiner rather than a counselor. However, in the defendants' post trial brief, Mr. Chandler is described as a counselor who is "finishing" his work on the master's degree.

**55.** The separate question whether TDOC inmates are afforded minimally adequate mental health care from a constitutional perspective, will be addressed, *infra*.

of the facility having a warden who is trained as a health professional. Indeed, Warden Aileene Love is a master's level registered nurse. Nevertheless, it is still asserted that DCI's health services are beset by deficiencies of constitutional magnitude.

The DCI infirmary includes one treatment and examination room which doubles as an emergency room, one dental station and laboratory, a medical records room, an x-ray room, a combination darkroom and laboratory, a medication room, eight patient beds and a nurse's station. A recent renovation has also produced six private security patient rooms. While Mr. Kiel concluded that those six rooms are appropriate for observation, subject to some modifications for suicide-prone inmates, Dr. King concludes that the rooms were appropriate only for a punitive function and were little better than the "dungeon" cells of TSP hospital's West-100, see supra.[56]

The medical staff at DCI is generally sufficient to provide 24-hour care to inmates. The full-time staff includes an M.D., a PA who is a graduate of a foreign medical school awaiting state licensure, three RN's (an additional three RN positions were authorized but vacant at the time the present information was compiled), four LPN's (another two positions were vacant) and a medical records technician. Contract pharmacists' services are provided 18 hours per week; a dentist is on site 27 hours per week; and specialist services are available as needed at TSP hospital.

Two challenges have been raised to the adequacy of medical staff coverage at DCI. First, it is argued, and the defendants' own expert concedes, that more nurses are needed to permit nursing personnel to be as involved as they should be in the delivery of mental health services. As it is, the medical staff's role is essentially limited to the provision of primary health care. There is, by contrast, general agreement that more attention should be given to monitoring the

medical aspects of the delivery of mental health services. Secondly, the plaintiffs argue that chronic staff vacancies render what would be an adequate staff unable to fully provide even the necessary level of primary medical care, citing, for example, the facility's reliance upon an unqualified inmate to provide x-ray services and an occasional inability to provide nursing coverage on all three shifts.

Other alleged problems cited by the plaintiffs include what they have referred to as a "marked lack of emergency preparedness," lack of adequate coordination between medical and psychological services, evidenced by poor recordkeeping procedures and inadequate monitoring of patients receiving psychoactive medications at the direction of mental health staff.

In fact, emergency equipment and procedures at DCI are extensive, and the problems in that area identified by Dr. King and Mr. Kiel are relatively minor. Dr. King's opinion was based upon his discovery of expired medications in the emergency drug box he inspected, and an inference that the health staff lacked any procedure for regularly checking the box. Mr. Kiel noted that the facility needed two additional pieces of emergency equipment: A resuscitator and a crash cart. He also stated that some form of emergency equipment should be available in DCI's housing areas. No other issues have been raised with respect to emergency preparedness at DCI.

Dr. King's criticism of the lack of coordination between medical and psychological care at DCI arose from his observation that medical and psychological records at the facility are maintained separately, with no standard, organized procedure for integrating the medical information into the psychological file. This situation, in his opinion, is dangerous and may result in harmful side effects from mixing psychotropic drugs (often prescribed in the course of psychiatric treatment) with other medications prescribed for purely medical reasons. Thus,

---

**56.** The court does not find it necessary to resolve the issue of the appropriateness of the intended use of these rooms. Even assuming

that Dr. King is completely correct, the situation does not rise to constitutional dimensions. See § IV, infra.

the problem is acutely related to the additional criticism concerning inadequate monitoring of patients receiving those major psychotropic drugs. The court accepts Dr. King's comments as valid, but is convinced that the problem will be greatly reduced by the implementation of the new standardized "problem oriented" medical records system on which the defendants, under Mr. Brodie's guidance, are working.

### I. Nashville Regional Correctional Facility

#### 1. Housing

As noted in the section on classifications, NRCF, which serves as the central classification center for most new male TDOC inmates, is actually two facilities: NRCF proper, sometimes known as Cockrill Bend ("CB" will be used herein in order to keep the discussion of the facility clear and to distinguish throughout between that newer facility and the older Guild 17), and the building which formerly contained the Nashville Community Service Center, now known as "Guild 17."

The CB facility, which opened in 1979, is the prototype for the regional prisons in Morgan, Bledsoe and Lake Counties. *See infra.* CB consists of 16 separate housing units (guilds) containing 25 single occupancy cells (actually rooms with solid doors with windows for observation) of 77 square feet. Each guild apparently also has an additional room of 104 square feet that has been renovated to house two inmates. The CB rooms are air-conditioned and contain a sink and toilet as well as a bed and space for storage of personal items. Each room also has a window, allowing for some natural light during the daytime hours. Showers are located near the center of each guild, on either side of a glassed-in guard station. Open areas adjacent to the guard station are used for eating, visiting and recreational purposes. Shortly before the trial in this case, the 16 guilds at CB housed a total of 419 inmates.

The plaintiffs have complained about TDOC's plans to double cell some inmates at CB in the future (as well as the occasional double celling that has occurred in the past on a temporary basis), but have not raised any substantial issue concerning present overcrowding at the facility. Similarly, no complaints concerning environmental conditions at CB have been raised, with the sole exception of an alleged fire safety problem that results from the locking system in which cell doors must be unlocked individually in the event of an emergency.

Guild 17, by contrast, has been challenged as being presently overcrowded. That maximum security facility, which was originally constructed in 1910 and was the state's first women's prison, now houses 160 inmates in 80 cells, all of which were designed for single occupancy. Of those 80 cells, many of which have only cold water plumbing, 48 are 54 square feet, and the remaining 32 are 72 square feet in size. Commissioner Bradley has stated that he is perhaps more "uncomfortable" with double celling at Guild 17 than at any other TDOC facility (although he also believes that single celling would be preferable throughout the system).

Beyond this, however, the Guild 17 building is in such poor condition that it probably should not house any inmates at all. In a 1979 report by the American Institute of Criminal Justice, Guild 17 was criticized for its "ancient design, its antiquated locking devices, its deteriorated condition, its inadequate or nonexistent auxillary facilities including sanitary, recreation and visiting, and its submarginal security features." The report concluded that the facility had outlived its usefulness and should be closed. In the interim, it was recommended that a maximum of 50 inmates should be housed there. Indeed, TDOC's own recognition of the sorrowful conditions of Guild 17 is evident from their justification of the need for construction of a new reception center, contained in a capital budget request for fiscal year 1980–81:

> [Guild 17] was never designed for its present use and the years of deterioration are obvious in spite of cosmetic efforts to renovate the facility .... This building became obsolete as a prison for the women and when the new women's prison was completed in 1965, the old facility was

abandoned and stood vacant several years until Brushy Mountain Prison was closed due to an employee union strike.

The old women's prison was then reopened to house trustees and relieve some of the overcrowding. The trustees remained in the building until the decision was made to move the Classification Center from behind the walls at the Main Prison into the old women's prison.

This decision resulted in some electrical and plumbing renovations, however, little structural change has ever taken place.

. . . .

Obviously an antiquited facility originally built and designed to serve as a prison for women presents structural and programmatic limitations when pressed into service as an adult male offender, maximum security facility.

Yet even today, Guild 17 stands (albeit in a delapidated and crumbling fashion) to welcome new inmates into its antiquated and overcrowded confines. The sole redeeming feature of the facility is that most inmates remain there only a few days. For those who stay at Guild 17 throughout the classification process, however, their ultimate transfer to a time building institution must come as a welcome event.

### 2. Idleness

There are no work, vocational or educational programs at NRCF, and inmates are thus confined to their cells except when they are actually involved in the classification process. Warden Stevens' estimate is that NRCF inmates spend about 20 hours per day in their cells. According to Mr. Nagel, the adverse impact of forced idleness is magnified when the idle inmates are new arrivals who are institutionalized for the first time and are thus experiencing a variety of new fears and anxieties.

### 3. Violence

Reported violence at NRCF, although somewhat higher than at other regional prisons, is substantially lower than at the larger male facilities in the TDOC system. Disciplinary records for 1980 reveal 6 convictions for assault and 21 for fighting. In 1981, the pace had picked up a bit, with 5 assault convictions and 51 fighting convictions through the first 8 months. The figures do not distinguish incidents at Guild 17 from those at CB, and Warden Stephens believes that the kinds and level of violence at the two components are about the same.

Furthermore, although the warden acknowledges the existence of the inmate code at NRCF, he believes that its effect there is relatively weak. That is primarily because the prisoners are new arrivals in the system, who in the short time they are assigned to NRCF are not provided many opportunities to comingle, to congregate in large groups or to form cliques or gangs. The same factor, in the warden's view, helps to explain the relatively low level of violence generally. The court credits Warden Stephens' statements about the lower effectiveness of the inmate code and concludes that unreported violence, like that which is reported, is less at NRCF than at some of the other TDOC prisons.

No substantial evidence has been presented to indicate inadequate security coverage at NRCF. One incident report does reveal that a particular assault in 1980 at Guild 17 continued for over 30 minutes without the intervention or even the presence of a guard. However, that single isolated incident is not sufficient to establish whether or not security coverage at the facility is, as a routine matter, less than adequate.

As noted, *supra*, the defendants are unhappy with double celling at Guild 17 in particular, primarily because so little is known about the new arrivals' potential for violence. In light of the historical level of violence at the facility, however, double celling is not viewed as actually causing substantial violence at Guild 17.

### 4. Medical Care

As the primary intake and classification center for the TDOC system, the medical health care mission of NRCF is somewhat unique. The system must not only provide primary and emergency care for inmates at both CB and Guild 17, but in addition must perform the physical examinations and classification workups for newly arrived in-

mates who are processed through the facility. The NRCF medical staff, like the facility's administration, is unified to serve both CB and Guild 17.

The classification component of NRCF's health care mission is divided into two stages. Immediately upon an inmate's arrival at Guild 17, an initial "quick and dirty" health screening occurs. The purpose of this screening is to identify any acute medical or mental problems that require immediate attention or special provisions, e.g., isolation to prevent the spread of communicable disease. The plaintiffs have criticized the way in which the initial medical screening occurs primarily because of the lack of a systematic approach that would ensure consistent safeguards. After the trial in the instant action, however, a new policy went into effect which seems to address that concern.

The second stage of medical classification is considerably more thorough, involving the taking of a history, performance of a battery of medical tests, and a full examination. This more complete workup is accomplished by the end of each inmate's third week at NRCF, although it may occur sooner. In addition, a complete dental examination, including x-rays, is performed within two weeks of an inmate's arrival.

The defendants have admitted that, at least as of January 1978, the medical screening component of the classification process had at times failed to predict or underrated serious medical conditions. While Dr. King has discovered at least two more recent instances where the system similarly failed to effectively identify and treat serious conditions, he found that the process had "improved markedly" over the last few years and cited no particular deficiencies. Both Mr. Kiel and Mr. Brodie are satisfied that the intake medical examina-

tion process is functioning fairly well, and in view of the 350 plus inmates evaluated at NRCF each month, the court is inclined to agree.

Full-time medical personnel at NRCF include one physician, six RN's, two medical technicians, one LPN, one dentist and one dental hygienist. The plaintiffs have asserted that this staff is too small to meet the institution's medical needs. However, little evidence has been offered in support of that contention. In fact, it appears that there is 24-hour nursing coverage six days per week and two shifts of coverage on the remaining day, according to the uncontradicted witness statement of Mr. Kiel.[57] Thus, although additional medical staff would be a desirable and worthwhile addition, the court is unable to say that the present staff is insufficient to meet the minimum medical needs of NRCF inmates.

The plaintiffs' criticism of emergency facilities at NRCF centers primarily upon space and organization of supplies and equipment. Dr. King's opinion is that the emergency area is too small to allow adequate mobility in a situation where several people are required to provide emergency care to a sick or injured patient. However, he offered no indication of how often such a situation might arise, or of the seriousness of the consequences likely to flow from working in such cramped quarters. Dr. King also found that supplies and equipment were poorly organized and identified several outdated medications in supply. While Mr. Kiel agreed that the medical facility at Guild 17 was small and crowded, he found in general that the emergency facilities at NRCF were adequate and relatively well-equipped. For serious emergencies, local ambulance service is available with approximately a ten-minute response time, and both the TSP hospital and Nash-

---

**57.** The plaintiffs have cited the NRCF Health Services Evaluation (Doc. # 1348) in support of their assertion that 24-hour nursing coverage is not available at the institution. However, the indication therein is not necessarily inconsistent with Mr. Kiel's observation: Technically, the lack of full coverage one day per week would have rendered improper a positive re-

sponse to the evaluation's questions about whether 24-hour coverage was provided. The court credits and adopts the more specific and detailed testimony of Mr. Kiel as to the nursing coverage actually provided at NRCF, and notes with interest that the plaintiffs did not even attempt to attack the statement directly in Mr. Kiel's deposition.

ville General Hospital are readily available. In light of the almost complete 24-hour nursing coverage, the fact that guards are not trained in first aid or CPR takes on greatly reduced significance.

Because of its use as a classification center and the concomitant need to fully evaluate new inmates during the classification process, NRCF has more extensive psychological services personnel than most other TDOC institutions. Primary reliance is upon four teams, each of which consists of a licensed psychological examiner and a bachelor's degree level counselor. In addition, the facility employs two testing diagnosticians who administer the various classification tests that the psychological examiners subsequently interpret. Finally NRCF receives four to five hours per week of contract services by a psychiatrist. Although the psychological services staff at NRCF is primarily involved in the classification process, they appear sufficient in number and ability to adequately respond to the crisis needs of inmates and to recommend appropriate mental health treatment when necessary.

The plaintiffs have pointed to two inmate suicides at NRCF since early 1980 as an indication that the level of mental health services there is inadequate to meet needs. However, those incidents at most reflect isolated failures of the system, and not inherent shortcomings. Indeed, in view of the one or two interventions for suicide or emotional problems that Warden Stevens testified occur monthly at NRCF, the success of two suicidal inmates in two years, although tragic, is not astounding. Despite those incidents, NRCF has adequate procedures and facilities for suicide watch, including a glassed-in observation room and intervention by the contract psychiatrist to determine the proper level of care.

*J. The Regional Prisons: Bledsoe, Morgan and Lake Counties*

*1. Housing*

The designs of BCRCF, MCRCF and LCRCF are virtually identical to the CB facility discussed, *supra*. They will be discussed together here, with relevant distinctions noted as necessary. The physical plants consist of 16 detached individual guilds, arranged in basically a circular pattern, each of which contains 25 individual rooms designed to accommodate one prisoner each. As at CB, the rooms are 77 square feet with solid doors. Dayrooms located on either side of the control room at the center of each guild are shared by the inmates in the 12 or 13 rooms on the same side of the guild. All three facilities are classified as medium security.

Most of the rooms at these three regional facilities were still single occupancy at the time of the instant trial. However, some double celling was already occurring, with the result that each regional prison housed more than the 400 inmates for which each was designed. At BCRCF, the population was 482; at MCRCF, the count was 481; and at LCRCF there were 435 inmates. The increases were being absorbed through the conversion of clinic areas, security offices and guild kitchens to housing space, in addition to some double celling in the guild cells. Every indication is that double celling at the regional prisons will continue to increase as the total TDOC population continues to boom.

*2. Environmental Conditions*

Few issues have been raised concerning environmental conditions at the regional prisons. In general, it is clear that these modern facilities are in good condition and do not present many of the environmental or sanitation problems associated with the older TDOC institutions. There is evidence that substantial increases in the populations of the prisons may tax the existing facilities, especially the sewage treatment facilities at BCRCF and MCRCF.

In addition, a series of monthly inspection reports at MCRCF reveal substandard conditions in the facility's food storage areas, including insect and rodent infestation and generally poor sanitation. Finally, the plaintiffs have criticized the regional prisons' preparedness for a fire emergency situation, specifically noting that, like other TDOC institutions, the regional guilds have

individually locking cell doors that would slow down any emergency evacuation.

### 3. Idleness and Violence

The plaintiffs have admitted that the incidence of violence at the regional prisons has been lower than at most other TDOC institutions, but argue that the growing populations, combined with inadequate program activities and inadequate guard coverage will result in a progressively more violent atmosphere at the facilities. Although as explained, *infra,* this court cannot be presently concerned with speculation about future possibilities, the allegations nonetheless compel at least a brief examination of presently existing levels of idleness, security coverage and violence at the three regional prisons.

At present population levels, idleness does not seem to be a serious problem at either BCRCF or MCRCF. For example, of the total number of inmates incarcerated at BCRCF in the summer of 1981, only 35 to 40 were unemployed. Most of the rest were apparently engaged in vocational or educational programs. There is an industrial operation in the form of a sawmill at BCRCF. At MCRCF, at the time of Dr. Fogel's inspection, he found that except for 59 inmates on special status, the entire population had some kind of assignments although a substantial number of those were only kept busy for part of the day.

Idleness is more pervasive at LCRCF. The defendants have admitted that because of the facility's remote location, employment opportunities for inmates are scarce.[58] There are some academic and vocational programs at LCRCF, and at the time of discovery in this case, 118 inmates were involved in academic programs and 96 inmates were participating in vocational courses.

Undisputed is the fact that any substantial increases in the populations of the regional prisons will severely tax the ability of the facilities to provide meaningful activity for inmates assigned there.

Mr. Fogel, as a result of his inspection of MCRCF (the only one of the regional facilities inspected by an expert witness for the plaintiffs), concluded that existing security coverage was inadequate to protect inmates for violence. He noted that there were not enough guards to furnish even one person per shift in each guild. Mr. Fogel reported that he was informed by the prison's associate warden that the "coverage is not what the Department or we feel is minimum safe coverage." That coverage, for all 16 guilds, consisted of 9 guards on the 6:00 a.m. to 2:00 p.m. shift; 12 guards from 2:00 p.m. until 10:00 p.m.; and 8 guards from 10:00 p.m. until 6:00 a.m.

All things considered, Mr. Fogel concluded that MCRCF was among the best prisons he had seen, but he expressed a concern that if as many as 800 men came to be housed there, "it will become one of the more dangerous places to work and live in." Nevertheless, as previously noted, MCRCF, as well as BCRCF and LCRCF have thus far been among the least violent of TDOC's adult institutions.

### 5. MCRCF Health Care

MCRCF, a facility which opened in 1980, contains a small clinic with a two-table examination room, a dental room, a room with a bed for short-term use, offices and a storage room. The clinic is staffed by two RN's and three MT's (two of whom are licensed LPN's). There is no physician or dentist on staff, those services being provided on a contract basis a few hours per week. There is no mid-level health practitioner either on staff or under contract.

Sick call is conducted daily by one of the nurses, who makes the initial diagnosis and decides whether to provide the needed treatment or refer the inmate to the contract physician. Inmates placed on the list to see the doctor are then faced with a two-to-seven-day wait. None of the nursing staff has received special training in the

---

**58.** As a result, the defendants have moved about 150 aged or infirm inmates who do not require employment to LCRCF. The plaintiffs have also challenged the wisdom of that move, in light of the facility's location and lack of extensive medical treatment capabilities. *See generally,* LCRCF health care discussion, *supra.*

diagnostic procedures that would be possessed by a mid-level practitioner, such as a physician's assistant. While the nurses are partially guided in this phase of their work by written protocols and policies, those are incomplete at the present time.

Similarly, none of the health care staff has any documented emergency care skills. Nevertheless, it is the nurses who make initial assessments in emergency situations, by telephone if no nurse is on site. Outside ambulance service is available with approximately a three-minute response time. A CPR-trained person is on site at all times.

Mental health services are provided by a psychological examiner who spends three days per week at MCRCF and two days per week at BMP, and by a staff of eight counselors, each of whom has an average load of 66 cases.

### 6. BCRCF Health Care

BCRCF, which opened in late 1979, contains a small infirmary very similar to the NRCF infirmary. The outpatient treatment area consists of a two-table examination room, which doubles as an emergency room, a dental office, a pharmacy, a medication room and a medical records office. There is no inpatient care provided and no beds for inpatient treatment or observation.

Full-time medical staff consists of a hospital superintendent licensed as an MT, two MT's who are licensed LPN's, and a licensed medical records technician. Physician services are furnished on contract four hours per week. An opthalmologist is under contract for eight hours service every three months, and additional specialists are available pursuant to contracts "as needed."

As at MCRCF, sick call and the attendant initial diagnosis is in the hands of the full-time staff. At BCRCF, however, the highest level of licensure on that staff is an LPN. Thus the problems of diagnosis and treatment beyond the skill level of the providers is apparently worsened at BCRCF. And again, access to physician care by persons determined by a nurse or MT to need such care may be delayed for up to a week.

Also like the situation at MCRCF, none of the staff at BCRCF has any special emergency skills, and they are apparently unqualified to properly and safely use much of the emergency equipment that is available on site. For example, the facility is equipped with two defibrillators, a sophisticated piece of emergency equipment which is characterized by Mr. Kiel (the defense expert) as a dangerous piece of equipment that ought only be used under the supervision of a physician, or at least a certified EMT. Ambulance service is shared with the Taft Youth Center, a facility about one and a half miles away. BCRCF does provide first aid training to security personnel and maintains a CPR-trained person on site at all times.

Such mental health services as there are at BCRCF are provided by a staff of eight counselors. One of those has a master's degree, and the rest have bachelor's degrees. There is no current contract for the provision of outside psychiatric services. Instead, officials rely upon transfer to DCI of inmates identified by counselors as needing acute psychological care.

### 7. LCRCF Health Care

The health service facility at LCRCF is similar to the facilities at the other regional prisons. It consists of a clinic with an examination/treatment room which doubles as an emergency room, a dental office with a small laboratory, a records room, a small laboratory, a medication room and an observation room. The facility is relatively well-equipped and indeed the adequacy of equipment is not in issue here.

Full-time medical staff at LCRCF includes five RN's with an additional RN position authorized but vacant at the time the present information was compiled, and a typist. At least one nurse is on site daily from 6:00 a.m. until 10:00 p.m., with a nurse on call for the remaining hours. The facility is served by a contract physician eight to ten hours per week. A dentist is available on site for a like amount of time, and contract optical services are provided three hours per week.

Sick call at LCRCF is held twice a day, seven days a week. Inmates requesting sick call sign a sheet in their guild and are then escorted to the clinic by an officer. At the clinic, the inmates are then examined by a staff nurse, who determines which inmate needs to be seen by a physician. Inmates in segregation units must request medical treatment through a guild officer, following which a nurse will visit the inmate in the unit.

Emergency procedures when no nurse is on duty at LCRCF involve contacting the nurse on call for appropriate instructions, or in life threatening emergencies, the shift lieutenant is authorized to transfer the inmate to the Union City Emergency Room prior to notification of the on-call nurse. Local ambulance service is available, but because of LCRCF's remote location, response time is approximately 35 minutes. The facility apparently has contingency plans for emergency transportation by TDOC vehicle, with an RN on board for assistance. Having begun operations in 1981, LCRCF has not, so far as the record reveals, yet had an emergency situation requiring transfer.

All LCRCF nurses are required to undergo CPR training once a year. CPR-trained personnel are on duty the first and second shifts each day. While security staff are not currently required to undergo CPR or first aid training, a first aid course is available to them and one guard who is a certified CPR instructor is apparently planning to provide training to other staff members.

LCRCF employs one full-time psychological examiner who is apparently the sole individual at the institution who is actively engaged in mental health related treatment. The facility also has access to Northwest Tennessee Mental Health Center for contract services, and, like other prisons, can transfer inmates to DCI for acute psychological care.

*K. Nashville Community Service Center*

The institution now known as NCSC was, prior to July 1, 1981, administratively a part of TSP, housing minimum security prisoners and then known as the Correctional Rehabilitation Center (CRC). It now houses, in addition to these minimum security prisoners, inmates assigned to the Nashville Work Release Center. As of October 1, 1981, NCSC housed 385 inmates, all of whom apparently are either classified as minimum direct or minimum trusty.

As noted in the capital budget request for fiscal year 1980–81, the NCSC main "building is over 30 years old and the plumbing and electrical work is dangerously outdated. There is [sic] not adequate shower and bathroom facilities. The ... building is not suited in some areas for human habitation under Federal and State laws." Some recent modifications have increased the square footage of housing space, through the conversion of staff housing to inmate quarters, and the addition of three new trailers for additional inmate housing. As a result, the "designated capacity" of the facility has risen from 300 to 405. However, it is clear that previous deficiencies in NCSC's main building, which contains about 172 inmates in three open dormitories, have gone uncorrected, and that conditions in that building remain substandard and deplorable.

The vast majority of evidence regarding NCSC was presented through the deposition testimony of plaintiff Norman Quincy Wright, who is incarcerated at the facility. Mr. Wright is personally familiar with living conditions in all three of the dormitories of NCSC's main building, having lived in each over the last several months. The court finds that Mr. Wright's testimony, which has not been substantially rebutted, and which was not seriously attacked during his cross-examination by counsel for the defendants, is both competent and credible.

Each of the dormitories in the NCSC main building contains rows of double bunks arranged perpendicular to the walls, with three to six feet between adjacent bunks. The sizes of these dormitories differ. The left wing is 3,024 square feet and houses 64 inmates, thus providing 47.25 square feet per inmate. The center wing houses about 50 inmates in a total of 2,040 square feet, giving 40.8 square feet per

prisoner. The right wing dormitory is 2,260 square feet and contains 58 inmates, thus giving each prisoner just under 39 square feet of space. These measurements include walkways, which may not be used either for storage of inmates' personal items or for exercise or recreation. Effective living space is therefore less than the figures given above and in the most spacious left wing is actually about 26.5 square feet per inmate.

Toilet and shower facilities in the dormitories are shared areas and are in a state of total disrepair. Overflowing sewage constantly covers the left wing bathroom floor, and of six commodes, two are usually inoperative. That bathroom also includes a urinal, but it, too, is frequently stopped up and subject to overflowing. The left wing's shower area contains a total of 12 shower heads, although they are so close together that only eight inmates can comfortably shower at the same time. The floor in the shower area remains dirty the majority of the time, and Mr. Wright testified to having developed athlete's foot for the first time in his life as a result of using the facility.

The center and right wings share toilet and shower facilities. As in the other bathroom, two of the five commodes are frequently inoperative. Mr. Wright has observed sewage overflowing from an open pipe in that bathroom "on numerous occasions." On one such occasion, the sewage "came out with the force of a hose pipe . . ., smelled terrible . . . [and] appeared to have fecal [matter] in it and toilet paper." Furthermore, the drain in the bathroom's floor apparently remains stopped up, with the result that the floor is frequently covered with water and sewage. Also like in the left wing, the urinal is frequently stopped up and at times overflows urine onto the bathroom floor. The resulting smell is "rancid," even as far away as the last bunk on the unit, where Mr. Wright was housed for a time. The shower facilities for the right and center wings had been closed because of their state of disrepair for most of the 10 months preceding Mr. Wright's deposition. Thus the inmates in those wings have been forced to share the shower on the left wing for most of the recent past.

Mr. Wright also testified that overflowing sewage from pipes in the left wing bathroom had leaked into the clothing room where he is employed, and that he had to walk through raw sewage in the work area for some six consecutive weeks. He also recalled an incident in the summer of 1981 when sewage overflowed and covered a large area behind the facility's loading dock, which, in spite of a very bad odor, was never cleaned up.

There is no ventilation system in either the right or center wings of the main NCSC building. Those windows that will open are largely without screens, thus presenting inmates with a Hobson's choice of suffering in stifling heat or encountering an insect infestation. TDOC officials have acknowledged that the

> temperature in any given [NCSC] dorm frequently exceeds 95°. At this temperature level it is impossible to get proper rest and without proper rest, residents' interest and motivation to do a good job in this work release placement suffers [sic]. Additionally, inmate irritability as well as disciplinary problems have a tendency to increase with temperature.

Mr. Wright additionally testified to fire safety hazards in the form of numerous exposed electrical wires in the NCSC housing units, as well as gas-fired heaters (located near some upper bunks) which he has observed shooting fire when automatically ignited by thermostatic control. (With respect to the latter, Wright also noted the extreme discomfort that accompanies a bunk location near one of those heaters.)

NCSC dormitories suffer, in addition to the insects that are prevalent in the summertime, from infestations of roaches and mice.

Finally, Mr. Wright testified as to several irregularities in food sanitation and storage at NCSC. These include one incident when raw pork (pig halves) was left uncovered on the loading dock from 7:00 a.m. until 3:00 p.m. on a summer day, and another instance

when boxed chickens and livers were stored in an unrefrigerated area. Blood from those boxes was leaking through the floor into the basement.

The court is convinced that conditions at NCSC's main housing unit are deplorable and that the area is unfit for human habitation. Affidavits submitted by the defendants to the effect that major repairs at the facility are in progress are insufficient to convince the court that the facility has yet been brought into habitable condition.

No issues have been raised concerning other living units at NCSC. Neither have issues been raised concerning idleness, violence or the level of health services at this facility.

*L. Impact*

The conditions complained of in this action and described, *supra,* are, as can be seen, divergent and in many respects, quite specific. They are also intimately interrelated. For example, the evidence is consistent and clear that the level of violence at a given prison is, to some extent at least, related to both the institution's population and to level of inmate idleness, among other factors. Similarly, whether a particular facility is "overcrowded" or not must be determined by reference to both the physical size of the housing facilities, and to the level of programming and support services available. Indeed, to view individual conditions in total isolation would be rather like the paradigm example of the old expression that one "can't see the forest for the trees." Prisoners, after all, are not subject to each challenged condition, one at a time, in turn. Rather, the inmates endure all of the conditions 24 hours per day, seven days per week, for the duration of their confinement.

The single factor that impacts consistently across the board upon every other challenged condition in this case is overcrowding. It is axiomatic that support services and programs are stretched to the limit when an institution's population exceeds the number of persons for which it was designed.[59] The adequacy not only of space, but of plumbing, bathing, toilet, and recreational facilities, as well as jobs and training opportunities, security coverage, and health services are all directly related to the number of persons incarcerated. As a general rule, to the extent that population increases, the adequacy of those and other particulars of the prison universe decreases.

Actual and potential adverse effects of certain specific conditions shown to exist are obvious, and some instances have already been stated. For example, plumbing defects that can or do result in sewage leaks or contamination of the drinking water supply pose obvious health risks, in addition to creating a noxious odor. Similarly, poor sanitation practices and the existence of disease-carrying vermin in both housing and food service areas are also a serious threat to health. Violations of electrical codes of the type found in several institutions, including exposed wiring and makeshift connections, present a risk of fire as well as injury or even death from electrical shock. The dangers inherent in incarceration in a facility where violent attacks are commonplace are both too obvious to detail and graphically illustrated by numerous items of evidence, including, *inter alia,* inmate testimony and the TSP emergency room logs. To the extent that overcrowding contributes to or exacerbates any of these other problems (and it clearly does), it likewise contributes to or exacerbates the specific risks of physical harm.

Evidence in the record, however, also establishes other definite and serious risks that are attributable directly to severe overcrowding. According to Mr. Hoover's uncontradicted statement, overcrowding in penal institutions can lead to depression and

---

59. Indeed, the defendants have admitted that some TDOC prisons are overcrowded from a programmatic standpoint, but assert that the lack of meaningful jobs and other programs simply does not raise any constitutional issues. Taken alone, the court agrees. *See infra.* Nevertheless, the absence of programs and the resulting level of idleness do contribute to violence among inmates, and not coincidentally, both idleness and violence tend to increase with population. Because of that connection, the court considers the level of idleness to be a relevant factor in assessing the constitutionality of conditions in TDOC institutions.

stress; increased disciplinary problems; increased suicide rates; increased death rates; increased psychiatric commitment rates; increased hypertension rates and attendant cardiovascular damage; and increased incidence of illnesses. Mr. Hoover supported this conclusion by citations in his report to studies conducted by the American Medical Association and the U.S. Army Epidemiological Board as well as a paper entitled *Health and High Density Confinement in Jails and Prisons,* by Bailus Walker, Jr., Ph.D., M.P.H., and Theodore Gordon.

Mr. Hoover's opinion regarding the increased health risks caused by overcrowding is also adequately supported by other evidence in the record. The outbreaks of hepatitis at TSP and FP, *supra,* were found by both federal and state epidemiologists to have been primarily caused by overcrowding. The doctor in charge of the TSP hospital, Dr. Paul Frishkorn, has also acknowledged the role of overcrowding in increasing the danger of hepatitis, a life-threatening disease that in the last few years has led to at least one death in the TDOC system. The plaintiffs' medical expert, Dr. Lambert King, stated his belief that the epidemiologists' findings were valid and that overcrowding also exacerbates chronic disease conditions and has a deleterious impact on the health of prisoners.

The defendants' psychological expert, Dr. Lawrence Bennett, concurred in Mr. Hoover's opinion that overcrowding can lead to increased psychological problems for inmates. Dr. Bennett testified that overcrowding exacerbates existing psychological problems and anxiety, thus increasing the tensions among inmates and leading to more serious psychological problems. TDOC's Deputy Commissioner Robert Morford agreed that overcrowding tends to lead to more violence and cited overcrowded conditions as the principal cause of a 1975 riot at TSP. Other TDOC officials concur in the connection between overcrowding and increased levels of violence.

This court is thus firmly convinced of several factors in regard to the conditions currently under review. First, each condi-tion must be evaluated in light of other, related conditions of confinement. Second, overcrowding is a problem that, to the extent it exists at all, negatively affects every other challenged condition, and is in that sense the single most serious and most pervasive condition about which the plaintiffs complain. Finally, overcrowding in itself leads to results that are harmful to inmates both physically and psychologically, and those harmful effects in a great many cases result in the infliction of both physical and mental suffering. The discussion will now turn to applicable legal standards, upon which the constitutionality of overcrowding and the other challenged conditions must stand or fall.

## IV. THE LEGAL STANDARDS: ANALYSIS AND CONCLUSIONS

### A. Jurisdiction

Subject matter jurisdiction over the claims arising under the United States Constitution and filed pursuant to 42 U.S.C. § 1983 is conferred by 28 U.S.C. § 1343(a)(3) and (4). Claims arising under the Tennessee Constitution and statutes are cognizable under the doctrine of pendent jurisdiction, in accordance with the principles laid down in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### B. The Eighth Amendment

The Eighth Amendment to the United States Constitution, insofar as is relevant here, prohibits the imposition of "cruel and unusual punishment." Originally applicable only to the federal government, the provision now clearly applies to the states by virtue of incorporation into the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). *Cf. Pervear v. Massachusetts,* 72 U.S. (5 Wall.) 475, 18 L.Ed. 608 (1867). The intent of the amendment's framers is uniformly accepted as being the prohibition of tortuous and physically barbaric punishments such as drawing and quartering, di-

semboweling and burning at the stake.[60] However, from the first Supreme Court case to actually construe the Eighth Amendment's language, the principle that its protection must always be examined in light of developing thought has been consistently applied. *See Wilkerson v. Utah,* 99 U.S. (9 Otto) 130, 135–36, 25 L.Ed. 345, 347–48 (1879).[61]

Over the years, the meaning of the ban on cruel and unusual punishment has been expanded to encompass more than the mere prohibition of torture. Punishments have been found to violate the Eighth Amendment even in the absence of the infliction of physical pain, if they were unconscionably excessive in relation to the offense committed. *See, e.g., Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion) (denationalization as punishment for wartime desertion). The cruel and unusual punishments clause has also been used to limit the conduct which a state may criminalize, and thus to prohibit any punishment at all for the mere status of narcotics addiction. *Robinson v. California, supra.*

The Supreme Court first examined Eighth Amendment limitations upon the states' treatment of incarcerated offenders in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

In that case the Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Id.,* 429 U.S. at 104, 97 S.Ct. at 291, 50 L.Ed.2d at 260 (citation omitted). In arriving at that conclusion, the Court noted:

[T]he Amendment proscribes more than physically barbarous punishments . . . . The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . ." against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain."

*Id.,* 429 U.S. at 102–03, 97 S.Ct. at 290, 50 L.Ed. at 259 (citations omitted). That language represents perhaps the highest standard ever articulated by the Supreme Court for evaluating claims of cruel and unusual punishment.

The first and only case in which the Supreme Court has decided an Eighth Amendment challenge to conditions of confinement in a penal institution was *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Therein, the Court reiterated most of the passage quoted from *Estelle, supra,* and then continued:

Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification."

No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." The Court has held, however, that "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges.

---

**60.** One commentator has persuasively posited the proposition that the framers' intent was based upon a misunderstanding of the meaning of the provision in the English Bill of Rights of 1689, from which the Eighth Amendment was adopted verbatim. Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif.L.Rev. 839 (1969). Nevertheless, that the prevention of torture and barbarous methods of punishment was the *raison d'etre* of the amendment's enactment is well established. *See Furman v. Georgia,* 408 U.S. 238, 319–22, 92 S.Ct. 2726, 2767–68, 33 L.Ed.2d 346, 395–97 (1972) (Marshall, J., concurring).

**61.** *See also, Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59, 68 (1981) (*quoting with approval Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1957) (plurality opinion)). *Cf. Weems v. United States,* 217 U.S. 349, 389–413, 30 S.Ct. 544, 558–67, 54 L.Ed. 793, 805–17 (1910) (White and Holmes, JJ., dissenting) and *McGautha v. California,* 402 U.S. 183, 225, 91 S.Ct. 1454, 1476, 28 L.Ed.2d 711, 737 (1971) (Black, J., concurring in the judgment).

To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. But such " 'judgment[s] should be informed by objective factors to the maximum extent possible.' "

. . . .

These principles apply when the conditions of confinement compose the punishment at issue.... In *Estelle v. Gamble,* supra, we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and even in less serious cases, it can result in pain without any penological purpose. In *Hutto [v. Finney],* supra, the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble.* But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Id.,* 452 U.S. at 346–47, 101 S.Ct. at 2398–99, 69 L.Ed.2d at 68–69 (citations omitted).

In *Rhodes,* the Supreme Court faced an extremely narrow issue and held simply that double celling of inmates at a particular Ohio prison was not, without more, unconstitutional. The district court in that case, after extensive findings that the relatively new prison was well-equipped, and "unquestionably a top-flight, first-class facility," [62] nevertheless ruled that long-term

double celling that had resulted in a prison population 38% greater than the facility's design capacity, amounted to cruel and unusual punishment. The cells at the prison were approximately 63 square feet, and although originally designed for one person, were each equipped with cabinets, shelves, a built-in wall radio, a toilet, sink, and two beds. The inmates all had access to dayroom space from 6:30 a.m. to 9:30 p.m. each day. Other conditions discussed by the district court produced findings that were generally favorable to the defendant state officials. *See id.,* 452 U.S. at 340–43, 101 S.Ct. at 2395–97, 69 L.Ed.2d at 65–67. In view of the favorable findings, the Court held that the conclusion that double celling at the facility constituted cruel and unusual punishment was wholly insupportable. *Id.,* 452 U.S. at 348, 101 S.Ct. at 2400, 69 L.Ed.2d at 69.

■ This court agrees with Justice Brennan in his concurring opinion that the *Rhodes* majority adopted the so-called "totality of the conditions" test. *See id.,* 452 U.S., n. 10 at 363, 101 S.Ct., n. 10 at 2407, 69 L.Ed.2d, n. 10 at 79 (Brennan, J., concurring). *See also, Ruiz v. Estelle,* 679 F.2d 1115, 1139 (5th Cir.1982). Under that test, various conditions, either "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities." 452 U.S. at 347, 101 S.Ct. at 2399, 69 L.Ed.2d at 69. Since the proper application of the totality test has produced some apparent confusion and debate, this court will make an effort to clarify the precise use to which the test may be properly put.[63]

■ While the totality test does require courts to consider challenged conditions in the context of the entire prison environment, and to pay particular attention to conditions that are closely related, it cannot be used to expand substantively the scope of Eighth Amendment protections.

---

**62.** *Chapman v. Rhodes,* 434 F.Supp. 1007 (S.D. Ohio 1977).

**63.** Defendants would have the court reject the use of the totality test altogether, a result which is unsupported and overreactive. Prop-

erly used, the totality test will not produce results substantially different from the standard urged by the defendants when they admit that particular conditions cannot be viewed in a vacuum.

That is, absent a finding of some specific constitutional violation, a court may not rest upon a "vague conclusion" that the total prison environment is unconstitutionally oppressive. *Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir.1982). The principal focus must remain upon specific conditions. *Id.* Likewise, the totality test cannot be used to justify a remedy that is broader than necessary to correct the specific constitutional deficiencies found. *Wright v. Rushen,* 642 F.2d 1129, 1133 (9th Cir.1981).

 Thus, the court believes that through the proper use of the totality of the conditions test, conditions which standing alone would not be cruel and unusual, might become so when viewed in the context of the total prison environment. But, unless there are conditions that, considered either alone or in combination, specifically amount to cruel and unusual punishment, there can be no Eighth Amendment violation. Likewise, the mere fact that conditions are interrelated does not justify a remedy that is more intrusive than necessary to correct the constitutional wrong. Such is the case even if the court is convinced that certain conditions, while not themselves unconstitutional, are either harsh, oppressive, or contrary to sound penological practices. *See Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399, 69 L.Ed.2d at 69.

As important as what the Supreme Court decided in *Rhodes* is what it did not decide. The Court did not rule that double celling may never amount to cruel and unusual punishment. Rather, the extensive analysis of related prison conditions makes it crystal clear that each case must be judged on its own unique facts. Furthermore, the Court did not purport to define what conditions of confinement, "other than those in *Gamble* and *Hutto,*" *id.,* may constitute cruel and

unusual punishment. That question, however, has been addressed in numerous lower court decisions. To the extent that those cases are not inconsistent with *Rhodes,* they retain their vitality and will be looked to for guidance in the present case.[64]

 The Eighth Amendment clearly requires states to furnish its inmates with "reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety."[65] *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977). Those areas are generally considered as the "core" areas entitled to Eighth Amendment protections. They are the basic necessities of civilized life, and are, during lawful incarceration for conviction of a crime, wholly controlled by prison officials. Inmates must necessarily rely upon prison officials and staff to ensure that those basic necessities are met.

 A corollary to the state's obligation to provide inmates with constitutionally adequate shelter is the requirement of minimally adequate living space that includes "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing)." *Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Other courts have held that adequate shelter must include adequate provisions for fire safety. *Leeds v. Watson,* 630 F.2d 674, 675–76 (9th Cir.1980); *Ruiz v. Estelle,* 503 F.Supp. 1265, 1383 (S.D.Tex.1980), *aff'd in part, rev'd in part and remanded,* 679 F.2d 1115 (1982);[66] *Gates v. Collier,* 349 F.Supp. 881, 888 (N.D.Miss.1972), *aff'd,* 501 F.2d 1291 (5th Cir.1974).

 On the other hand, constitutionally adequate housing is not denied simply by uncomfortable temperatures inside cells, unless it is shown that the situation endan-

---

**64.** The Sixth Circuit has not yet rendered a controlling decision on most of the issues presently in dispute, and the court must therefore look to cases from other circuits.

**65.** Except for sanitation in food storage and preparation, the adequacy of food in TDOC prisons is not challenged, similarly there is no

complaint concerning the adequacy of clothing that the inmates are provided.

**66.** The constitutional requirement of adequate fire safety provisions was affirmed, but the district court's conclusions that fire safety was constitutionally inadequate was reversed. 679 F.2d at 1152–53.

gers inmates' health. *Smith v. Sullivan,* 553 F.2d 373, 381 (5th Cir.1977). Similarly, high levels of noise are not, without more, violations of the Eighth Amendment. *Hutchings v. Corum,* 501 F.Supp. 1276, 1293 (W.D.Mo.1980). As noted by the Supreme Court in *Rhodes,* the Constitution simply does not require complete comfort and does not prohibit double celling *per se.* 452 U.S. at 349, 101 S.Ct. at 2400, 69 L.Ed.2d at 70.

The Eighth Amendment, as noted, does require the maintenance of reasonably sanitary conditions in prisons, especially in the housing and food preparation and service areas. *Ramos, supra,* 639 F.2d at 569–72. In general, conditions must be sanitary enough so that inmates are not exposed to an unreasonable risk of disease. *Id.; Lightfoot v. Walker,* 486 F.Supp. 504, 524 (E.D.Wis.1980). Inmates must be furnished with materials to keep their cells clean, *Ramos,* 639 F.2d at 570, and for the maintenance of personal hygiene. *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 860 n. 11 (4th Cir.1975).

As noted, *supra,* medical care must be reasonably sufficient to prevent needless human suffering, and prison officials may not exhibit "deliberate indifference to serious medical needs of prisoners," *Estelle, supra,* 429 U.S. at 104, 97 S.Ct. at 291, 50 L.Ed.2d at 260. When, as here, the entire system of health care delivery is challenged,

> deliberate indifference to inmates' health needs may be shown by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff . . . or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.

*Ramos, supra,* at 575. Stated otherwise, the health care system is constitutionally inadequate if staffing, equipment or facilities "are so wholly inadequate that suffering would be inevitable." *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir.1974). *See also, Laaman v. Helgemoe,* 437 F.Supp. 269, 312 (D.N.H.1977).

The requirement that the state furnish health care includes necessary dental services. *Clifton v. Robinson,* 500 F.Supp. 30, 35 (E.D.Pa.1980). In addition, inmates must be provided with medically necessary mental health treatment. *Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir.1981); *Ramos, supra,* at 578. *Bowring v. Godwin,* 551 F.2d 44 (4th Cir.1977).

On the other hand, the Eighth Amendment does not require that the medical care provided be the very best available, nor does it protect inmates from isolated instances of improper diagnosis or treatment. *Estelle, supra,* 429 U.S. at 106, 97 S.Ct. at 292, 50 L.Ed.2d at 261. In the absence of deliberate indifference to serious medical needs, there is no constitutional infirmity. *Id.; Westlake v. Lucas,* 537 F.2d 857 (6th Cir.1976).

In the area of personal safety, inmates are entitled to be reasonably "protected from the constant threat of violence and . . . sexual assault." *Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981), *cert. dismissed, sub nom. Ledbetter v. Jones,* 453 U.S. 950, 69 L.Ed.2d 1033, 102 S.Ct. 27 (1981); *Ramos, supra,* at 572; *Woodhous v. Virginia,* 487 F.2d 889 (4th Cir.1973). However, states are not required to keep inmates completely free from violence, but just to furnish a reasonably safe environment. *Stickney v. List,* 519 F.Supp. 617, 620 (D.Nev.1981). Thus, the Eighth Amendment is not violated by an occasional, isolated violent incident, but by "confinement in an institution where violence and terror reign." *Woodhous, supra,* at 890.

The Eighth Amendment does not entitle a prisoner to rehabilitation. *Hutto v. Finney, supra,* 437 U.S. at 686, n. 8, 98 S.Ct. at 2571, n. 8, 57 L.Ed.2d at 531, n. 8. Thus the mere failure of prison officials to provide rehabilitative programs is not, by itself, unconstitutional. *Bono v. Saxbe,* 620 F.2d 609, 615 (7th Cir.1981). However, at least one circuit has held that there is a constitutional right "to be confined in an

environment which does not result in ... degeneration or ... [threaten the inmates'] mental and physical well being." *Ramos, supra,* at 566, *quoting Battle v. Anderson,* 564 F.2d 388, 403 (10th Cir.1977). Other cases have rejected that argument. *Newman, supra,* at 291; *Reddin v. Israel,* 561 F.2d 715, 718 (7th Cir.1977).

 This court is convinced that the Constitution protects only against physical or mental deterioration that is so severe that it amounts to unnecessary pain or suffering. Thus, the mere fact that inmates may tend to degenerate as a result of incarceration is not actionable. On the other hand, if conditions are so bad that serious physical or psychological deterioration is inevitable, then the result is cruel and unusual punishment.[67] As a practical matter, it is difficult to envision what conditions might lead to such severe deterioration without also implicating one or more of the recognized core areas of Eighth Amendment protection. Certainly the mere lack of rehabilitative programs does not lead to such a violation.

 Likewise, except to the extent that some independently protected right is implicated, inmates have no constitutional claim to any particular security classification, housing or job assignments. *Jones v. Diamond, supra,* at 1015. Rather, the classification system is a matter ordinarily left to the expertise and discretion of prison administrators. *Id.; Newman, supra* at 287. Nevertheless, if the proof shows a sufficient connection between an improper classification system and a protected constitutional right, such as the right to be reasonably free from excessive violence, there may be just cause for court intervention in the proper case.

 It should also be noted that the Constitution does not require a state to "operate penal institutions in accordance with criminological doctrine or to employ only experts in their management." *Jones,*

*supra,* at 1368. And, while guidelines of professional organizations such as the American Correctional Association represent desirable goals for penal institutions, neither they nor the opinions of experts can be regarded as establishing constitutional minima. *See Burks v. Walsh,* 461 F.Supp. 454, 483 (W.D.Mo.1978). Rather, constitutional standards are determined by the principles discussed, *supra,* and are always dependent upon the contemporary standards of civilized decency that currently prevail in our society.

 Finally, superimposed upon all of the Eighth Amendment penal conditions cases is the principle that "wide-ranging deference [must ordinarily] be accorded the decisions of prison administrators." *Jones v. North Carolina Prisoners' Labor Unions, Inc.,* 443 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629, 638–39 (1977); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Absent a clear finding of constitutional violations, federal courts simply will not interfere with the state's administration of its prison system. *Johnson v. Avery,* 382 F.2d 353, 355 (6th Cir. 1967), *rev'd on other grounds,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Furthermore, the Supreme Court has recently cautioned that federal "courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution." *Rhodes, supra,* 452 U.S. at 352, 101 S.Ct. at 2401, 69 L.Ed.2d at 72.

Against this background, the court will consider the constitutionality of conditions in protected Eighth Amendment areas, at each TDOC institution.

*C. State Law Claims*

Article I, Section 16 of the Tennessee Constitution is a verbatim duplication of the Eighth Amendment to the United States Constitution. At the time of its enactment, 1870, it is assumed that the framers intended the provision to be entirely coextensive with the parallel Eighth Amendment. As noted, *supra,* the Eighth

---

**67.** This is clearly the rationale of cases holding that prisoners are entitled to sufficient physical exercise to maintain proper health. *See Spain*

*v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979); *Miller v. Carson,* 563 F.2d 741, 751 n. 12 (5th Cir.1977).

Amendment's cruel and unusual punishments clause at the time was thought to be strictly a prohibition upon the imposition of tortures and other barbarous forms of punishment.

Thus, the framers of the Tennessee Constitution apparently thought that in order to ensure the humane treatment of incarcerated offenders, a separate provision was needed. Article I, Section 32 of the Tennessee Constitution provides:

> That the erection of safe and comfortable prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for.

This provision has never been construed in any reported case.

██ In view of the development of federal Eighth Amendment litigation, and the now well-established principle that the cruel and unusual punishments clause requires the humane treatment of prisoners, and their housing in facilities that provide for basic needs in accordance with "evolving standards of decency," *Trop, supra* 356 U.S. at 101, 78 S.Ct. at 598, the court is convinced that the protections intended to be ensured by Tenn. Const. Art. I, § 32, are now provided by the Eighth Amendment. In the opinion of the court, Art. I, § 32 simply does not afford greater protection than is now available under the aegis of the Eighth Amendment. *See* n. 2 and accompanying text, *supra.*

Therefore, the standards applicable to conditions of confinement by virtue of the Eighth Amendment are equally applicable to both of the relevant provisions of the Tennessee Constitution. Despite the rather unique language of the state constitution, that document does not, insofar as is relevant here, substantially extend the rights guaranteed to lawfully incarcerated persons under the United States Constitution.

In addition to the federal and state constitutional provisions, the plaintiffs have alleged violations of various rights purportedly established by state statutes. They claim a right to rehabilitation pursuant to Tenn. Code Ann. § 41–1801 *et seq.,* to classification in the "manner . . . most conducive to prison discipline and the moral status of the prisoner," Tenn.Code Ann. § 41–302, and a right to a counselor with a caseload of less than 25. Tenn.Code Ann. § 41–1807.

██ However, the court is not convinced that these statutes were intended to create legally enforceable rights. Rather, they appear to leave to TDOC discretion the implementation and programming details necessary to achieve the legislative purpose. Furthermore, to whatever extent the statutes create an interest entitled to federal due process protection, due process is satisfied by the administration of the required programs by TDOC within the broad parameters of the statutory guidelines. While the evidence in this case does reveal that some of the goals of the statutes are not being fully achieved, it does not reveal the kind of total disregard of the legislative will that would be required to establish a due process violation, even if a protected liberty interest were found.

Thus, the court is concerned solely with alleged violations of the Eighth Amendment's cruel and unusual punishments clause, and will proceed now to determine whether the conditions in each TDOC prison discussed in § III, *supra,* pass constitutional muster. Those core areas entitled to protection and presently subject to challenge will be considered separately.

### D. Conclusions

#### 1. Adequacy of Housing

██ Considering the totality of the conditions presently existing at each of the TDOC prisons, § III, *supra,* the court finds that the housing provided at most of the facilities is at least minimally adequate. However, there are some exceptions, and inmates in some TDOC facilities are housed under conditions that amount to cruel and unusual punishment.

At TSP, housing units I–VI are unconscionably overcrowded. Inmates are double celled in tiny cages like so many animals in a zoo, with an average of about 23 square feet in which each man lives, sleeps, performs his bodily functions, and spends a

great portion of each day. Beyond the deplorable lack of space, the cells are noisy, poorly lit, often in a state of disrepair and equipped with plumbing that is dangerous to the prisoner's health. These environmental conditions range from bad to shocking, and clearly have a deleterious impact upon the lives of the inmates housed there. Violence at the prison is rampant, including frequent episodes of assault and sexual attack upon cellmates. With the pervasive idleness, inmates have few alternatives but to sit in their tiny cells and brood.

The conclusion is inescapable that TSP units I–VI are inadequate to properly house and provide for the current population. The court finds those units to be so severely overcrowded as to be offensive to any notion of basic human decency. In addition, since overcrowding is a primary cause of all of the most serious problems at TSP, and is in turn made worse by the conditions it causes, the only effective remedy is to reduce the prison's population. The court concludes that the only way in which units I–VI can be made constitutionally adequate is to cease double celling in those units. This will reduce TSP's population to approximately 900 inmates, a number which the institution should be able to constitutionally house and provide for.

Overcrowding is generally as severe at Guild 17 of NRCF as it is at TSP, although some distinguishing factors should be noted. First, inmates remain at Guild 17 only for a relatively short time, six to eight weeks maximum. In addition, the level of violence at the facility is substantially lower than at TSP. Those two factors would suggest that the overcrowding might be constitutionally tolerable at Guild 17. However, considering all other relevant factors, the court concludes otherwise.

Of the 80 cells at the facility, 48 are only 54 square feet, thus offering 27 square feet per inmate. Some of those cells (the record does not show how many) have no hot water. The facility on the whole is in a severely deteriorated state, such that it probably ought to be closed entirely. Inmates at Guild 17 are all almost always idle

and are confined to their cells about 20 hours per day. Finally, the evidence is convincing that the impact of idleness and other oppressive conditions is heightened for the new inmates unfamiliar with prison life, who comprise Guild 17's population.

In view of the totality of housing conditions at Guild 17, the court concludes that the facility is unconscionably and unconstitutionally overcrowded, resulting in cruel and unusual punishment. The population at the facility must accordingly be reduced by the elimination of double celling. In addition, the confinement of inmates for more than a few days in cells without hot water plumbing, especially when that confinement is for as much as 20 hours per day, deprives those inmates of the minimal necessities needed for the maintenance of health and personal hygiene, and is also cruel and unusual. *See Ramos, supra.* Accordingly, those cells at Guild 17 without hot water plumbing must not be used to house the facility's "keepers," i.e., those inmates who are to remain at Guild 17 for the entire period of the classification process.

The court finds that two other TDOC housing units currently fail to meet constitutional minima. These are the main building at NCSC and D-block at BMP. The problem with these facilities is not with overcrowding, but with the shocking conditions of the buildings themselves.

At NCSC, inmates housed in the main building's two dormitories are subjected to environmental conditions that combine to render the building unfit for human habitation. The defendants have recognized that the plumbing and electric systems are dangerous, that toilet and shower facilities are inadequate, and that the building fails to meet requirements of both federal and state laws. The building also has inadequate ventilation and heating units that pose a serious fire hazard. Sanitation in the building is abominable, in both the living units and kitchen and food storage areas. Absent the speedy completion of substantial modifications, the building must be closed and not used for housing purposes.

With respect to conditions in BMP's D-block, the court agrees with Mr. Hoover that, as at NCSC, the building is unfit for human habitation. The building is more of a dungeon than a civilized prison, and housing any inmates under the conditions that exist there is offensive to a common sense of decency. Absent speedy completion of extensive modifications, the building must be closed and not used for housing purposes.

The court's decision that at present, all other housing units in the TDOC system are constitutionally adequate should not be taken as an endorsement of conditions or as an indication that serious problems do not exist. To the contrary, serious problems abound. Every TDOC prison faces at least the potential for severe overcrowding in the not-distant future. Indeed, all are currently housing populations that exceed the capacity for which they were originally designed. It appears that dormitory units at FP, MCC and TPW, in particular, are both overcrowded and unwisely utilized.

Numerous disturbing environmental problems exist in the various institutions, including some serious fire safety hazards and sanitation practices that are less than desirable. Equally disturbing is the high level of idleness that is pervasive throughout TDOC prisons, and the concomitant absence of rehabilitative programs. For these conditions and others, Tennessee citizens may ultimately pay an incalculable price as the system releases into society incorrigible, hardened and unrehabilitated offenders, who can be expected to continue their lives of crime.

However, although the court is gravely concerned with these various conditions and is convinced that the defendants as well as the public and the plaintiffs would be well served by moving rapidly to correct the deficiencies, they are not presently so serious as to warrant the conclusion that other housing units are constitutionally inadequate.[68]

## 2. Sanitation

Evidence concerning poor sanitation at TDOC facilities was directed both toward living units and food service and preparation areas. To a large extent, the proof in regard to the former has already been considered, in conjunction with the evaluation of the adequacy of housing in general. However, since sanitation is a discrete core area entitled to independent Eighth Amendment protections, the court's conclusions with regard thereto will be separately stated.

The living units shown to have the most grossly unsanitary conditions were NCSC's main building and BMP's D-block. Indeed, poor sanitation was one important factor leading to the conclusion that those units must be closed, *supra*. Under present circumstances, proper sanitation in those buildings is impossible, and that condition alone would support a finding that confinement there amounts to cruel and unusual punishment.

With regard to the TSP living units, as well, there was substantial evidence of unsanitary conditions. The most disturbing of that evidence was the prevalence of cross-connections between stools and the facility's drinking water supply. That condition is extremely hazardous and should not be allowed to continue. However, based upon the evidence that repairs are being made to correct the problem, the court would not be warranted in finding a discrete constitutional violation. Other unsanitary conditions in TSP's living units should be mitigated by the reduction in the institution's population that must be achieved to alleviate the severe overcrowding. *See, supra.*

The court is also disturbed by the apparent absence of procedures throughout the TDOC system for sanitizing bedding before being issued to different inmates. However, the proof was insufficient to show the extent to which that problem actually causes injury or increases the risk of serious

---

68. Of course, no opinion is expressed on whether some of the conditions that are clearly dangerous, such as fire safety deficiencies, might give rise to individual claims in the event that an injury occurs. The present decision simply holds that the conditions shown are not now so serious as to amount to cruel and unusual punishment.

disease. The court is unable, on the present record, to find that the absence of such procedures, either alone or in combination with other conditions, violates the plaintiffs' constitutional rights.

Other evidence of unsanitary conditions within TDOC housing units, while describing an unpleasant and undesirable scene, simply does not rise to a constitutional level. In fact, it should be noted that many of the conditions are attributable to poor housekeeping practices on the part of the inmates themselves, and are thus in some measure beyond the control of the defendants.

The lack of sanitation shown in some kitchen and food service areas, however, is a different story. Particularly at BMP and FP, conditions in the kitchens, food storage and food service areas are appalling. Worse, inmates who are forced to eat the food prepared and served under those conditions face a constant risk of contracting any number of food-borne diseases. The Constitution requires that food be prepared and served in a manner that reasonably accords with sound sanitary procedures; at BMP and FP this is not being done. The current situation simply cannot be tolerated in any civilized institution, and procedures for ensuring that basic sanitary practices are consistently followed must be developed and implemented.

Similar problems were also noted in the kitchen and food storage and service areas at TSP, although not to the same extent as at FP and BMP. Nevertheless, the court is convinced that failure to maintain sanitary food facilities at TSP is a problem that is serious enough and common enough to pose substantial risks to the health of inmates. Therefore, the procedures to be developed for ensuring basic sanitary practices should include the TSP food storage, preparation and service areas as well.

### 3. Personal Safety

At the present time, the court is convinced that inmates housed at TSP, FP and BMP live in an environment "where violence and terror reign," *Woodhous, supra,* at 890, and are subject to the constant threat of violence and sexual assault. *Jones v. Diamond, supra,* at 1373. Violence of every description is commonplace in each of those prisons, and the security staff is ineffective to afford the inmates adequate protection. Considering all the evidence, the court concludes that this inability to control violence and to protect inmates at TSP, FP and BMP amounts to cruel and unusual punishment in violation of the Eighth Amendment.

As noted, *supra,* the causes of prison violence are myriad. They include overcrowding, idleness, a classification system that fails to identify and segregate violence-prone inmates, insufficient numbers of guards, insufficient training of guards, improper use of dormitory housing, prison design and undoubtedly others. The situations at TSP, FP and BMP are attributable in varying degrees to all of these factors, and it may in fact be impossible to identify any one factor as the primary culprit. However, steps must be taken immediately to achieve both short-term and long-term solutions to the problem. For the time being, at least, the court will defer to the professional expertise of TDOC officials to frame an appropriate remedy to the problem of excessive violence.

Although the level of violence at other TDOC institutions has not yet reached unconstitutional dimensions, the court observes somewhat morosely that the explosive formula for serious violence exists throughout the system. Indeed, many of the causes of violence are endemic to the system. A number of the other prisons have already begun to experience an increase in violence as their populations have grown. It is thus to be hoped that any proposed solution will address the systemic problems and thereby attempt to avert the potential disaster that looms at every TDOC prison. In addition, the evidence concerning insufficient security coverage in the MCC dormitories is disturbing. In light of the fact that violence is not yet pervasive at the facility, the court declines to find a constitutional violation based upon the number of guards alone. The situation,

however, warrants close monitoring and attention by TDOC officials, lest tragedy becomes inevitable.

### 4. Health Services

#### (a) Medical Care

The system of health care delivery to TDOC inmates is, as it has been for years, beset by serious problems. However, unless those problems evidence a "deliberate indifference to serious medical needs of prisoners," they do not rise to constitutional dimensions. *Estelle, supra,* 429 U.S. at 104, 97 S.Ct. at 291, 50 L.Ed.2d at 260.

The vast majority of specific deficiencies in the delivery of health care to Tennessee inmates, while they may reflect poor administration and management, simply fail to indicate such deliberate indifference. Other problems reflect a failure to achieve certain desirable and aspirational goals, but do not necessarily reveal constitutional shortcomings. Such is the case, for example, with the failure to seek full accreditation for the TSP hospital, a move that is certainly desirable but which the court believes is not constitutionally required. Still other problems apparently flow from the administrative structure of the TDOC health care system, a structure about which experts disagree. This court is simply not inclined to attempt to tell the defendants how their organization should be structured, and will thus not presently intervene on that issue.

On the other hand, other problems are serious enough to establish a deliberate indifference to serious medical needs, and to convince the court that until the deficiencies are remedied, substantial suffering will inevitably result. *Id.; Bishop, supra,* at 1226. Not coincidentally, perhaps, these problems are present to some extent in virtually every TDOC prison. They are: The provision of medical care by persons beyond the level of their training and expertise, particularly the use of inmates in the direct delivery of care, and the failure to employ medically trained personnel for the provision of 24-hour emergency coverage at each institution.[69] Without adequately trained and qualified personnel, the consistent delivery of adequate medical care is impossible, and needless human suffering is the inevitable result. The failure of TDOC to employ sufficient qualified personnel in the face of repeated admonitions and recommendations from both inside and outside the department demonstrates such deliberate indifference to and wanton disregard of the serious medical needs of inmates as to amount to cruel and inhuman punishment.

*The only effective remedy would appear to be hiring whatever additional staff are necessary to correct these specific problems at each institution.* The court is convinced that through the hiring of sufficient qualified medical staff, the most serious problems regarding the availability of health care in TDOC institutions will be alleviated. That is not to say that other problems will not remain. To the contrary, the evidence has shown a wide array of deficiencies in the TDOC health care delivery system, many of which are unrelated to staffing. Nevertheless, the court believes the hiring of qualified and trained medical staff in numbers sufficient to provide care within the limits of each provider's training and skill, and to ensure 24-hour trained emergency coverage, will produce a constitutionally adequate system.

#### (b) Dental Care

The evidence presented by the plaintiffs with respect to dental care in TDOC institutions is insufficient to establish constitutional violations. At the most, the evidence shows delays in access to routine and preventive dental care, and in any event does not establish deliberate indifference to serious medical needs.

#### (c) Mental Health Services

Clearly, the availability of psychiatric and mental health care to TDOC inmates is

---

**69.** At the present time, medical staff coverage at DCI and NRCF is constitutionally adequate. No issues have been raised concerning health care at NCSC. This holding therefore applies to all other TDOC prisons.

insufficient to meet all of the needs of inmates in the system. There is no doubt that inmates could benefit from expanded counseling and mental health treatment programs. Similarly, the court is convinced that the citizens of Tennessee would be the ultimate beneficiaries of a system that eventually released more emotionally stable individuals. None of those observations, however, answers the question whether the present system is adequate to meet constitutional minima.

The court, somewhat reluctantly, concludes that the present system for delivery of mental health services is constitutionally adequate. Inmates in serious need of psychiatric treatment apparently receive that care at DCI. Some problems have been noted with the ability of institutional staff to adequately identify those in need of transfer to DCI, and there is no doubt that the present system could be improved. But on the whole, the court finds that inmates with truly serious mental health needs are usually identified and promptly transferred to DCI for treatment. The treatment afforded at DCI is also constitutionally adequate. That more extensive on-site mental health services are not currently available at other prisons is lamentable and disturbing, but does not at the present time evidence the deliberate indifference to serious needs, necessary to show cruel and unusual punishment.

### E. Other Conditions

The only other practice shown to exist in TDOC prisons that amounts to cruel and unusual punishment is the holding of inmates in segregation at TPW for as long as 30 days without any opportunity to exercise. Prisoners must be afforded sufficient opportunity for physical exercise to maintain proper health. *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979).

To the extent that other conditions or practices have been alleged to amount to cruel and unusual punishment, the court does not argue. Many other conditions are, indeed, harsh and unpleasant. The court is particularly disturbed by the apparent lack of constructive programming for prisoners, and by the resulting likelihood that many inmates will emerge from the prison system worse off than when they entered. However, the Constitution simply does not protect against all harsh, or even oppressive conditions of confinement. As the Supreme Court has made clear, such conditions are "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399, 69 L.Ed.2d at 69. The Constitution only protects against conditions that are so bad that in light of contemporary standards of human decency, they are cruel and unusual. *Id.*

### F. Remedy

This court is acutely sensitive to the delicate balance that must be struck in our federal system between the protection of constitutional rights by federal courts and the state's ability to administer its own affairs. That awareness has guided the court in attempting to narrowly define the precise constitutional violations that have been found to exist. The same awareness must also guide the fashioning of an appropriate remedy. The central problem facing the court is how to ensure the speedy elimination of unconstitutional conditions in the least intrusive manner possible.

The remedy should be no broader than is necessary to correct the constitutional violations, *Wright v. Rushen, supra,* at 1133, and if possible should not put the court in the position of attempting to administer the state's prison system. *Johnson v. Avery, supra,* at 355. For these reasons, the court has not acceded to the plaintiffs' request to issue a wide-ranging declaratory judgment establishing, *inter alia,* the maximum permissible populations at each TDOC prison. The court simply at this juncture refuses the invitation to prospectively declare that certain conditions, should they arise, would amount to cruel and unusual punishment.

Rather, on the assumption that state officials are better suited than the court to fashion a detailed remedial plan, the court will place primary responsibility for developing specific remedies to the violations found upon the defendants. The court will

establish a timetable for the submission of proposed remedies and will retain jurisdiction for so long as is necessary to eliminate cruel and unusual conditions of confinement in Tennessee's prisons.

Under the circumstances, however, the court believes that the parties as well as the court will be well served by the appointment of a special master with the limited responsibility of reviewing the defendants' proposals and reporting to the court upon the advisability of implementing those plans. Fed.R.Civ.P. 53. Several factors have led to this conclusion. First, the various conditions complained of are intimately interrelated, and care will need to be taken that the remedy developed in response to an existing violation does not lead to other constitutional violations. Similarly, the reduction of population at one institution must not be accomplished in such a way that another facility becomes unconstitutionally overcrowded. Third, since the causes of existing violations are so complex and intertwined, a number of possible solutions to specific violations may well have to be examined and weighed to determine which is preferable. The court is convinced that a special master with expertise in the corrections field, but who is functioning independently and as an officer of the court, will be of immeasurable value in evaluating proposed remedies. For these reasons and because most of the violations found represent problems about which TDOC has been long aware, the court concludes that the case presents the type of exceptional circumstances that warrant the appointment of a special master. *See Reed v. Cleveland Board of Education,* 607 F.2d 737 (6th Cir.1979).

The special master will be directed to call upon whatever sources are available and necessary to aid in the evaluation of the defendants' plan, but to keep in mind the principle that the court is only concerned with constitutional violations. The master's report will therefore assess only the following: Whether or not the defendants' proposals will remedy the specific violations which the court has found; and whether implementation of those proposals will likely result in any other unconstitutional conditions, in accordance with the principles expressed in this opinion. The report will not undertake to suggest changes beyond those that are constitutionally required, regardless of the master's opinion as to the advisability of particular measures from a standpoint of corrections policy.

Counsel for the parties should attempt to agree upon a qualified person to serve as special master and submit that person's name to the court within thirty days. If no agreement can be reached, each side shall then recommend to the court no more than three individuals who would be appropriate for appointment as special master. All recommendations should include a brief statement of the qualifications of each individual recommended.

The defendants will be immediately enjoined from holding inmates in segregation at TPW for more than three days without an opportunity for physical exercise. The defendants will also be ordered to begin immediately the process of developing concrete plans for remedying the other specific constitutional violations found. A timetable for accomplishing the various tasks will be incorporated into the court's order.

Finally, it should go without saying that if the foregoing approach proves ineffective to eliminate cruel and unusual punishment in TDOC prisons, the court will not hesitate to resort to more drastic measures.

An appropriate order will be entered.

### ORDER

In accordance with the memorandum contemporaneously filed, it is hereby DECLARED that the following conditions and practices amount to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 16 and 32 of the Tennessee Constitution:

(1) Double celling inmates in Units I–VI at Tennessee State Penitentiary and at Guild 17 of the Nashville Regional Correctional Facility;

(2) confinement of any inmate for more than one week's duration in a cell not equipped with hot water;

(3) confinement of inmates in Block D of Brushy Mountain Prison and the main building at the Nashville Community Service Center, said buildings being presently unfit for human habitation;

(4) the failure to maintain minimum sanitary conditions in the food storage, preparation and service areas at Fort Pillow State Farm, Brushy Mountain Prison, and Tennessee State Penitentiary;

(5) the failure to adequately protect inmates incarcerated at Tennessee State Penitentiary, Fort Pillow State Farm, and Brushy Mountain Prison from the likelihood of violent attack;

(6) the failure to provide minimally adequate medical care for inmates incarcerated at Tennessee State Penitentiary, Fort Pillow State Farm, Tennessee Prison for Women, Brushy Mountain Prison, Turney Center for Youthful Offenders, Memphis Correctional Center, Bledsoe County Regional Correctional Facility, Morgan County Regional Correctional Facility, Lake County Regional Correctional Facility; and

(7) the confinement of inmates at Tennessee Prison for Women in segregation status for more than one week without any opportunity for physical exercise.

It is therefore ORDERED that:

(8) The defendants are immediately and permanently enjoined from confining inmates at the Tennessee Prison for Women in segregation status for more than one week without the opportunity to engage in physical exercise;

(9) the parties shall, within thirty (30) days, submit to the court the name of an individual to serve as special master pursuant to Fed.R.Civ.P. 53, whose duties shall be specifically limited as outlined in the attached memorandum;

(10) in the event the parties are unable to agree on a person to serve as special master, each party shall submit recommendations as outlined in the attached memorandum;

(11) the defendants shall, within sixty (60) days, or as soon thereafter as a special master shall be appointed, submit to said master a plan designed to immediately remedy the constitutional violations found with respect to housing conditions at Brushy Mountain Prison and the Nashville Community Service Center, as stated in paragraph (3) of this Order;

(12) the defendants shall, within six (6) months submit to the special master plans for correcting all other constitutional violations found by the court in this action;

(13) the special master shall report to the court as soon as is practicable as to the advisability of implementing the plans submitted by the defendants;

(14) the special master shall be compensated by the defendants in accordance with a monthly rate to be later established by the court, but the parties may suggest to the court an appropriate rate of compensation; and

(15) this court shall retain jurisdiction of this cause pending complete implementation of an adequate remedy.

It is so ORDERED.